IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAURN THOMAS, | : | |
| Plaintiff, | : | |
| | : | Case No. |
| -v.- | : | |
| | : | COMPLAINT & JURY DEMAND |
| CITY OF PHILADELPHIA, MARTIN DEVLIN, PAUL WORRELL, and JAMES GIST | : | |
| Defendants. | : | |

Plaintiff Shaurn Thomas, by and through his attorneys, the law firm of Dechert LLP, hereby alleges as follows:

## INTRODUCTION

1.      Shaurn Thomas spent 24 years in prison for a crime he did not commit because of the repeated, unconstitutional acts of the Defendants in this case. After years of struggling to prove his innocence in multiple court cases by showing that he was at the Philadelphia Youth Study Center, nowhere near the crime scene, at the time of the crime for which he was convicted, the Philadelphia District Attorney ("DA") suddenly vacated Mr. Thomas' conviction in May 2017 because it no longer had confidence in the jury's guilty verdict.

2.      Mr. Thomas' ordeal and his decades in prison were the direct result of the repeated and willful unconstitutional acts of Defendants Martin Devlin, Paul Worrell, James Gist, and the Philadelphia Police Department ("PPD"). Casting aside all notions of fairness and justice, these Defendants conspired to send the then-teenaged Mr. Thomas to prison for the rest of his life by:

a)   contriving testimony from witnesses;

b)   calling off and failing to acknowledge the unbiased eyewitnesses who directly contradicted the testimony of corruptly incentivized witnesses with regard to meaningful details of the murder;

c)   purposely hiding exculpatory evidence from the DA and Mr. Thomas' defense counsel that directly contradicted the testimony of Defendants' corruptly incentivized witnesses;

d)   knowingly providing false evidence to the prosecutor to secure the conviction of an innocent man; and

e)   failing to investigate thoroughly Mr. Thomas' alibi.

3.      Specifically, because no physical, scientific, or eyewitness evidence, connection to the victim, or even logic connected Mr. Thomas to the murder of Domingo Martinez on November 13, 1990, the Defendants suborned perjury from two corrupt witnesses, John and William Stallworth, to arrest and convict Mr. Thomas.

4.      Defendants coerced John Stallworth into providing a false confession naming Mr. Thomas as a co-conspirator in the murder of Domingo Martinez. Even though the Defendants knew the confession was false, Defendants used the false confession to arrest John Stallworth for murder and pressure him to selectively edit his confession so that the confession could be used to justify the arrest of Mr. Thomas.

5.      Defendants knew they were unable to secure the conviction of Mr. Thomas with the testimony of John Stallworth alone, so they provided a false story to the second corrupt witness, William Stallworth, John Stallworth's brother. William Stallworth's police-supplied narrative falsely placed Mr. Thomas at the murder scene. William Stallworth admitted to counsel for Mr. Thomas and prosecutors at the DA's office that he testified falsely at trial due to the unconstitutional misconduct of Defendants.

2

6.      Four unrelated and unbiased eyewitnesses to the murder completely contradicted the Stallworth brothers' version.

7.      Defendants purposely disregarded the eyewitness accounts and fed a story concerning the Martinez murder to the DA that was completely contrived to bolster the Stallworths' false testimony that was irreconcilable with known eyewitness accounts. As part of this scheme, Defendants provided photographs of a blue car to the trial prosecutor that fit Defendants' contrived story and that the Defendants knew at the time of trial was not involved in the murder.

8.      Defendants could have easily established that Mr. Thomas could not have committed the crime because Mr. Thomas was present at the Philadelphia Youth Study Center at the time of the Martinez murder, but they deliberately ignored this fact and failed to investigate his alibi.

9.      Finally, to further ensure that Mr. Thomas was convicted of a crime he did not commit, Defendants purposely hid from the DA and Mr. Thomas' defense counsel exculpatory evidence that Defendants knew would have totally exonerated Mr. Thomas at trial.

10.      This scheme of disregarding eyewitnesses, coercing confessions from the most vulnerable people, fabricating evidence, and failing to provide exculpatory evidence to defense counsel was the Defendants' standard Modus Operandi over years for multiple investigations and trials. As alleged below in paragraphs 188 to 207, the PPD used all or part of the specifically mentioned conduct in at least nine cases from 1988 to 1994 to obtain convictions which were constitutionally suspect, many of which have been overturned.

11.      The City of Philadelphia, through the acts of the PPD, was complicit in the unconstitutional acts of Defendants resulting in the wrongful imprisonment of Mr. Thomas. Mr. Thomas' wrongful conviction was the direct result of the unconstitutional and otherwise improper policies, practices, and customs of the PPD, including the Homicide Unit, which, for a

period starting as early as the 1970s and continuing through the investigation in this case and for years thereafter, show deliberate indifference by Defendant City of Philadelphia to practices of coerced confessions, fabrication of evidence, witness intimidation and coercion, suppression of exculpatory evidence, and abuse of authority.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## PARTIES

15.     Plaintiff **Shaurn Thomas** is, and at all times relevant to this Complaint was, a resident of the State of Pennsylvania. Mr. Thomas was born in Philadelphia in 1974. In July 1993, at the age of 19, Mr. Thomas was wrongfully charged with the murder of Domingo Martinez, taken into police custody, and imprisoned pending trial. In December 1994, Mr. Thomas was wrongfully convicted of the robbery and murder of Mr. Martinez and sentenced to mandatory life without the possibility of parole. He remained in prison until the DA agreed to vacate his conviction and release him in May 2017. On June 13, 2017, the DA announced that it would not try Mr. Thomas again for the Martinez murder.

16.     Defendant **City of Philadelphia** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania. The City of Philadelphia, at all times relevant

to this Complaint, officially employed the individual police Defendants in this matter, and was responsible for the policies, practices, and customs of the PPD.

17.     Defendant **Martin Devlin**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crime and Mr. Thomas' wrongful conviction, Defendant Devlin was a detective assigned to the PPD's Homicide Unit.

18.     Defendant **Paul Worrell**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crime and Mr. Thomas' wrongful conviction, Defendant Worrell was a detective assigned to the PPD's Homicide Unit.

19.     Defendant **James Gist**, at all times relevant to this Complaint, was acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. At the time of the crime and Mr. Thomas' wrongful conviction, Gist was a Philadelphia Police Officer assigned to the 39th District.

## FACTUAL ALLEGATIONS

**I.      November 12-13, 1990 – Mr. Martinez's Murder and the Whereabouts of Shaurn Thomas**

### A.      The Murder of Mr. Martinez

20.     In November 1990, Domingo Martinez was a 78-year-old North Philadelphia businessman who owned several businesses described as "check cashing" and "travel agencies."

In reality, these businesses were unregulated "community banks" that accepted cash deposits from local residents who could not or would not deposit cash in a traditional bank.

21.     On November 13, 1990, Domingo Martinez's daughter, Sara Negron, managed the Martinez business located at 513 W. Girard Avenue in Philadelphia.

22.     On November 13, 1990, at about 9:00 a.m., Domingo Martinez's daughter, Sara Negron, called the Mellon Bank at 1201 Spring Garden Street in Philadelphia and told bank personnel that her father would need to pick up $25,000 that morning for his businesses and asked the bank to have the money ready for him to pick up.

23.     On that same date between about 9:15 a.m. and 9:30 a.m., Mr. Martinez entered the Mellon Bank at 1201 Spring Garden Street, picked up the $25,000, and left the bank.

24.     In November 1990, the Mellon Bank at 1201 Spring Garden Street utilized video surveillance cameras to record the interior of the bank. These surveillance cameras do not show Mr. Thomas or any of the other participants inside the bank selecting Mr. Martinez as a victim -- in direct contradiction to the Defendants' hand-picked witnesses and those witness' contrived testimony.

25.     Bank security guard Gregory Davis accompanied Mr. Martinez out of the bank and saw Martinez place the $25,000 in the trunk of his car. Davis then saw Martinez drive west on Spring Garden Street toward Broad Street. Davis looked around outside the bank and saw no one either on foot or in a car in the immediate vicinity.

