## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAURN THOMAS, | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | No. 17-4196 |
| *Defendants*. | : | |

## MEMORANDUM

PRATTER, J.                                                                FEBRUARY 2, 2018

### INTRODUCTION

In 1994, Shaurn Thomas was convicted of a murder he did not commit. Last year, the Philadelphia District Attorney's Office successfully initiated the process that led to his conviction being vacated because the Office no longer had faith in the evidence that presumably led to the jury's verdict.

Mr. Thomas has sued the City of Philadelphia, two former police detectives, and one former police officer. He alleges that they ignored exculpatory evidence, manufactured incriminating evidence, and coerced confessions from his alleged co-conspirators.

The defendants have filed two partial motions to dismiss that center on questions of qualified immunity. The Court (1) grants the detectives' partial motion to dismiss to the extent the motion is based on on qualified immunity grounds, (2) grants the City's motion to dismiss a portion of the *Monell* claim, but (3) denies Officer Gist's motion to dismiss, which was based on non–qualified immunity grounds.

**FACTS**

The factual background is intricate and best understood by beginning narrowly and then taking a progressively wider view.

First, the Court restates the story of the murder that prosecutors told at Mr. Thomas's trial, followed by a summary of the evidence that investigators marshalled to tell their story — a rumor, a phony getaway car, and three coerced confessions. A wider lens reveals evidence that the investigators ignored — evidence that, if taken seriously at the time, very likely would have kept Mr. Thomas from ever being charged. Reference is also made to similar conduct in other criminal investigations by the Philadelphia Police Department during the early 1990s.

Finally, the Court summarizes the recent history of this case, namely, Mr. Thomas's exoneration in light of recanted witness statements.

## I. Murder and Trial

On the morning of November 13, 1990, Domingo Martinez was murdered after making a large cash withdrawal from a North Philadelphia bank. As the 78-year-old was driving from the bank to his payday-lending business, he was side-swiped by another car. At least one man emerged from the car, shot Mr. Martinez, pulled him from his car, and left him to die in the street. The killer drove away in Mr. Martinez's car, followed by the assailing car.

The case was investigated by Philadelphia police detectives Martin Devlin and Paul Worrell, with assistance from Officer James Gist. Four years later, two pairs of brothers were convicted for the murder: Shaurn Thomas, Mustafa Thomas, John Stallworth, and William Stallworth. Shaurn Thomas was 16 years old at the time of the murder of Mr. Martinez.

At trial in 1994, both Stallworth brothers testified that the four conspirators planned the murder while living in the Abbotsford Homes housing project. They testified that six men in two

2

separate cars coordinated the attack on Mr. Martinez. Prosecutors showed the jury Polaroid pictures of a stripped blue Chevrolet in the Abbotsford courtyard, which the Stallworth brothers identified as one of the cars used in the murder.

## II. Evidence Used to Convict Mr. Thomas

Three pieces of evidence pointed to Mr. Shaurn Thomas's guilt at trial: a rumor that he had participated in the murder, evidence of the blue car that detectives said he drove, and the centerpiece of the detectives' case — coerced confessions from two of his alleged co-conspirators.

### A. Rumor at Abbotsford Homes

While patrolling the Abbotsford Homes housing project, Officer Gist heard a rumor that eventually became the story told at trial. An informant told him that "the Thompson [sic] brothers set [the Martinez murder] up and the Stallworths killed the guy." Officer Gist knew that the Thomas brothers and the Stallworth brothers had all been Abbotsford residents.

### B. Blue Car

The rumor did not specify the color of the car used in the murder, but Officer Gist knew that Shaurn Thomas drove a blue car. He relayed the rumor to Detectives Devlin and Worrell, along with his knowledge that Mr. Thomas drove a blue car.

Even though Mr. Thomas drove a blue Mercury — which had broken down months before the murder — the investigators developed a story in which the murderers used a different blue car. They confiscated a blue Chevrolet Caprice, whose owner and origins were unknown. Initially, the detectives told the prosecutor that the blue Caprice was the murder vehicle.

During the trial in 1994, however, a forensics specialist compared evidence from the confiscated Caprice to evidence collected at the crime scene and concluded that the Caprice was

*not* the murder car. Given this newfound doubt, the prosecutor asked the detectives if they had any other evidence linking a blue car to the Thomas and Stallworth brothers.

They did. Officer Gist had taken Polaroid photos of a *different* blue car — a stripped blue Chevrolet sitting in the Abbotsford courtyard. The detectives showed the prosecutor the Polaroid photos. The photos were shown to the jury and the Stallworth brothers testified that the stripped blue Chevrolet was the car used in the murder.

### C. The Stallworths' Coerced Confessions

The testimony of John and William Stallworth was the lynchpin of the prosecution's case. But, it later turned out, their confessions were coerced by the detectives to fit the prosecution's plot line.