26.     At about 9:55 a.m., after he left the bank, Domingo Martinez was driving east in the 800 block of West Sedgley Street in Philadelphia, about three miles from the Mellon Bank, when a single car driving behind Martinez sped up and struck Martinez's car on the driver's side.

27.     Martinez's car and the striking car both stopped and three men emerged from the striking car. One of the three men shot Martinez through the windshield of his car and dragged him into the street, leaving him to die. The shooter then jumped in the victim's car and drove the car and the $25,000 away. Mr. Martinez died within an hour.

28.     Police recovered Mr. Martinez's car in the 2100 block of North Diamond Street in Philadelphia after residents of that block discovered the car with the trunk open and the $25,000 Martinez took from the bank gone.

29.     At the time of the murder of Domingo Martinez, Mr. Thomas was at the Philadelphia Youth Study Center miles from the murder scene being interviewed by a juvenile probation officer following his arrest for attempted theft.

**B.      The Whereabouts of Shaurn Thomas on November 13, 1990, the Day of the Murder**

30.     During the nighttime hours of November 12, 1990, the day before the Martinez murder, 16-year old Mr. Thomas was arrested in Center City Philadelphia and charged with attempted theft of a motorcycle.

31.     Mr. Thomas was held in a juvenile holding cell overnight into November 13, 1990, in the PPD's 9th Police District, then located at 20th Street and Pennsylvania Avenue, while police prepared arrest and investigative paperwork.

32.     Because Mr. Thomas was a juvenile, all investigative and arrest paperwork needed to be completed while Mr. Thomas was in police custody.

33.     The Youth Study Center in 1990 served as a court for initial juvenile appearances, an interview site for juvenile probation officers (known as intake officers) to determine whether a juvenile should be formally charged (known as the Intake Conference) and whether the juvenile should be held in custody or released, and finally as a detention center for juvenile offenders.

**34.**     On November 13, 1990, the day of the murder, sometime after sunrise, Mr. Thomas was released from police custody at the 9th District to his mother, Hazeline Thomas. Police instructed Ms. Thomas to take Shaurn a block away to the Youth Study Center for a 9 a.m. Intake Conference.

**35.**     At about 9 a.m. on November 13, 1990, Hazeline Thomas and Shaurn Thomas entered the Youth Study Center for an intake conference. Shaurn and Hazeline Thomas were placed in a waiting area and told to await the call of his case at the same time that Domingo Martinez was leaving the bank, driving through Philadelphia, and being killed.

**36.**     After waiting for a time, Mr. Thomas was summoned to a room where he was interviewed by juvenile probation employee Doris Williams.

**37.**     At the end of Mr. Thomas' interview at the Youth Study Center, Doris Williams told Mr. Thomas to sign a subpoena ordering him to appear for his next court date.

**38.**     Early in the afternoon of November 13, 1990, Mr. Thomas was released from the Youth Study Center and returned home with his sister, Elaine Thomas.

**39.**     Mr. Thomas was not at Abbotsford Homes meeting with the Stallworths the night before the murder or on the morning of the murder, nor was he at the scene of the murder on November 13, 1990. He was at the Philadelphia Youth Study Center attending an intake conference during these hours.

**II.     The Investigation**

**A.     The Crime Scene Investigation**

**40.**     Philadelphia Police Officer William McDowell, assigned to the Mobile Crime Detection Unit, processed Mr. Martinez's car for evidence on the day of the murder. Officer McDowell took several photographs of the victim's car showing the damage to the driver's side.

41.    Police Officer McDowell also removed a "sample of white paint" "from the left front fender" of the victim's car in the damaged area. McDowell also removed "one piece of chrome stripping . . . from the left rear wheel well" of the victim's car. The chrome stripping "contained white paint." Officer McDowell did not find any blue paint on the victim's car.

42.    Officer McDowell discovered and lifted ten latent fingerprints from several areas of the victim's car, including the interior and exterior of the driver's door. The fingerprints did not match any of the people eventually convicted for the Martinez murder, specifically, William Stallworth, John Stallworth, Mustafa Thomas, and Shaurn Thomas.

43.    Philadelphia Police Officer James Caldwell of the Mobile Crime Detection Unit processed the crime scene at 800 West Sedgley Street. Caldwell took photographs of tire marks in the street at that location and recovered from the crime scene four pieces of broken red plastic light cover from a car's tail light, among other items. Neither the tire marks nor the tail light cover were ever connected to any vehicle Mr. Thomas ever owned or drove or had ever ridden in.

### B.    The Eyewitnesses to the Murder of Mr. Martinez

44.    At least four people witnessed the murder of Domingo Martinez. The witnesses all claimed the killers drove either a Chevrolet Nova or Buick Skylark, not a blue Mercury, which was the car driven by Mr. Thomas earlier in 1990, or a blue Chevrolet, the type of car Defendants told the DA was used in the Martinez murder.

45.    The first witness, Allen King, who was driving east on Sedgley Street two cars behind the killers, told police that he saw an African-American man, 6 feet 1 inch tall, medium build, brown complexion dragging a man from a car at 800 W. Sedgley Street in Philadelphia. King told

police he saw "two Spanish guys" in a red and white car that was stopped in front of the victim's car. He described the murder car as a 1976-1978 Chevrolet Nova or Buick Skylark.

46.     A second witness, Roy Howard, who was a passenger in the car driven by Allen King, told police he saw a red and white car two cars in front of him and Mr. King on Sedgley Street. The red and white car suddenly pulled around a gray car (Mr. Martinez's car) and stopped, cutting off the gray car. Three men got out of the red and white car, walked back to the gray car, and one of the men from the red and white car, who was holding a gun, opened the driver's door of the gray car and pulled the driver out. The other two men returned to the red and white car and sped off. The man who pulled the victim from his car climbed into the gray car and also sped off heading east on Sedgley Street.

47.     Mr. Howard described the man with the gun as 6 feet tall, medium build, dark skin.

48.     Roy Howard told police that:  a) he saw no one else involved in the murder other than the three men in the red and white car, and b) he could definitely identify the car driven by the killers if he saw it again. None of the Defendants ever bothered to show Mr. Howard the pictures of the two different blue cars they claimed were involved in the murder.

49.     A third eyewitness, Carmen Garcia, was interviewed the day of the murder by Detective Thomas Augustine. Ms. Garcia told Augustine she was standing several hundred feet from the murder scene in the doorway of 3403 North 7th Street in Philadelphia on the morning of November 13, 1990.

50.     Ms. Garcia heard what she identified as an automobile accident a distance away on Sedgley Street. As she looked up to Sedgley Street, she saw two gray cars, a primer gray Chevrolet Nova and a shiny gray car. Three African-American men approached the shiny gray

car and Ms. Garcia heard a gunshot. She was too far away to see a gun. After the shot, the men scattered, and both gray cars sped off east on Sedgley Street.

51.     Ms. Garcia provided a description to police that was broadcast several minutes after the murder. The broadcast indicated police were looking for three black males in a gray Chevrolet Nova.

52.     A fourth eyewitness, Ronald Smith, was a student at Temple University in November 1990. Mr. Smith was the only eyewitness to the murder who was not interviewed on the day of the murder.

53.      On November 28, 1990, Defendant Martin Devlin interviewed Ronald Smith. Defendant Devlin claims he wrote out by hand the entire interview record verbatim in question and answer format. Defendant Devlin's version, however, is incomplete and selective.

54.     Defendant Devlin's account states that Ronald Smith was driving home from school at about 10 a.m. As Mr. Smith was driving over a railroad overpass on Sedgley, he saw a "big black male pulling this older male out of this cream colored Oldsmobile." Smith then allegedly told Devlin that he saw the large black male get in the victim's car and drive away "real fast," and turned onto 6th Street.

55.     In Devlin's hand-written statement, Mr. Smith described the person who dragged the man from the car as 6 feet 1 inch tall, stocky build, dark brown complexion, about 25 years old.

56.     Devlin's account also states that Mr. Smith saw no one else at the murder scene. When Devlin asked Mr. Smith if he "saw any other cars in the area parked either along-side of, behind, or in front of the Olds," Mr. Smith answered, according to Devlin, "I don't really remember if there was or not."