Detectives Devlin and Worrell first arrested John Stallworth on October 27, 1992, nearly two years after the murder. During the interrogation, they physically abused him and threatened him with the death penalty, leading him to provide a false confession. He confessed that six men committed the murder: John and William Stallworth, Shaurn and Mustafa Thomas, Steven D. "Nasir" Johnson, and Louis Gay. John Stallworth told detectives that Mr. Gay had watched Mr. Martinez withdraw money at the bank. He also told them that the six attackers were divided into two cars, a leading blue car and a trailing gray car.

But, as it happens, there was a problem with the confession that the detectives had John Stallworth sign: Louis Gay was in prison on the day of the murder. So, on July 6, 1993, under the aegis of the detectives, John Stallworth changed his story to replace Louis Gay with an "unknown man" who had watched Mr. Martinez in the bank.

Still, an eyewitness was needed to place Shaurn Thomas at the scene of the murder. In John Stallworth's confession, he and Shaurn Thomas were in different cars. So, in early 1994,

the detectives oversaw William Stallworth's signing of a confession that matched his brother's. In this iteration, William testified that he and Shaurn Thomas were together in the trailing gray car.

### III.    Exculpatory Evidence Ignored by Detectives Devlin and Worrell

Detectives Devlin and Worrell ignored six categories of evidence in pursuit of the "six-man, two-car" story implicating Mr. Thomas.  In brief, the detectives ignored: (1) Mr. Thomas's alibi, (2) eyewitness accounts, (3) paint traces on Mr. Martinez's car, (4) fingerprints on Mr. Martinez's car, (5) another group of suspects arrested shortly after the murder, and (6) the potential motive of the victim's own daughter.

#### A.  *Shaurn Thomas's Alibi*

At the time that Mr. Martinez was murdered, Shaurn Thomas was being interviewed by a juvenile probation officer.

Mr. Martinez was murdered at roughly 9:45 a.m. on November 13, 1990.  The night before, 16-year-old Shaurn Thomas had been arrested for attempted theft of a bicycle in Center City.  He spent the night in a juvenile holding cell.  The next morning, his mother picked him up and took him to the Philadelphia Youth Study Center, where he was interviewed by a juvenile probation officer.  He was not released from the Youth Study Center until the afternoon of November 13 — hours after the Martinez murder.

Detectives Worrell and Devlin knew that Shaurn Thomas was arrested the day before the murder and would have been at the Youth Study Center at the time of the murder.  According to the complaint here, they failed to investigate this alibi because it did not fit with the story to be told at trial.

### B. Eyewitnesses

All four eyewitnesses controvert the story given by the detectives to the prosecutor. All witnesses saw either a Chevrolet Nova or a Buick Skylark. None saw a blue Mercury, the car driven by Shaurn Thomas early in 1990. And none saw a blue Chevrolet, the car the detectives told the prosecutor was used in the murder.

The eyewitness accounts did not fit with the detectives' story in four ways: number of attackers, number of cars, car color, and car type.

| Witness | Witness's Position | Number of Assailants | Number of Cars | Car Color | Car Type |
|---------|--------------------|-----------------------|----------------|-----------|----------|
| **Allen King** | Two cars behind the attackers | Three | One | Red and white car | Either a Chevy Nova or Buick Skylark |
| **Roy Howard** | Two cars behind the attackers (Allen King's passenger) | Three | One | Red and white car | |
| **Carmen Garcia** | Pedestrian several hundred feet from scene | Three | One | Gray | Chevy Nova |
| **Ronald Smith** | Directly behind attackers' car | Three | Only one car: only one car was between witness's car and Martinez's car. | | |
| *Story at Trial* | -- | *Six* | *Two* | *One blue, one gray* | *Blue Chevrolet Caprice or blue Mercury* |

### C. Paint Traces

The day of the murder, another officer processed Mr. Martinez's car for evidence. Mr. Martinez's car had been side-swiped by the attackers' car, so the officer expected to find paint residue on Mr. Martinez's car. The officer found white paint on the car's fender and wheel well. He found no blue paint.

### D.  Fingerprints

The same officer who processed the victim's car for traces of paint also searched for fingerprints.  Given the report that one of the attackers dragged Mr. Martinez from the car after shooting him, the officer expected to find fingerprints on the driver's side door.  None of the prints he found matched any of the Stallworth or Thomas brothers' prints.

### E.  Other Suspects Stopped in Similar Car

Three days after murder, police officers stopped a gray Chevrolet Nova (that is, a car that fit some eyewitness descriptions) only six blocks from the murder.  The car was carrying three men, and a gun was found in the car.

Detectives Worrell and Devlin interrogated the three men, all of whom admitted that they had known Mr. Martinez.

One of the three passengers blamed the murder on another passenger's cousin.  He stated that the cousin, who often used the car, was in a bar the day after the murder, flush with cash, bragging that he had "robbed this old Puerto Rican guy" after the victim had made a cash withdrawal at a bank.  The cousin described the robbery in the same manner that the Martinez robbery-murder happened: side-swiping the victim's car, jumping out of the assailing car, and robbing the victim.