57.     In fact, Ronald Smith believes he told Defendant Devlin far more information than Defendant Devlin's hand-written version provides, including:

    a)    On November 13, 1990, he was driving home from school and there were two cars driving in front of him on Sedgley Street;

    b)    Suddenly the car that was driving directly in front of Mr. Smith swerved around the car in front of it as if it was attempting to pass, struck the driver's side of the lead car, and cut in front of the car that it struck. Both cars stopped;

    c)    Mr. Smith stopped next to the car that was struck, thinking he witnessed a real accident and would assist if needed;

    d)    A man exited the striking vehicle, stood in front of vehicle that was struck, and then shot the driver through the windshield of the car;

    e)    Mr. Smith then slid down in his seat and hit the gas pedal, driving quickly east on Sedgley Street; and

    f)    Mr. Smith told Devlin that the car directly in front of him was the striking vehicle and contained the killer, and there was no other car between his car and the striking car.

58.     When Mr. Smith left the murder scene, he stopped a Philadelphia Police Sergeant several blocks away and told her what he had seen.

59.     Mr. Smith never told Defendant Devlin that he did not remember if there were other cars involved in the murder as Defendant Devlin's statement provided in 1990. Instead, Mr. Smith recalls telling Defendant Devlin he did not see any other car involved in the murder, and he saw no other people involved in the murder.

60.     Several weeks after the November 13, 1990 murder of Domingo Martinez, Defendant Devlin called Mr. Smith and informed him that he was not needed as a witness because his description did not match the suspects in the case.

61.     Defendant Devlin also told Mr. Smith that his description of the killer was different than the descriptions provided by other witnesses, which was untrue.

62.     Ronald Smith was no more than ten feet away when the fatal shot was fired that killed Domingo Martinez. This witness, who saw the murder from a few feet away, closer than anyone else, and who could confirm that the false narrative later contrived by Defendants, i.e., that there was a car allegedly carrying Mr. Thomas supposedly following directly behind the murder car, was not only ignored by Defendants in their investigation, but was purposely called off.

### C.     The Chevy Nova Traffic Stop Only 3 Days after the Murder – Exculpatory Evidence that Was Withheld for more Than 23 Years

63.     On December 4, 2014, Mr. Thomas' Post-Conviction Relief Act ("PCRA") counsel asked the PPD for the Martinez Homicide file – which, as a matter of PPD practice, contains all the documents generated and received by the Philadelphia Police Homicide investigators in the course of the investigation of a murder.

64.     Several weeks after the submission of this request, the PPD said the Martinez homicide file was missing and they had no idea where it was.

65.     The PPD said the Martinez homicide file had been removed from the Philadelphia Archive and never returned.

66.     On June 12, 2015, Mr. Thomas' counsel asked the Philadelphia DA for assistance in locating the missing Martinez homicide file. On June 23, 2015, the DA informed Mr. Thomas' counsel that they could not locate the file.

67.     On November 3, 2016, Mr. Thomas' counsel again asked the Philadelphia DA to attempt to locate the homicide file. On December 15, 2016, the DA's Office replied that it had been unable to locate the Martinez Homicide file.

68.     On May 12, 2017, members of the Conviction Review Unit of the Philadelphia DA's Office revealed to Mr. Thomas' counsel that they located the Philadelphia Police Homicide Unit file containing the records of the Martinez murder investigation from the early 1990s.

69.     PCRA counsel first requested these records in December 2014, two and a half years earlier.

70.     The Homicide File contained investigative records that Defendants Devlin and Worrell never disclosed to the DA's Office nor to Mr. Thomas' defense counsel that revealed the following information for the first time to Mr. Thomas and his attorneys.

71.     On November 16, 1990, three days after the Martinez murder, Philadelphia Police assigned to the 25th District (where the murder took place) stopped a gray Chevrolet Nova in the area of 12th and Venango Streets that was occupied by three African-American males: Oliver Walthour, Lloyd Hicks, and Bobby Harris.

72.     Police stopped the gray Nova because it fit the description of the car used in the Martinez murder just three days before.

73.     Police stopped the Nova at a location only six blocks from the Martinez murder scene.

74.     Police recovered a gun from inside the Nova.

75.     Police transported all three men, Walthour, Hicks, and Harris, to the Homicide Unit where Defendants Devlin and Worrell interrogated them.

76.     All three occupants of the Nova admitted that they knew the victim, Domingo Martinez.

77.     Defendant Devlin interrogated Oliver Walthour, who claimed the Nova belonged to Lloyd Hicks, but that Hicks' cousin, John Lewis, often drove the Nova.

78.     In an apparent effort to divert attention from himself, Walthour claimed John Lewis may have been the killer.

79.     Walthour told Defendant Devlin that the day after the Martinez murder, November 14, 1990, he was in a bar at 8th and Venango Streets, where he saw John Lewis "flashing around a lot

of money." Walthour asked Lewis where he got all the money, and Lewis told Walthour that he (Lewis) "robbed this old Puerto Rican guy between 7th and Tioga and Sedgley."

80.     Walthour additionally claimed John Lewis told him "they followed him (the Puerto Rican man) in a car and they hit the dude's car, and when they stopped he said he (John Lewis) jumped out the car. He was acting like it was the other dude's fault." Walthour then told Defendant Devlin that Lewis robbed the Puerto Rican man.

81.     Walthour told Defendant Devlin that John Lewis "always told me that he made his money going into banks and watching people get money and when the people left the bank they would follow them and rob them."

82.     Walthour also told Defendant Devlin that John Lewis always carries a gun.

83.     When Defendant Devlin asked Walthour where he was on November 13, 1990, the day of the murder, Walthour told him he slept until the afternoon and then accompanied a friend to a house at Broad Street and Erie Avenue.

84.     A transcript of a 911 call provided to Mr. Thomas in criminal discovery revealed that on November 21, 1990, a caller to Philadelphia 911 claimed that three men who "killed the Puerto Rican millionaire" were hiding in a house for several days at Broad and Erie.

85.     Defendants Devlin and Worrell requested Officer Eberhardt of the Mobile Crime Detection Unit process the Nova for evidence related to the Martinez murder.

86.     Five months after the Nova was stopped and Walthour, Hicks, and Harris were interrogated, on April 5, 1991, Oliver Walthour was arrested for the March 20, 1991 robbery and murder of a store owner at 3523 N. 8th Street, two blocks from the Martinez murder scene. He was convicted and is serving a life sentence for that crime.

87.     Bobby Harris, also an occupant of the Nova that was stopped on November 16, 1990, was also a suspect in the March 1991 robbery and murder but was not charged.

88.     Defendants Devlin and Worrell knew all of this information before Mr. Thomas' trial.

89.     Defendants Devlin and Worrell did nothing with this information.

90.     Defendants Devlin and Worrell did not reveal any of the information in Paragraphs 71 to 83 and 85 to 87 to the DA at any time.

91.     Defendants Devlin and Worrell did not reveal any of the information in Paragraphs 71 to 83 or 85 to 87 to Mr. Thomas' lawyer in preparation for the December 1994 trial.

92.     Upon information and belief, the reason the Defendants did not reveal the information in paragraphs 71 to 83 and 85 to 87 was they knew that Mr. Thomas' lawyer would use the Chevy Nova incident to get an acquittal of Mr. Thomas.

        **D.     The Martinez Family and Another Suspect**

93.     Defendant police detectives initially investigated the robbery and murder of Domingo Martinez as an "inside job" by bank employees and later members of the victim's family.

94.     On the day of the murder, Defendants Devlin and Worrell interviewed at least two bank employees, and other detectives interviewed Domingo Martinez's daughter, Sara Negron

95.     A week after the murder, Defendant Devlin interviewed Sara Negron a second time. During the second interview, Devlin revealed to Ms. Negron that "several sources" with obvious inside knowledge of the Martinez-Negron family provided information to Devlin.

96.     The information provided reveals that the sources demonstrated their belief that Sara Negron was involved in her father's murder. The identities of these sources have never been revealed to Mr. Thomas' counsel.