Detectives Devlin and Worrell did nothing with this information.  They did not share it with the prosecutor or with Shaurn Thomas's defense team.

### F.  Possible Motive of Victim's Daughter

Mr. Martinez's adult daughter, Sara Negron, managed the payday-lending business. Shortly before the murder, the two had had a falling out in which Mr. Martinez threatened to disinherit Ms. Negron.

At the time of the murder, Ms. Negron was married but was having an affair with another man, someone who allegedly ran an illegal gambling business. A short time before the murder, Ms. Negron and Mr. Martinez had a fight over the affair; Mr. Martinez said that if Ms. Negron divorced her husband for her gambler boyfriend, then he would sell his business in order to disinherit her.

Starting some 12 days before the murder, Ms. Negron had embezzled money from her father's business. On the day of the murder, Ms. Negron knew that her father would be securing cash at the bank. After the murder, Ms. Negron did indeed 1) inherit the business, 2) divorce her husband, and 3) sell the business to her boyfriend for $1.00.

Based on tips that the murder was an "inside job," Detective Devlin interviewed Ms. Negron and learned all of this information. Nonetheless, the police continued to build a case against Shaurn Thomas.

## IV. Police Department Custom of Abuse

To bolster his *Monell* claim against the City, Mr. Thomas's complaint recounts nine similar incidents of police misconduct in Philadelphia from 1988 to 1994. Compl. ¶¶ 188–207. Mr. Thomas alleges that the City's failure to train and discipline detectives contributed to coercive interrogations, fabricated evidence, and *Brady* violations. Of the nine individual cases, seven involved coerced confessions (Anthony Wright, Carlos Hernandez/Ed Williams, Jackie Combs, Willie Veasy, Percy St. George, Donald Ray Adams, and Walter Ogrod); four involved fabricated evidence (Wright, St. George, Jimmy Dennis, and Andrew Swainson); and one involved a *Brady* violation (Dennis).

In addition to the nine individual cases, Mr. Thomas references a Pulitzer Prize–winning investigation by the *Philadelphia Inquirer* in 1977 and 1978 and several consent decrees involving the City.

### V.   Recent History: Shaurn Thomas's Exoneration

In 2011, William Stallworth — the only witness to affirmatively place Mr. Thomas at the murder — recanted his confession.  He explained that he had been intimidated by the detectives who threatened him and his brother with the death penalty.

Also in 2011, the Innocence Project discovered the forensics report on the blue Chevy Caprice.  This report, which refuted the detectives' theory that the Caprice had been the car used in connection with the murder, was never disclosed to Mr. Thomas's defense team.

In 2017, William Stallworth met with prosecutors from the District Attorney's Office and reiterated that he had made up his confession to avoid the death penalty.  The prosecutors investigated Mr. Thomas's conviction and concluded that Mr. Thomas was at the Youth Study Center at the time of the murder.  In addition, the District Attorney's Office learned — for the first time — about the three men in the Chevy Nova whom Detectives Worrell and Devlin stopped just days after the murder.

Mr. Thomas's conviction was vacated in May of 2017, and the District Attorney's Office announced that it would not retry him.

**PROCEDURAL HISTORY**

Mr. Thomas sued the City, Detectives Devlin and Worrell, and Officer Gist.  His complaint, which includes a demand for punitive damages, contains six counts:

1. Malicious prosecution under § 1983 in violation of Fourth and Fourteenth Amendments.  The parties have briefed this count as **two** separate claims:
   a. Malicious prosecution in violation of the *Fourth* Amendment; and
   b. Malicious prosecution in violation of the *Fourteenth* Amendment;

2. Fabricating evidence and withholding exculpatory evidence under § 1983. This count actually encompasses **three** separate claims, as briefed by the parties:
   a. Fabricating evidence;
   b. *Brady* violations; and
   c. Failure to conduct a constitutionally adequate investigation;

3. Civil rights conspiracy under § 1983;

4. Failure to intervene under § 1983;

5. A *Monell* claim against the City; and

6. Malicious prosecution under Pennsylvania law.

There are two pending motions to dismiss: one from Officer Gist and one from Detectives Worrell and Devlin and the City. The Court heard oral argument on the motions.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and

view those facts and inferences in the light most favorable to the nonmoving party. *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or even discount reality. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## ANALYSIS

The Court addresses each claim individually. For the reasons set forth in this Memorandum, the Court rules as follows:

(1) **Fourth Amendment Malicious Prosecution**: The Court denies Officer Gist's motion to dismiss the Fourth Amendment malicious prosecution claim.

(2) **Fourteenth Amendment Malicious Prosecution**: The Court acknowledges the individual defendants' qualified immunity as to the Fourteenth Amendment malicious prosecution claim and grants the motion based on their immunity.

(3) **Fabrication of Evidence**: The Court denies Officer Gist's motion to dismiss the fabrication-of-evidence claim.

(4) ***Brady***: The Court grants the individual defendants' qualified immunity–based motion as to the *Brady* claim.