97.     Defendant Devlin's second interview with Sara Negron revealed that:

a)  Sara Negron called the bank the morning of her father's murder and ordered the $25,000;

b)  Sara Negron was married, but she was having an extra-marital affair with a criminal;

c)  Sara Negron's boyfriend, who ran an illegal gambling business in North Philadelphia, employed a man who fit the eyewitness descriptions of the killer of Domingo Martinez;

d)  Sara Negron told her criminal boyfriend that her father regularly picked up large sums of money at the Mellon Bank at 1201 Spring Garden Street;

e)  Sara's boyfriend did not show up at his business the morning of the Martinez murder and was also not at home;

f)  Sara and her father, Domingo Martinez, had a fight a short time before the murder during which Martinez warned Ms. Negron that if she divorced her husband for her criminal boyfriend, he, Martinez, "would sell the business and put [her] out on the street;" and

g)  Sara Negron told her criminal boyfriend about the fight with her father, and relayed what her father said concerning his intent to disinherit her.

98.  On the following day, November 21, 1990, Defendant Devlin interviewed Sara Negron's boyfriend, Benjamin Quiles. Quiles told Devlin that he was not at his illegal business at the time of the Martinez murder because, on a day described by police as "cold and windy," Quiles decided to ride his bicycle from his home in North Philadelphia to Feasterville, Bucks County, Pennsylvania, and back again—a distance of about 34 miles round trip.

99.  At the time of the murder, Sara Negron was embezzling money from her father's business and customers. According to Commonwealth records, beginning on November 1, 1990, twelve days before her father was murdered, Sara Negron was stealing money deposited with Ms. Negron while she ran her father's "community bank." She later fled to Puerto Rico and was extradited to Pennsylvania. Ms. Negron eventually pleaded guilty to multiple counts of Misapplication of Entrusted Property, formerly 18 Pa. C.S. § 4106, now § 4113, Theft by Failing

to Make Required Disposition of Funds Received, 18 Pa. C.S. § 3927, and Criminal Conspiracy, 18 Pa. C.S. § 903.

100.    The amount of money Ms. Negron allegedly stole was $89,612, but this represented only the amount the Commonwealth could actually document. Ms. Negron stole far more from people who could not document the amount stolen from them because they either lacked documentation or they could not come forward due to the money coming from an illegal source.

101.    Fourteen weeks after her father's murder, and after the Defendants turned their attention to residents of Abbotsford Homes, Sara Negron filed for divorce.

102.    Ms. Negron took over her father's business after his death.

103.    In 1995, just prior to the community bank's declaration of bankruptcy, Sara Negron transferred the business property at 513 West Girard Avenue to her boyfriend, Benjamin Quiles, for the sum of one dollar.

### E.    The Stallworths – The Manufactured Cooperators

104.    Within several weeks of Mr. Martinez' murder, an informant named Almarine "Ree-Ree" Coleman (now Almarine Anderson), living in Abbotsford Homes housing project in Northwest Philadelphia, miles away from the murder scene, told two Philadelphia Police Officers assigned to the 39th District, Five Squad, that she heard a rumor concerning the Martinez murder. Those officers were Valerie Watson (now deceased) and Defendant James Gist.

105.    Ms. Coleman told Watson and Defendant Gist that she heard a rumor that "the Thompson brothers set it [the Martinez' murder] up and the Stallworths killed the guy." The Stallworths are brothers John and William Stallworth, both of whom are originally from Camden, New Jersey. John and William lived for a time in Abbotsford Homes with their Aunt Cecelia Stallworth.

**106.**   Ms. Coleman never told police anything about the number of people involved in the murder or the car or cars they drove because the rumor did not contain this information.

**107.**   Ms. Coleman never told Defendants or anyone else that the killers drove a blue car.

**108.**   Officer Watson and Defendant Gist referred this rumor to Defendants Devlin and Worrell.

      **F.**    **The "Blue Car" Theory**

**109.**   Not a single eyewitness or Ms. Coleman ever said there was a blue car included in any way in the side-swiping of Mr. Martinez' car on Sedgley Street or even at the scene of the accident and shooting.

**110.**   Because they often patrolled in Abbotsford Homes where the Thomases lived, Officer Watson and Defendant Gist knew Mr. Thomas and his brother, Mustafa Thomas, and that the Thomas brothers sometimes drove a blue car in early 1990 because they stopped Mr. Thomas in a blue Mercury several times.

**111.**   Watson and Defendant Gist told Defendants Devlin and Worrell that the Thomas brothers drove a blue car at the time of the murder.

**112.**   Ignoring the consistent descriptions provided by eyewitnesses along with the physical evidence corroborating that the killers drove either a red and white or a gray Nova or Skylark, Defendants Devlin, Worrell and Gist contrived a story involving a blue car because they knew the Thomas brothers drove a blue car. This contrived story continued all the way through trial.

**113.**   Mr. Thomas no longer had the blue Mercury by late summer or early fall of 1990, before Mr. Martinez was killed, because it broke down permanently and was no longer operable.

**114.**   In or about February 1991, three months after the murder, Detective Thomas Augustine confiscated a blue 1977 Chevrolet Caprice Classic automobile and transported it to the Police

Garage. This car was photographed by Officer James Caldwell of the Mobile Crime Detection Unit and identified on police reports as being involved in the Martinez murder. No information has ever been provided to Mr. Thomas or his criminal or PCRA counsel concerning the circumstances of this car's confiscation, or its true owner.

115.    On or about February 8, 1991, Detective Augustine requested that Police Officer James Caldwell of Mobile Crime Detection Unit process and document evidence taken from the blue 1977 Caprice that Augustine confiscated, and Augustine and/or Defendants Devlin and Worrell falsely told Officer Caldwell that the Caprice was used in the Martinez murder.

116.    The property receipt on which the evidence was documented was not turned over to Plaintiff's counsel until March 2, 2012.

117.    The evidence removed from the 1977 Caprice Classic included chrome trim taken from the passenger side wheel well containing "blue-gray transfer paint," a broken light cover taken from the car's tail light, and a red face mask.

118.    Police Officer Caldwell also took fourteen black and white photographs of the 1977 Caprice Classic that he gave to Defendant detectives.

119.    Defendants Devlin and Worrell gave the photographs of the blue 1977 Caprice to Assistant Philadelphia District Attorney Randolph Williams and told Williams that the photographs depicted the car used in the Martinez murder.

120.    Sometime in 1991, Officer Watson and Defendant Gist, using a Polaroid camera, photographed a different blue Chevrolet that had been stripped and was sitting in the courtyard at Abbotsford Homes. Neither the stripped Chevrolet nor the 1977 Caprice Classic was the blue car driven by Mr. Thomas in 1990, which was a Mercury.

**121.**   Watson and Defendant Gist gave two of the Polaroid photographs taken of the stripped blue Chevrolet in Abbotsford Homes to Defendants Devlin and Worrell.

**122.**   Defendants were clearly pursuing a false, contrived story that was wholly unsupported by evidence or logic. The blue car story was inconsistent with every single eyewitness statement, i.e., that three men (two of them possibly Hispanic) driving a red and white or gray Nova or Skylark murdered Domingo Martinez. Instead, Defendants began to drive the false narrative that six men in two cars, a blue car and a gray car, murdered Domingo Martinez in a totally random act by Abbotsford Homes residents who never saw the victim before and did not know where he was going, much less that he had placed $25,000 in the trunk of his car.

     **G.**    **John Stallworth's False Confession**

**123.**   In 1992, Defendants Devlin and Worrell had still not arrested anyone for the Martinez murder.  In 1992, Defendants Devlin and Worrell hatched a plan to bring John Stallworth to Philadelphia from New Jersey and coerce a false confession from him concerning the Martinez murder.

**124.**   Defendants Devlin and Worrell enlisted the assistance of Detective Joseph Hasara, who secured a federal arrest warrant for John Stallworth charging him with violating 18 U.S.C. § 1073, Flight to Avoid Prosecution.

**125.**   Joseph Hasara, a detective assigned to a federal fugitive task force, sought John Stallworth in New Jersey, and Stallworth's attorney Jerrold Colton arranged to have his client surrender to federal authorities in Philadelphia on or about October 27, 1992.