(5) **Failure to Investigate**: The Court grants the individual defendants' motion to dismiss the failure-to-investigate claim.

(6) **Civil Rights Conspiracy**: The Court denies Officer Gist's motion to dismiss the claim for civil rights conspiracy.

(7) ***Monell***: The Court grants the City's motion to dismiss part of the *Monell* claim.

(8) **Punitive Damages**: The Court denies Officer Gist's motion to dismiss the claim for punitive damages.

## I. Fourth Amendment Malicious Prosecution

Officer Gist argues that the claim for Fourth Amendment malicious prosecution must be dismissed. The City and Detectives Devlin and Worrell have not moved to dismiss this claim.

A malicious prosecution claim under the Fourth Amendment requires a plaintiff to establish that:

> (1) the defendant initiated a criminal proceeding;
>
> (2) the criminal proceeding ended in the plaintiff's favor;
>
> (3) the defendant initiated the proceeding without probable cause;
>
> (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and
>
> (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014) (quoting *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)). A malicious prosecution claim under Pennsylvania law requires a plaintiff to show all but the fifth element (deprivation of liberty). *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000).

Police officers (as opposed to prosecutors) may be liable for malicious prosecution if they "conceal or misrepresent material facts" to the prosecutor. *Halsey*, 750 F.3d at 297 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004)). In particular, an officer is liable if he "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the

prosecutor's ability to exercise independent judgment in deciding whether to prosecute." *Finnemen v. SEPTA*, 267 F. Supp. 3d 628 (E.D. Pa. 2017) (cleaned up[1]).

Officer Gist contributed to the faulty and fallacious investigation in three ways: he relayed the rumor about the Stallworth and Thomas brothers to the detectives, told the detectives that Shaurn Thomas drove a blue car, and took Polaroid photos of a stripped blue Chevrolet in the Abbotsford courtyard.

Officer Gist's liability for malicious prosecution hinges on the Polaroid photos he provided to the detectives. He poses three reasons why he cannot be liable for malicious prosecution. None has merit.

**First**, he argues that he provided the photos to the *detectives*, not directly to the *prosecutor*, and therefore he is absolved of liability. This is a distinction without a difference. Certainly, in most malicious prosecution cases against police officers, the officers provide misleading information to the prosecutor directly. The Court realizes that Officer Gist was plainly not driving this investigation alone or in a leadership role. But the question is simply whether he "influenced or participated in the decision to institute criminal proceedings." *Halsey*, 750 F.3d at 297 (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)). At a minimum, Officer Gist's Polaroids allegedly "influenced" the decision to bring charges.

**Second**, Officer Gist argues that the prosecutors decided to bring charges without seeing the Polaroid photos. This statement, while chronologically correct, ignores the two ways in which the photos were used. First, John Stallworth identified the blue Chevrolet in the photos while making his false confession. *See* Compl. ¶ 162. Second, during trial, new forensic

---

[1]     "'Cleaned up' is a new parenthetical used to eliminate unnecessary explanation of non-substantive prior alterations." *United States v. Steward*, -- F.3d --, No. 16-3886, 2018 WL 541771, at *2 n.3 (8th Cir. Jan. 25, 2018); *see also, e.g.*, *United States v. Reyes*, 866 F.3d 316 (5th Cir. 2017).

evidence caused the prosecutor to question the evidence against Mr. Thomas, and only then did the detectives produce the Polaroid photos. In other words, the complaint supports an inference that the photos were used to shore up a weakening case and, thus, dissuade a wavering prosecutor from dropping the charges, hence, moving ahead with the prosecution. Because a prosecution continues until a conviction is final, Officer Gist's photos allegedly "influenced" the decision to prosecute, that is, to maintain the prosecution.

**Third**, Officer Gist argues that he did not know how the photos would be used. All he did was take some photos of a blue Chevrolet in the Abbotsford courtyard. He contends that he could not have known that the photos would be used to build a sham case against an innocent man.

This argument is better suited for a later phase of the litigation. At this stage, however, the complaint supports an inference that Officer Gist was in on the detectives' scheme to frame Mr. Thomas. After all, why else would Officer Gist take photos of a car that did not fit any witness descriptions, and bother to pass those photos on to the detectives? Such suspicious conduct supports an inference that Officer Gist knew he was acting, or perhaps intending or hoping, to incriminate Mr. Thomas.

## II. Fourteenth Amendment Malicious Prosecution

The individual defendants argue that any claim for malicious prosecution may proceed only under the Fourth Amendment, not under the Fourteenth Amendment. As an initial matter, there is no *substantive* due process right to be free from malicious prosecution. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("[I]t is the Fourth Amendment, and not substantive due process, under which [a malicious prosecution] claim must be judged."). The parties dispute whether the *procedural* due process clause protects against malicious prosecution.

This is a close question which the Court need not resolve at this time. Instead, the Court concludes that any procedural due process right is not (and was not at the relevant time) clearly established, meaning that the officers are entitled to qualified immunity in this case.