**126.**   On or about October 27, 1992, attorney Colton brought John Stallworth to the Federal Building in Philadelphia and surrendered John Stallworth to Detective Hasara with the

understanding that Stallworth would be charged with the federal offense of Flight to Avoid Prosecution in a Pennsylvania 1989 robbery case.

127.   Upon information and belief, Colton told Hasara that Stallworth invoked his right to remain silent and should not be asked any questions outside of Colton's presence.

128.   Joseph Hasara then immediately drove John Stallworth to Philadelphia Police Headquarters at 8th and Race Streets and delivered him to Defendants Devlin and Worrell in a Homicide Unit interrogation room.

129.   In the interrogation room, Defendants Devlin and Worrell ignored Jerrold Colton's invocation of John Stallworth's right to remain silent and Mr. Colton's admonition that John Stallworth should not be interrogated without counsel being present. Outside of the presence of Stallworth's counsel, Defendants Devlin and Worrell began interrogating John Stallworth.

130.   Defendants Devlin and Worrell threatened and physically abused John Stallworth, forcing him to provide a false confession to the murder of Domingo Martinez that was hand-written by Defendant Devlin.

131.   In his false confession, John Stallworth supposedly confirmed the story contrived by Defendants, i.e., that six men in two cars, a blue car and a gray car, robbed Domingo Martinez at random.

132.   The six men named in the first version of John Stallworth's confession were: John Stallworth, William Stallworth, Shaurn Thomas, Mustafa Thomas, "Nasir," and Louis Gay.

133.   Upon information and belief, "Nasir" is Steven D. Johnson, date of birth August 31, 1961.

134.   In this first version of his confession, John Stallworth stated that Louis Gay was part of the group that robbed Mr. Martinez on November 13, 1990.  John Stallworth claimed that Louis

Gay drove to the bank with John Stallworth and Thomas, and entered the Mellon Bank at 1201 Spring Garden Street on November 13, 1990, and watched victim Domingo Martinez pick up the $25,000. John Stallworth said Gay then returned to the blue car and reported this to the other co-conspirators.

**135.** The Mellon Bank at 1201 Spring Garden Street employed surveillance cameras.

**136.** Defendants Devlin and Worrell knew that John Stallworth's story concerning Louis Gay entering the bank and watching Domingo Martinez pick up money was false for at least two reasons:

  1)  They knew Louis Gay was in prison on the day of the murder; and

  2)  The Mellon Bank at 1201 Spring Garden Street employed surveillance cameras which do not show anyone, much less Louis Gay, entering the bank and watching Martinez.

**137.** Based on John Stallworth's first version of his confession, elicited via threats and physical abuse, Defendants Devlin and Worrell arrested him for the Martinez murder and recommended murder charges to the DA based solely on the confession they knew to be false.

**138.** Defendants Devlin and Worrell knowingly provided John Stallworth's false confession to the DA. The DA charged John Stallworth with the Martinez murder based solely on that confession.

**139.** On October 29, 1992, roughly two days later, Defendants Devlin and Worrell interrogated John Stallworth's brother, William Stallworth, who was in a New Jersey jail for another crime. William Stallworth told Defendants that he was not involved in the Martinez murder and knew nothing about it. John Stallworth had implicated William Stallworth in his false confession.

**140.** On July 6, 1993, after spending months in jail awaiting trial and facing the death penalty for his false confession, John Stallworth agreed to change his story to eliminate Louis Gay, who was in prison on the day of the murder.

**141.** On July 6, 1993, John Stallworth provided a new confession to Defendants Devlin and Worrell. In this version of events, John claimed that an unknown man, not Louis Gay, entered the bank at 1201 Spring Garden Street and came back to tell them that a man withdrew cash.

**142.** Defendants Devlin and Worrell were also aware that this new version of the story was false because they viewed the Mellon Bank surveillance video which did not show anyone viewing Martinez when Martinez was receiving the money on the morning of November 13.

**143.** On July 6, 1993, John Stallworth agreed to plead guilty to third degree murder and testify against Mr. Thomas and others at trial.

**144.** Following the July 6, 1993 interrogation, Defendants arrested Mr. Thomas, along with Mustafa Thomas and William Stallworth, for the murder of Domingo Martinez.

**145.** Defendants Devlin and Worrell never arrested "Nasir" nor the other man who John Stallworth claimed had participated in the Martinez murder.

**H.    William Stallworth Also Changes His Story to Include Shaurn Thomas**

**146.** John Stallworth's story was that he was in the back seat of the lead blue car, while his brother, William, was in the trailing gray car with Mr. Thomas and "Nasir."

**147.** Because John told detectives that he was lying down and could not see anything going on in the other car, he could not positively place Mr. Thomas at the murder scene. Therefore, Defendants needed William Stallworth to testify at trial to ensure Mr. Thomas' conviction.

**148.** Defendants Devlin and Worrell instructed John Stallworth to speak with his brother, William, while they were in jail awaiting trial.

24

149.    Defendants Devlin and Worrell brought William Stallworth to the Homicide Unit along with John Stallworth. Defendants told William that that the Commonwealth of Pennsylvania was seeking the death penalty against his brother, John, and John would not get his plea deal if William did not tell the same story that John was telling. Defendants also told William Stallworth that John made a deal to testify against William as well as the Thomas brothers, so William would likely be convicted of murder unless he cooperated with the Defendants.

150.    On January 25, 1994, William Stallworth changed his October 31, 1992 statement and agreed to plead guilty and testify against Mr. Thomas at trial.

151.    As a result of Defendants' pressure and out of fear of execution or spending the rest of his life in prison, William Stallworth adopted the identical story that John provided, i.e., six men, two cars: a blue car and a gray car, "Nasir," unknown male, John and William Stallworth, Shaurn and Mustafa Thomas.

152.    William Stallworth also claimed that Mr. Thomas accompanied him and "Nasir" to the scene of the Martinez murder, following behind a blue car carrying John Stallworth, Mustafa Thomas, and an unknown male.

153.    William Stallworth was the only witness at trial or at any other time during the investigation who ever placed Mr. Thomas at the scene of the Martinez murder, and no eyewitness ever identified Mr. Thomas.

154.    In or about September 2011, William Stallworth, recanted his claims and said that he was coerced into providing false testimony by Defendants Devlin and Worrell who told him that he would be convicted because his brother, John, was going to testify against him, and John would not get the plea deal he was promised and would receive the death penalty if William did not plead guilty and agree to testify at Mr. Thomas' trial.

**155.**   In the years since William Stallworth changed his original statement and confessed to participating in the Martinez murder, he has recanted this confession numerous times to counsel for Mr. Thomas, to the Pennsylvania Board of Probation and Parole, and to the Philadelphia DA.

**III.**   **Defendants Fail to Investigate Thoroughly Shaurn Thomas' Presence at the Youth Study Center at the time of the Murder**

**156.**   Sometime before Mr. Thomas' trial, Defendants Devlin and Worrell discovered that Mr. Thomas was arrested the day before the murder and that he would have been at the city-owned Philadelphia Youth Study Center at the time of the Martinez murder.

**157.**   Defendants Devlin and Worrell failed to conduct an investigation concerning Mr. Thomas' alibi despite the plentiful evidence that the Martinez murder did not happen the way that it was presented at trial.

**158.**   Had Defendants Devlin and Worrell visited the Philadelphia Youth Study Center, or talked to the employees who worked there, they could easily have verified Mr. Thomas' appearance at the intake conference at the very time the murder was committed.

**159.**   Had Defendants Devlin and Worrell verified Mr. Thomas' alibi, the Defendants' entire contrived case would have fallen apart.

**IV.**   **Trial**

**160.**   Defendants Devlin and Worrell never provided any property receipts connected to the Martinez murder investigation to the Philadelphia DA, including property receipts documenting the confiscation of cars in the murder case, evidence taken from those cars, and evidence taken from the murder scene.

**161.**   As a result, no property receipts were provided to Mr. Thomas' attorney as discovery material.

162.    Defendants Devlin and Worrell did not disclose to prosecutor Randolph Williams that they had two Polaroid photographs of a blue Chevrolet that John Stallworth had allegedly identified as the car used in the Martinez murder while making version 2 of his false confession.