### A. *Does the procedural due process clause protect against malicious prosecution?*

The parties' briefing on this question has focused on three areas: (1) case law in the Third Circuit, (2) this Court's opinion last year in *Wright v. City of Philadelphia*, and (3) theoretical underpinnings for a due process right against malicious prosecution.

**First**, case law in this Circuit may be described as inconsistent. As our Court of Appeals acknowledged in 2014:

> [W]hile [the plaintiff] pled both Fourth and Fourteenth Amendment malicious prosecution counts, at some point in the proceeding . . . he abandoned the Fourteenth Amendment iteration of the malicious prosecution claim, **thus obviating the need for us to decide its viability**. *Compare Torres v. McLaughlin*, 163 F.3d 169, 173 (3d Cir. 1998) (reaffirming that § 1983 malicious prosecution claims cannot be based on substantive due process but **declining to decide whether they could be grounded in procedural due process**), *with Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (suggesting that Supreme Court case law leaves only the Fourth Amendment as potential source of malicious prosecution claims).

*Halsey*, 750 F.3d at 290 n.14 (emphasis added). In other words, the Third Circuit Court of Appeals has not actually decided whether such a procedural due process right exists.

**Second**, *Wright v. City of Philadelphia* concluded that a plaintiff's Fourteenth Amendment claims were "most analogous to malicious prosecution" because they "involved the trial process itself." 229 F. Supp. 3d 322, 331 (E.D. Pa. 2017). At first glance, this seems to endorse the existence of a malicious prosecution claim based on the Fourteenth Amendment. But the Court's *Wright* decision actually was limited to a decision of whether the claims were

closer to false imprisonment or to malicious prosecution *for the purpose of determining the statute of limitations*:

> Pursuant to the paradigm set up in *Wallace* [*v. Kato*, 549 U.S. 384 (2007)], a § 1983 plaintiff's claims based on wrongful detention are either analogous to the tort of false imprisonment (if the claims are premised on wrongful detention without legal process) or the tort of malicious prosecution (if the claims are premised on wrongful detention pursuant to the wrongful use of legal process). . . . Here, the claims . . . are most analogous to the tort of malicious prosecution, which requires a plaintiff to demonstrate the initiation and maintenance of a criminal prosecution without probable cause. . . . Accordingly, the claims asserted . . . did not accrue until Mr. Wright's criminal proceeding terminated in his favor upon his August 2016 acquittal. The entirety of Mr. Wright's Complaint, filed on September 20, 2016, was timely.

*Id*. at 331–32. Thus, the actual discussion and ruling in *Wright* does not resolve the question whether the procedural due process clause supports a claim for malicious prosecution.

**Third**, Mr. Thomas's briefing has explained why a procedural due process right against malicious prosecution makes theoretical sense. The fundamental distinction between the Fourth and Fourteenth Amendments is temporal: The Fourth Amendment's "protection against unlawful seizures extends only until trial." *Halsey*, 750 F.3d at 291. Once trial starts, however, the Fourteenth Amendment kicks in: "The guarantee of due process of law . . . protects defendants during an entire criminal proceeding *through and after trial*." *Id.* (emphasis added); *see also Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.").

This temporal distinction suggests that a procedural due process right against malicious prosecution may exist. However, this was, and indeed remains, an unsettled question, meaning that Mr. Thomas fails to overcome the defense of qualified immunity, discussed next.

### B. Qualified Immunity

In order to hold a government official liable under § 1983, the right claimed by the plaintiff must have been clearly established at the time of the alleged violation. *See, e.g.*, *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The procedural due process right against malicious prosecution is not clearly established. The Supreme Court has not yet articulated such a right. And the Third Circuit Court of Appeals stopped short of deciding the right's "viability" in 2014, let alone in the early 1990s when Mr. Thomas interacted with the defendants. *See Halsey*, 750 F.3d at 290 n.14; *see also Mondragon*, 519 F.3d at 1083 ("After the institution of legal process, any remaining constitutional claim is analogous to a malicious prosecution claim. The Supreme Court has not yet explicitly decided whether such a claim exists in these circumstances under the Fourth Amendment or the procedural component of the Due Process Clause.").

In response, Mr. Thomas shifts his focus from the *right* to the officers' *conduct*. As he puts it, the "exact constitutional provision" that has been violated is "irrelevant," so long as some constitutional provision is clearly violated. The officers' conduct as alleged in this case was clearly unconstitutional: it violated Mr. Thomas's clearly established *Fourth* Amendment right against malicious prosecution. But the conduct was not clearly unconstitutional under the *Fourteenth* Amendment. Thus, the question becomes: what is a Court to do when certain conduct is clearly unconstitutional, but due to a different constitutional source? Is there still qualified immunity as to the unsettled constitutional source — in this case, the Fourteenth Amendment?

The parties each endeavor to marshal case law to support their positions.