163.    Before trial, Defendants Devlin and Worrell prepared John and William Stallworth and rehearsed with them what the brothers would say on the witness stand.

164.    Both John and William Stallworth testified falsely at Mr. Thomas' trial, relaying the contrived story supplied to them by Defendants Devlin and Worrell.

165.    Due to the false information provided by Defendants Devlin and Worrell concerning the 1977 Caprice Classic, prosecutor Williams introduced the fourteen photographs of the Caprice Classic, told the trial court the photos depicted the murder car, and attempted to link the Caprice to the murder.

166.    Due to the false information provided by Defendants Devlin and Worrell, Officer James Caldwell told the jury at Mr. Thomas' criminal trial that he removed gray paint from the blue Caprice Classic, and the victim's car was gray, that he recovered a broken tail light and a face mask from the Caprice Classic.

167.    Because prosecutor Williams believed what Defendants Devlin and Worrell told him, i.e., that the blue 1977 Caprice Classic was the murder car, Williams asked Criminalist Ronald McCoy to compare items taken from the Caprice to items found at the Martinez murder scene to find a positive connection proving the Caprice was the murder car and corroborating the contrived story told by the Stallworths at trial.

168.    Sometime between December 12, 1994 and December 15, 1994, McCoy compared the evidence received from the Caprice Classic with the crime scene evidence and found that they did <u>not</u> match.

**169.**   During Mr. Thomas' trial, between December 12, 1994 and December 15, 1994, criminalist McCoy notified prosecutor Williams that the '77 Caprice Classic was <u>not</u> the murder car.

**170.**   Upon information and belief, Williams contacted Defendants Devlin and Worrell and told them the Caprice Classic did not match the crime scene evidence.

**171.**   Defendants Devlin and Worrell then revealed the 2 Polaroid photographs to prosecutor Williams.

**172.**   On December 15, 1994, Defendant Paul Worrell disclosed the existence of the 2 Polaroid photographs to the jury in Mr. Thomas' trial.

**173.**   On December 15, 1994, Defendants Devlin and Worrell spoke with John and William Stallworth and instructed them to identify the blue Chevrolet in the 2 Polaroid photographs as the Martinez murder car.

**174.**   On December 15, 1994, prosecutor Williams recalled John and William Stallworth to the witness stand, and they both identified the car in the 2 Polaroid photographs as the Martinez murder car.

**175.**   As a result of the false story contrived by Defendants and coerced from the Stallworths, the failure to notify defense counsel of the findings regarding the 1977 Chevrolet Caprice, the hiding of the files regarding the Chevy Nova incident, and the failure to investigate Mr. Thomas' solid alibi, the jury convicted Mr. Thomas of murder. Mr. Thomas was sentenced to mandatory life in prison without the possibility of parole.

**V.**   **The Aftermath—The Discovery of the Withheld Evidence that Would Exonerate Shaurn Thomas**

**176.** From the day he was arrested, Mr. Thomas claimed he was innocent of the murder of Domingo Martinez. Following his conviction, Mr. Thomas continued his efforts to prove his innocence.

**177.** In or about 2009, Mr. Thomas requested the assistance of the Pennsylvania Innocence Project in proving his innocence.

**178.** On or about June 28, 2011, while investigating Mr. Thomas' case, volunteer counsel obtained from the PPD a Philadelphia Police Criminalistics Report dated December 16, 1994. This report indicated that the author, Criminalist Ronald McCoy, compared the evidence taken from the blue 1977 Caprice Classic that Defendants falsely offered to the trial prosecutor as the car used in the murder to the evidence found at the Martinez crime scene.

**179.** The December 16, 1994 criminalistics report proved that the broken taillight on the Caprice Classic and the pieces of red light cover at the murder scene did not match, and the chrome trim removed from the Caprice Classic contained blue paint, not gray paint as Officer James Caldwell testified at Mr. Thomas' trial. This report was never before provided to Mr. Thomas or any of his lawyers.

**180.** The December 16, 1994 criminalistics report also demonstrated that as early as January 26, 1991, well before the Stallworth brothers' "confessions," Defendants Devlin and Worrell were attempting to falsely link a blue car to the Martinez murder in an effort to frame Mr. Thomas. The report proved that Defendants confiscated a blue 1976 Chevrolet and asked Police Officer McBride of the Mobile Crime Detection Unit to process it for evidence.

**181.** In or about April 2017, after Mr. Thomas had spent nearly 24 years in prison, trial witness William Stallworth met with prosecutors from the DA's Office and told them that he testified falsely against Mr. Thomas at trial in 1994.

**182.** In or about April 2017, the DA's Office concluded its own investigation concerning Mr. Thomas' murder conviction and concluded that Mr. Thomas was likely at the Philadelphia Youth Study Center on the morning of the Martinez murder.

**183.** Because Defendants Devlin and Worrell never provided any property receipts related to the Martinez murder investigation to the DA, Mr. Thomas was completely unaware that Defendants hid exculpatory evidence that could have totally exonerated him at trial.

**184.** In May 2017, the DA's Office discovered the information concerning the Chevy Nova incident and the interrogation of Walthour, Hicks, and Harris in the Homicide investigative file.

**185.** As a result of the DA's investigation into Mr. Thomas' alibi and their conclusion that Mr. Thomas was likely at the Philadelphia Youth Study Center on the morning of the murder, the recantation of the only witness who placed Mr. Thomas at the scene of the murder, and the discovery of the stunning exculpatory evidence hidden in Defendants' police files, the DA vacated Mr. Thomas' conviction in May 2017.

**186.** On May 23, 2017, Mr. Thomas was released from SCI Frackville, a maximum security prison. He had been in jail or in prison since July 1993.

**187.** On June 13, 2017, the DA's office announced that it would not re-charge Mr. Thomas for the Martinez murder.

**VI.  The PPD's Pattern and Practice of Unconstitutional Misconduct in Homicide Investigations, Including the Fabrication of Evidence, Coercion and Suggestion of False Statements from Witnesses and Suspects, and Suppression of Exculpatory Evidence**

**188.** For many years, dating back at least to the 1970s and continuing well beyond the time of the investigation of Domingo Martinez's murder, the City of Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in

particular, using coercive techniques in interviews and interrogations to obtain confessions; fabricating inculpatory evidence; withholding exculpatory evidence; ignoring eyewitness interviews; and fabricating incriminating statements from witnesses, suspects, and arrestees by feeding details about the crime that the police knew (or believed to be true) to those witnesses, suspects, and arrestees.

189.    This policy, practice, or custom involved the withholding and hiding of evidence from the prosecutor and defense lawyers for the accused leading up to and at trial, and continuing with PCRA counsel for decades, including without limitation: interview reports, photographs, forensic analyses, circumstances of confessions, facts on how confessions were coerced, and what promises were made to obtain confessions or incentivize witnesses.

190.    This policy, practice, or custom involved the use of various techniques to coerce inculpatory statements, including without limitation: isolation; separating juvenile or other vulnerable suspects or witnesses from their friends and families; subjecting individuals to needlessly prolonged interrogations; making false promises, including promises that a suspect or witness would be allowed to go home if he or she makes an inculpatory statement; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing false assurances—including to juveniles and other vulnerable people—that the suspect will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

191.    This policy, practice, or custom also involved the use of various techniques to make false statements appear true and reliable, including without limitation: providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading steps to make coerced

statements appear as if they originated from the suspect following a lawful interrogation; selectively documenting or editing a witness's or suspect's eventual statement and not the preceding interrogation, preparation, and rehearsal; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words,

192.    These practices were well known to the PPD and City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of, *inter alia*, newspaper investigations including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977-1978; governmental investigations; complaints from lawyers and civilians; and internal police investigations.

193.    Various cases demonstrate that this misconduct was pervasive within the PPD at the time of Mr. Thomas' arrest, and, upon information and belief, the misconduct described below was committed with the knowledge of, in full view of Homicide and PPD supervisors or because of their deliberate indifference to this misconduct.