On the one hand, courts have addressed qualified immunity as providing "fair and clear warning" to officers "that their *conduct* is unlawful." *Halsey*, 750 F.3d at 295 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (en banc)) (emphasis added); *see also United States v. Lanier*, 520 U.S. 259, 270 (1997) (explaining that "the qualified immunity test is simply the adaptation of the fair warning standard" from the criminal context). As Mr. Thomas put the issue: "The dispositive question here is whether Defendants Devlin and Worrell were on notice that their conduct violated Mr. Thomas' constitutional rights. The answer is yes."

On the other hand, "[t]he contours of the *right*," as opposed to the *conduct*, "must be sufficiently clear that a reasonable official would understand that what he is doing violates *that right*." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added).

The Court holds that this latter "right-centric" position is the correct one. It would be strange to say that right *X* is clearly established just because right *Y* is clearly established and happens to prohibit the same conduct. Indeed, precisely *because* right *Y* is clearly established (in this case, precisely *because* a Fourth Amendment right against malicious prosecution is clearly established), Mr. Thomas has a clear avenue to recovery for being the target of a malicious prosecution.

Therefore, the Court holds that the individual defendants have qualified immunity from a claim for malicious prosecution in violation of the procedural due process clause.

### III.    Fabrication of Evidence

Only Officer Gist has moved to dismiss Mr. Thomas's fabrication-of-evidence claim. Where a government official fabricates evidence to secure a conviction, a criminal defendant "has a stand-alone claim" for fabrication of evidence "if there is a reasonable likelihood that, without the use of [fabricated] evidence, the defendant would not have been convicted." *Halsey*,

750 F.3d at 294. After all, "no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence." *Id.* at 292–93.

Mr. Thomas claims that Officer Gist fabricated evidence by taking photos of the blue Chevy in Abbotsford, and those photos were eventually used to frame Mr. Thomas at trial. Officer Gist advances two arguments why this claim should nevertheless be dismissed. Neither has merit.

**First**, Officer Gist argues that Mr. Thomas was charged before the prosecutors saw his Polaroids. *See* Compl. ¶ 162 ("Defendants Devlin and Worrell did not disclose to prosecutor Randolph Williams that they had two Polaroid photographs of a blue Chevrolet that John Stallworth had allegedly identified as the car used in the Martinez murder while making version 2 of his false confession.").

As an initial matter, Officer Gist relies on the wrong rule. He cites *Black v. Lower Merion Twp.*, 835 F.3d 358 (3d Cir. 2016), for the proposition that "an acquitted criminal defendant may have a stand-alone fabricated evidence claim . . . if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." *Id.* at 371. But *Black*'s would-not-have-been-charged rule applies when an *acquitted* defendant brings a case. Here, by contrast, Mr. Thomas was *convicted*, so the operative rule comes from *Halsey*: "if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under § 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." *Halsey*, 750 F.3d at 294.

In any event, as in his challenge to the claim for malicious prosecution, Officer Gist ignores the two ways in which the photos were used. John Stallworth identified the car in the

photos while making his false confession.  *See* Compl. ¶ 162.  And during trial, new forensic evidence caused the prosecutor to question the evidence against Mr. Thomas.  Only then did the detectives produce the Polaroid photos.  In other words, the complaint supports an inference that the photos were used to shore up a weakening case and dissuade a wavering prosecutor from dropping the charges.

**Second**, Officer Gist argues that he did not provide the Polaroids to Detectives Worrell and Devlin in bad faith.  For incorrect evidence to be considered fabricated, "[t]here must be 'persuasive evidence supporting a conclusion that the proponents of the evidence' are aware that evidence is incorrect or that the evidence is offered in bad faith."  *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295).

As in his challenge to the claim for malicious prosecution, Officer Gist argues that he did not know that the photos would be used to build a sham case against an innocent man.  As with malicious prosecution, the Court concludes that, at this early stage, the complaint supports an inference that Officer Gist was part of the detectives' scheme to frame Mr. Thomas.

## IV.    Withholding Evidence (*Brady*)

All individual defendants challenge the *Brady* claim against them.  *Brady* suppression occurs when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor."  *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).  Officers must "affirmatively conceal material evidence from the prosecutor" to be liable under *Brady*.  *See Gibson v. Superintendent*, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181, 183 (3d Cir. 2010).

Officer Gist argues that he had no exculpatory information.  The Court agrees.

As to Detectives Worrell and Devlin, the best example of undisclosed *Brady* material is the report of the men stopped in the Chevy Nova just three days after the murder. The detectives argue that the complaint does not allege that they *affirmatively concealed* this report from prosecutors. They point out that a report of the Chevy Nova stop was in the Martinez homicide file all along.

In any event, the real battle on the *Brady* count is qualified immunity: did police officers (as opposed to prosecutors) have clearly established *Brady* duties in 1993? In *Gibson v. Superintendent of New Jersey Department of Law & Public Safety*, the Third Circuit Court of Appeals held that officers' *Brady* obligations were "not clearly established at the time of [the plaintiff's] prosecution in 1994." 411 F.3d 427, 443 (3d Cir. 2005). Those obligations became clearly established in 1995, when the Supreme Court decided *Kyles v. Whitley*, 514 U.S. 419 (1995). *See Gibson*, 411 F.3d at 443–44.