194.    **Anthony Wright** (2:16-cv-5020 EDPA). Louise Talley was raped and murdered in her home. Despite evidence inculpating other people, Defendants Devlin and Augustine, as well as Detectives Dusak, Baker, Santiago, and others, focused on Anthony Wright. Detectives obtained false statements from alleged witnesses inculpating Mr. Wright. These statements were coerced. After falsely telling Mr. Wright that they would bring him right back home, detectives took Mr. Wright to the Homicide Unit for interrogation. There, Defendant Devlin coerced Mr. Wright into signing a false confession, admitting to the murder of Louise Talley. The false statement, written by Homicide detectives, included a false statement that Mr. Wright had worn a Chicago Bulls shirt, blue jeans with suede material, and black Fila sneakers when he murdered Ms. Talley. Detectives then planted this clothing in Mr. Wright's home. The clothes were eventually tested

for DNA, which proved that the items of clothing were worn by Ms. Talley, not by Mr. Wright. DNA tests of rape kit evidence proved that a man named Ronnie Byrd raped Ms. Louise Talley. Notwithstanding this evidence, the Commonwealth, after vacating Mr. Wright's conviction, tried him again for the Talley murder in 2016. Mr. Wright was acquitted.

195.    **Carlos Hernandez** (CP-51-CR-0302131-1991) **& Ed Williams**. A woman and her boyfriend were robbed at gunpoint by two men, and her boyfriend was shot. **Defendant Devlin** interrogated a key witness, Juan Sanchez, and extracted a statement from him implicating Carlos Hernandez and another man. Mr. Sanchez described the circumstances of his statement as follows: Detective Devlin held him in custody and interrogated him for three days, without food or water; he was denied use of the bathroom and had to urinate on the floor, and Detective Devlin hit him several times. After coercing Mr. Sanchez' statement, Detective Devlin interrogated Mr. Hernandez and obtained a statement from him implicating Ed Williams. Mr. Hernandez described the circumstances of his statement as follows: Detective Devlin had him handcuffed to a chair and held him without food, water, or use of a bathroom; Detective Devlin punched him in the face and pressed his foot on Mr. Hernandez's crotch until Hernandez relented and signed the statement. Later it was proved that Mr. Williams was in a secured drug treatment facility at the time of the crime.

196.    **Jackie Combs, Jr.** PPD detectives, including **Detective Devlin**, coerced four young witnesses into testifying against Mr. Combs for a murder that he denies committing. One of those witnesses, just 15 years old at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he didn't do it." The witnesses, who gave varied accounts of the killing, have explained that their statements were the result of physical and verbal abuse by detectives.

197. **Willie Veasy** (CP-51-CR-0641521-1992). Mr. Veasy was convicted of a murder that occurred in North Philadelphia while he was working at a popular and busy restaurant in Jenkintown, Pennsylvania. Mr. Veasy was interrogated by Defendant Devlin until he provided a "confession." Mr. Veasy has described that Defendant Devlin isolated him in an interrogation room where Defendant Devlin verbally abused him and kicked at his testicles until Mr. Veasy agreed to sign the "confession."

198. **Percy St. George** (CP-51-CR-1012571-1993). In investigating a murder, Detective Manny Santiago obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, Detective Santiago coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by Detective Santiago. After David Glenn testified regarding Detective Santiago's misconduct and disavowed the statement Santiago had coerced him to sign, Santiago notified the court and the Commonwealth of his intention to assert his Fifth Amendment right against self-incrimination to avoid having to testify about his actions in that case. Shortly after receiving this letter from Santiago's counsel, the prosecution dismissed all charges against St. George, but Detective Santiago remained with the PPD through September 1996.

199. **Jimmy Dennis**. On October 22, 1991, Cheddell Williams was killed in North Philadelphia. Detective Jasztrzembski led a team of detectives, including Detective Santiago, who pursued the investigation. Dennis was arrested on November 22, 1991. In 2016, the U.S. Court of Appeals for the Third Circuit, sitting *en banc*, affirmed the District Court's decision overturning Dennis' conviction and granting federal habeas relief based on multiple *Brady*

violations. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016). District Judge Anita Brody ruled that the PPD "covered up evidence" that "pointed away" from Dennis's guilt, suppressed key witness statements, and staged sham suspect lineups. The District Court noted that although Jasztrzembski had never itemized or photographed clothing taken from Dennis' home, before being lost mysteriously before trial, Jasztrzembski nevertheless took the stand and claimed that the clothes matched the kind worn by Dennis the day he allegedly shot the girl.

**200.** **Donald Ray Adams** (CP-51-CR-0743812-1991). Mr. Adams was charged and convicted in the 1990 murders of Daryl Patterson and Thomas Winn. The initial investigation of the case did not produce a suspect, and in June 1991 PPD detectives David Clark and Igor Alfimow were assigned to re-investigate the matter. These detectives secured a statement from an alleged witness, Donna Benjamin, implicating Mr. Adams. Based almost entirely on this testimony, Mr. Adams was convicted and sentenced to life imprisonment. In fact, the statement from Ms. Benjamin was coerced and false, and some years later she recanted. In 2007, the Philadelphia Court of Common Pleas granted post-conviction relief based on the testimony of Ms. Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned, and in his twenties. Mr. Adams was 5'4", 200 pounds, dark skinned, and in his thirties. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a re-trial, Mr. Adams was acquitted of all charges. In a subsequent civil suit for malicious prosecution, the matter was settled and Mr. Adams received

compensation for his wrongful conviction. *See Adams v. City of Phila.*, Docket No. 130400909, Phila. Common Pleas Ct.

201.    **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley—an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m. The prosecution dropped charges against Presley three weeks later. Detective Santiago soon took a statement from Presley. Presley explained Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Santiago. Rather than showing Presley a real photo array, all seven photos that Santiago showed Presley were of Swainson. Presley explained that he only testified against Swainson because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter *Commonwealth v. Kareem Miller*, D.C. No. 88-18-55934; CP-51-CR-1024751, to Mr. Swainson). Mr. Swainson has a PCRA petition pending.

202.    **Walter Ogrod** (CP-51-CR-0532781-1992). Mr. Ogrod, a trucker with a low average IQ, was sentenced to death for the murder of a four-year-old girl based entirely on a "confession" Ogrod gave to **Defendant Devlin**. Ogrod had driven all night and had not been to bed in 36 hours when Defendant Devlin went to work. According to Defendant Devlin, about an hour into the interrogation, Ogrod supposedly burst into tears and gave a 16-page confession. Ogrod, however, has claimed that he was interrogated for hours by Defendant Devlin and a second detective. He finally broke from lack of sleep and began to believe what the detectives fed him— eventually signing the statement written out in longhand by Defendant Devlin. After hearing Ogrod's testimony, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial

three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has a PCRA petition pending and is represented by counsel from Morgan Lewis and the Federal Community Defender Capital Habeas Unit.

203.    At the time of the investigation and prosecution of this case, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating purported witnesses in criminal investigations, without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions and/or for material benefits. These detentions and interrogations were concluded without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

204.    During the 1980s and early 1990s, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three separate occasions in the 1980s, courts in the Eastern District of Pennsylvania issue orders enjoining the Police Department from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey" that resulted in the unlawful arrest and detention of 1,500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); *Arrington v. City of Philadelphia*, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions, and searches of African-American men during investigations of the "Center City Stalker").

205.    Thereafter, in the late 1980s and early 1990s, a group of officers operating out of the 39th Police District (39th District, Five Squad), engaged in widespread unconstitutional practices,

including fabrication of search and arrest warrants and other false allegations of criminal conduct, planting of evidence on suspects, and coercive and physically abusive interrogations. In one case, 39th District officers completely manufactured false evidence that resulted in the wrongful conviction of Raymond Carter for murder. *See Carter v. City of Philadelphia*, No. 00-3671, 2002 WL 992811 (3d Cir. April 10, 2002). This squad, led by Officer John Baird, engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to the Philadelphia Police Internal Affairs Divisions ("IAD") and the DA, deliberately biased internal investigations, and a practice and custom of exonerating police officers regardless of the evidence of misconduct. This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution by the United States Attorney. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Thomas was charged, a Court in the Eastern District entered a Consent Decree requiring wide-ranging reforms in the PPD and, in particular, providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

206.    In summary, at the time of the investigation and prosecution of Mr. Thomas, the PPD had a practice, policy, and custom of:

    a)    Engaging in unlawful interrogation of suspects, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, and failing to disclose exculpatory evidence;

    b)    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

    c)    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

    d)    Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police interrogations, searches, and

arrests, coercion of witnesses, falsifying and fabricating evidence, and suppression of exculpatory evidence; and

e)      Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the Defendant officers in this case, to violate the rights of citizens such as Mr. Thomas.