At oral argument, counsel for Mr. Thomas acknowledged that *Gibson* controls here. Nevertheless, Mr. Thomas's briefing offered three reasons why the Court should not follow *Gibson*'s statement that police officers' *Brady* obligations were "not clearly established . . . in 1994." None is persuasive.

**First**, Mr. Thomas argues that the 2014 Third Circuit opinion in *Halsey* rewrote the *Gibson* history. In *Halsey*, the alleged constitutional violation — fabrication of evidence — occurred in 1985. *See* 750 F.3d at 296. The court expressly noted that, by 1985, "more than two decades had passed" since *Brady* "required that the prosecution reveal exculpatory evidence to a criminal defendant." *Id.* Therefore, the court found that "[r]*easonable officers should have known that if they could not withhold exculpatory evidence from a defendant, they certainly could not fabricate inculpatory evidence against a suspect.*" *Id.* (emphasis added). In other

words, because prosecutors' *Brady* obligations were so deeply ingrained by 1985, officers should have known that fabricating evidence by officers was likewise unconstitutional.

The first clause of the italicized sentence — that officers in 1985 should have known of their *Brady* obligations — is admittedly completely at odds with the holding of *Gibson* — that reasonable officers in 1994 did not know of their *Brady* obligations. As between the holding of *Gibson* and a sentence fragment in *Halsey*, the controlling nature of *Gibson* is more persuasive. The Court is unpersuaded that the *Halsey* court meant to overrule *Gibson*'s holding as to *Brady* on its way to a conclusion as to fabrication of evidence (the issue in *Halsey*).

**Second**, Mr. Thomas argues that the weight of authority in the other circuit courts demonstrates that officers' *Brady* obligations were established before 1994. The consensus in the other circuits is indeed substantial.[2] But the persuasive "weight of that authority," *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam), must be considered diminished because the *Gibson* court was aware of — indeed, cited — these very opinions in reaching its own, contrary, conclusion:

---

[2]    *See Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("[T]he police satisfy their obligations under Brady when they turn exculpatory evidence over to the prosecutors."); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) ("[A] police officer cannot avail himself of a qualified immunity defense if he . . . deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles."); *Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009) (holding that it was clearly established in 1990 that *Brady* applied to police officers because "the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights"); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("[W]as it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup? . . . The answer is yes."); *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1087 (9th Cir. 2009) (holding that *Brady* applied to police officers at least as early as 1990); *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("No one could doubt that the prohibition on . . . omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986 . . . ."); *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996) ("[C]learly established law in 1987 and 1988 prohibited the police from concealing exculpatory or impeachment evidence.").

> [The plaintiff] also alleges that the [defendant officers] failed to inform the prosecutor of the exculpatory information. Several circuits have recognized that police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor. *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996); *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988). We agree. . . . However, we also realize that this duty on the part of the Troopers was not clearly established at the time of [the] prosecution in 1994.

*Gibson*, 411 F.3d at 443. In sum, the *Gibson* court was aware of other circuits' conclusions to the contrary. It nevertheless held that officers' *Brady* obligations were not clearly established in 1994. It is not this Court's role to second-guess that decision here.

**Third**, Mr. Thomas argues that the Court should disregard *Gibson* for incorrectly interpreting the Supreme Court's decision in *Kyles*. Again, that is not this Court's place to decide. The *Gibson* court's treatment of *Kyles* is reproduced below, and the Court can find nothing incorrect about it or other basis to disregard it:

> Although this Court held in *United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir. 1991), that evidence in the hands of the police could be imputed to the prosecutor, the Supreme Court did not settle this matter until 1995 when it decided *Kyles v. Whitley*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). More importantly, the related duty of the police to disclose information to the prosecutor was not widely addressed until later. Even in 2000, this Court was only able to *assume* that police officers "have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." *Smith v. Holtz,* 210 F.3d 186, 197 n.14 (3d Cir. 2000). Because such a right was not clearly established in this Circuit at the time of [the plaintiff's] conviction, [the officers] are entitled to qualified immunity with regard to their failure to inform the prosecutor of *Brady* material.

*Gibson*, 411 F.3d at 443–44.  If anything, the passage demonstrates that *Gibson* extended the holding of *Kyles* — from knowledge of evidence imputed to the *prosecutor*, to a "related" obligation on the part of the *officer*.

## V.    Failure to Investigate

The individual defendants argue that there is no independent constitutional cause of action for "failure to investigate."  The Court agrees.