207.      At the time of the investigation and prosecution of Mr. Thomas, and for many years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. IAD of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a)      The PPD's internal investigatory process was riddled with excessive and chronic delays in resolving disciplinary complaints;

b)      The PPD lacked consistent, rational, and meaningful disciplinary and remedial actions;

c)      The PPD failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d)      The PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e)      The PPD discipline, as practiced, was incident-based rather than progressive; thus repeat violators were not penalized in proportion to the number of violations;

f)      The conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g)      A global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h)      A global analysis shows serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i)      The PPD lacked an effective early warning system to identify, track, and monitor "problem" officers;

j)    IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, and interviews that were conducted were below acceptable standards of police practices and failed to address key issues; and

k)    IAD failed to acknowledge the disproportionate use of force by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## DAMAGES

208.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Thomas to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve over 24 years in prison for a crime he did not commit.

209.    As a direct result of Defendants' conduct and omissions, Mr. Thomas sustained injuries and damages, including loss of freedom for 24 years, loss of his youth, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

210.    As a direct result of Defendants' conduct and omissions, Mr. Thomas was deprived of his familial relationships, including with his son who was 11 months old when Mr. Thomas was arrested, with his two daughters, who were newly-born infants when Mr. Thomas was arrested, with his great-grandmother who passed away while Mr. Thomas was in prison, with his grandparents who passed away while Mr. Thomas was in prison, and with two of his cousins who passed away while Mr. Thomas was in prison.

211.    As a direct result of Defendants' conduct and omissions, Mr. Thomas sustained economic injuries and damages, including loss of income and loss of career opportunities.

212.   As a direct result of Defendants' conduct and omissions, Mr. Thomas sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments

213.   Plaintiff incorporates by reference all of the foregoing paragraphs.

214.   The individual Defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Thomas for Domingo Martinez's robbery and murder, intentionally caused Mr. Thomas to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Thomas' clearly established right, under the Fourth and Fourteenth Amendments to the United States Constitution, to be free of prosecution absent probable cause.

215.   The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

216.   The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Thomas' clearly established constitutional rights. No reasonable officer in 1990 would have believed this conduct was lawful.

217.   The prosecution finally terminated in Mr. Thomas favor on June 13, 2017, when the Commonwealth of Pennsylvania announced it would not re-charge Mr. Thomas with the murder of Domingo Martinez.

**218.** The acts and omissions by the individual Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Thomas' injuries because Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Thomas.

**COUNT II: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against All Individual Defendants*

**219.** Plaintiff Incorporates by reference all of the foregoing paragraphs.

**220.** The individual Defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Thomas of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation: the false statements of John Stallworth, and William Stallworth; falsely claiming that a blue Chevrolet was used in the Martinez murder to further corruptly link Mr. Thomas to that crime; and providing photographs of a 1977 Chevrolet Caprice Classic and later providing Polaroid photographs of a blue Chevrolet to prosecutors in an effort to bolster the false testimony of the Stallworth brothers and to falsely link Mr. Thomas to the Martinez murder when Defendants knew or should have known that the killers of Domingo Martinez did not employ a blue car.

**221.** The individual Defendants deprived Mr. Thomas of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation: information regarding the true circumstances of the murder of Domingo Martinez; that three men and not six killed Martinez; that three men with a gun in a Nova containing traces of gray paint were stopped by police shortly after the murder, in the same area

42

that the murder occurred, who knew the victim and told police they knew who killed Martinez, one of whom was later convicted or robbery and murder in the same neighborhood, that several people named in false confessions by the Stallworths as conspirators in the Martinez murder had alibis for the date and time of the crime; that Defendants fabricated an account of the murder and instructed John and William Stallworth concerning the details of that contrived story and rehearsed the Stallworths in preparation for their trial testimony; and that Defendants withheld information from the prosecutor concerning the nature of John Stallworth's false confession and the misconduct that led to that confession.

222.    The individual Defendants deprived Mr. Thomas of his right to a fair trial by failing to conduct a constitutionally adequate investigation, including without limitation by failing to pursue information concerning the victim's family and the three men stopped in the Chevrolet Nova on November 16, 1990, and by failing to use any reasonable effort to determine Mr. Thomas' whereabouts the night before or at the time of Mr. Martinez' murder.

223.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Thomas' clearly established constitutional rights. No reasonable officer in 1990 would have believed this conduct was lawful.

224.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Thomas' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Thomas' wrongful arrest, prosecution, conviction, and incarceration.

### COUNT III: 42 U.S.C. § 1983 Civil Rights Conspiracy
*Against All Individual Defendants*

225.    Plaintiff incorporates by reference all of the foregoing paragraphs.

226.    The individual Defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert to deprive Mr. Thomas of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and to a fair trial.

227.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a) Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

b) Coercing and fabricating John Stallworth's and William Stallworth's false confession that inculpated Mr. Thomas;

c) Misrepresenting that a blue car was used in the murder of Domingo Martinez in order to falsely to link Mr. Thomas to the crime;

d) Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

e) Wrongfully prosecuting Mr. Thomas while knowing that they lacked probable cause; and

f) Committing perjury during hearings and trials.

228.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Thomas' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Thomas' wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV: 42 U.S.C. § 1983 Failure to Intervene
### *Against All Individual Defendants*

229.    Plaintiff incorporates by reference all of the foregoing paragraphs.

230.    By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment with the PPD, had opportunities to intervene on behalf of Mr.

Thomas to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

**231.** These Defendants' failures to intervene violated Mr. Thomas' clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1990 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Thomas to be arrested and prosecuted without probable cause were lawful.

**232.** Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Thomas' injuries. Defendants knew, or should have known, that their conduct would result in Mr. Thomas' wrongful arrest, prosecution, conviction, and imprisonment.

## COUNT V: 42 U.S.C. § 1983 Municipal Liability Claim

*Against Defendant City of Philadelphia*

**233.** Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

**234.** The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Thomas' wrongful arrest and conviction, and for many years preceding and following this investigation a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the withholding of exculpatory evidence; the use of coercive techniques in interviews and interrogations to obtain

45

confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

235.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating exculpatory evidence; and particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and despite being of notice of these unconstitutional practices, policies, or customs, the City of Philadelphia failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

236.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Thomas' false arrest, prosecution, and twenty-four years of incarceration, as well as the other injuries and damages set forth above.

### COUNT VI: Malicious Prosecution under Pennsylvania State Law
*Against All Individual Defendants*

237.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

238.    The individual Defendants initiated or continued proceedings against Mr. Thomas, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Mr. Thomas' favor on June 13, 2017, when the Commonwealth vacated Mr. Thomas' conviction and announced that they would not re-charge him with murder.

239.    As a result of this malicious prosecution, Mr. Thomas sustained the injuries and damages set forth above.

**WHEREFORE,** Plaintiff Shaurn Thomas prays as follows:

A.    That the Court award compensatory damages to Plaintiff and against all

      Defendants, jointly and severally, in an amount to be determined at trial;

B.    That the Court award punitive damages to Plaintiff, and against all individual

      Defendants in their individual capacities, in an amount to be determined at trial,

      that will deter such conduct by Defendants in the future;

C.    For a trial by jury;

D.    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs,

      including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42

      U.S.C. § 1983 claims; and

E.    For any and all relief to which Plaintiff may be entitled.


                                       */s/ James Figorski*

                                       James Figorski (PA ID #200549)
                                       Stephen D. Brown (PA ID #27829)
                                       Tiffany Engsell (PA ID # 320711)
                                       Dechert LLP
                                         Cira Centre
                                         2929 Arch Street
                                       Philadelphia, PA  19104
                                       (215) 994-4000

Dated:  September 20, 2017