There is "no constitutional right to a police investigation."  *E.g.*, *Whitehead v. City of Phila.*, No. 13-2167, 2014 WL 657486, at *2 (E.D. Pa. Feb. 19, 2014).  As this Court put the matter in *Wright*, "[i]t certainly remains to be seen whether there is an independent cause of action under the Fourteenth Amendment . . . for 'failing to conduct a constitutionally adequate investigation,' and the *Court will not affirmatively recognize one here at this time*."  229 F. Supp. 3d at 332 n.3 (emphasis added).  At oral argument, counsel for Mr. Thomas acknowledged that the Third Circuit Court of Appeals has not recognized such a cause of action.

Even if such a constitutional cause of action exists,[3] it is not — and certainly was not in the mid-1990s — clearly established, meaning that the defendants are (or would be) shielded by qualified immunity anyway.  *See, e.g.*, *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011); *Mammaro v. N.J. Div. of Child Protection*, 814 F.3d 164, 169 (3d Cir. 2016).

And, here, even without a stand-alone claim for "failure to investigate," the detectives' wrongful conduct is still captured in other claims.  For instance, the leads that the detectives failed to investigate pertain to the malicious prosecution claim — the detectives arguably knew

---

[3]    As intriguing as it may be to contemplate whether such a constitutional right exists, any such contemplation leads inexorably to bedeviling questions such as: how much "investigation" is enough, and what techniques would be required in order to pass constitutional muster?  As the discussion in this Memorandum should make clear, the alleged problem in this case was not the *absence* of an investigation at all but rather a faulty, fallacious, and corrupt one.  Hence, it is not essential to resolution of these motions to determine whether a right to an investigation exists.

enough to realize they did not have probable cause, but they prosecuted Mr. Thomas anyway. The investigation-related issues are indeed addressed in other causes of action in this case.

## VI.    Civil Rights Conspiracy

Officer Gist challenges the count for civil rights conspiracy. The claim requires:

(1) The existence of a conspiracy;

(2) An agreement or meeting of the minds to violate constitutional or civil rights; and

(3) A deprivation of those rights in furtherance of the conspiracy.

*E.g.*, *Rosembert v. Borough of E. Lansdowne*, 14 F. Supp. 3d 631, 647 (E.D. Pa. 2014).

The parties did not make much of this issue in the briefing. As explained above, the Court finds that Mr. Thomas has alleged enough to show that Officer Gist contributed to the false story about the murder, which was then used to arrest and convict Mr. Thomas, and, hence, was part of a civil rights conspiracy.

## VII.    *Monell*

The City concedes that Mr. Thomas "does plead sufficient facts in his complaint to bring a Fourth Amendment malicious prosecution claim and Fourteenth Amendment fabrication of evidence claim against the City." Instead, the City challenges Mr. Thomas' claims for Fourteenth Amendment malicious prosecution, *Brady* violations, and failure to investigate.

To hold a municipality liable under § 1983, a plaintiff must "identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004).

First, the Court notes that Mr. Thomas has only alleged one other instance of a *Brady* violation: the Jimmy Dennis prosecution. *See* Compl. ¶ 199. This is not sufficient to allege a municipal custom or policy of *Brady* violations. *Cf. Wright v. City of Phila.*, 229 F. Supp. 3d

322, 337 (E.D. Pa. 2017) (declining to dismiss a *Monell* claim when the plaintiff alleged "at least eight separate instances" in which officers "engaged in the type of misconduct that is alleged to have occurred here").

Second, as to Fourteenth Amendment malicious prosecution, *Brady* violations, and failure to investigate, the City argues that Mr. Thomas cannot show that the City was deliberately indifferent to its officers' misconduct. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Board of Comm'rs of Bryan Cty. v. Brown* 520 U.S. 397, 410 (1997). Though no court within the Third Circuit has weighed in, several courts have held that a municipality cannot be deliberately indifferent to a right that is not clearly established. *See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) ("[A] municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established."); *see also Townes v. City of New York,* 176 F.3d 138, 143–44 (2d Cir. 1999); *Williamson v. City of Virginia Beach,* 786 F. Supp. 1238, 1264-65 (E.D. Va. 1992); *Zwalesky v. Manistee County,* 749 F. Supp. 815, 820 (W.D. Mich. 1990). Because the rights at issue in the claims for Fourteenth Amendment malicious prosecution, *Brady* violations, and failure to investigate were not clearly established in 1994, the Court dismisses the *Monell* count as to these claims.

The Court notes the narrowness of this conclusion: because the City concedes that Mr. Thomas has articulated a *Monell* claim for Fourth Amendment malicious prosecution and for Fourteenth Amendment fabrication of evidence, the *Monell* count itself survives.

**VIII.  Punitive Damages**

Officer Gist argues that Mr. Thomas may not recover punitive damages in this § 1983 case.  Not so.  Punitive damages are available against an individual § 1983 defendant "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see also Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989).  The Court therefore denies this portion of Officer Gist's motion.  The appropriateness of assessing punitive damages remains to be seen.

CONCLUSION

For the foregoing reasons, Officer Gist's motion to dismiss is granted in part and denied in part and the motion of Detectives Devlin and Worrell and the City of Philadelphia is granted.  An appropriate order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE