**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAURN THOMAS, | : | |
| Plaintiff, | : | |
| | : | **Civil Action** |
| v. | : | **No. 17-4196** |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| Defendants. | : | |

## ORDER

AND NOW, this _____ day of _____, 2019, upon consideration of

the Defendants' Motion for Summary Judgment, it is **HEREBY ORDERED** that the Motion is

**GRANTED** and that this case is **DISMISSED WITH PREJUDICE**.


BY THE COURT:


_____

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAURN THOMAS, | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **Civil Action** |
| v. | : | **No. 17-4196** |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| **Defendants.** | : | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants City of Philadelphia, Detective Devlin, and Detective Worrell hereby file this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  In support of this Motion, the Defendants incorporate the attached Memorandum of Law.  The Defendants respectfully request that this Court dismiss the claims asserted against them with prejudice.

Date:  April 4, 2019

Respectfully submitted,

/s/ Michael R. Miller
Michael R. Miller
Deputy City Solicitor
Pa. Attorney ID No. 315759
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
215-683-5433 (phone)
215-683-5397 (fax)
michael.r.miller@phila.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHAURN THOMAS,** | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 17-4196** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants.** | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.   BACKGROUND ................................................................................................... 5

   A.   Factual Background ..................................................................................... 5

   B.   Plaintiff's Supposed "Alibi" ...................................................................... 10

   C.   Procedural History ...................................................................................... 11

II.  ARGUMENT ...................................................................................................... 12

   A.   The Court Should Dismiss this Suit Because Plaintiff Did Not Receive a Favorable Termination................................................................................................... 12

   B.   The Court Should Dismiss this Suit Because No Reasonable Jury Could Find that the Detectives Lacked Probable Cause to Arrest Plaintiff or Fabricated Evidence. ....................... 15

   C.   The Court Should Dismiss the Claims Against the City of Philadelphia. ........................ 19

III. CONCLUSION ................................................................................................... 23

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHAURN THOMAS, | : | |
| Plaintiff, | : | |
| | : | **Civil Action** |
| v. | : | **No. 17-4196** |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| Defendants. | : | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Twenty-five years ago, Detectives Martin Devlin and Paul Worrell lawfully arrested Plaintiff for murdering Domingo Martinez.  Plaintiff has now brought malicious prosecution and fabrication of evidence claims against these detectives and the City of Philadelphia, but these claims fail because: (i) Plaintiff did not receive a favorable termination to his criminal proceeding; (ii) Plaintiff has failed to identify evidence from which a reasonable jury could conclude that Detectives Devlin and Worrell violated his constitutional rights; and (iii) Plaintiff has failed to adduce the evidence required to bring a claim against the City to trial.  Therefore, the Court should dismiss this suit with prejudice.

## I.      BACKGROUND

### A.      Factual Background

On November 13, 1990, 78-year old Domingo Martinez was robbed, shot and killed at 9:58 a.m. in Philadelphia after he had withdrawn $25,000 from a local bank.  *See* Statement of Undisputed Material Facts ("SUMF") at ¶¶ 1-2.  Two years before the murder, Plaintiff first met John and William Stallworth, two brothers who (like Plaintiff) lived in the Abbottsford Housing

5

Projects. *See id.* at ¶ 4. Plaintiff and William Stallworth quickly became associates, and Plaintiff also became connected with the Stallworths' cousin, Nathaniel Stallworth, another resident of Abbottsford. *See id.* at ¶¶ 5-6.

From their base in Abbottsford, Plaintiff and his family formed a criminal syndicate that soon became connected to a series of gunshot robbery-murders against elderly business owners. While Plaintiff sold crack cocaine in Abbottsford, an arrest warrant was issued for his older brother, Mustafa Thomas, on May 30, 1991, after Mustafa robbed and murdered a 61-year old gas station owner named Harvey Bryant. *See id.* at ¶¶ 7-8. Like Mr. Martinez, Mr. Bryant was an elderly small business owner, and both men died after suffering a gunshot wound to the left chest. *See id.* at ¶¶ 2-3, 8, 8(a.). On May 8, 1992, police located and arrested Mustafa Thomas for the gunshot robbery-murder of Mr. Bryant, and in June 1993 Mustafa was convicted of the murder. *See id.* at ¶¶ 8(d.), 8(e.).

Meanwhile, Plaintiff and his father were being investigated for another gunshot robbery-murder of an elderly business owner. On January 18, 1993, Christopher Dinwiddie told Philadelphia Police Detective Jeff Piree that he observed Plaintiff "stand in the vestibule [of a speakeasy] with a long shotgun" while Plaintiff's father shot, robbed and murdered 67-year old Harry James, the owner of the speakeasy. *See id.* at ¶ 9. During this interview, Mr. Dinwiddie told Detective Piree that Plaintiff's nickname was "Killer," and that he talked to "Killer" a "couple of days" after the murder, who told him that "it was stupid for him and his dad to rob Harry and wrong for his dad to have shot Mr. Harry." *See id.* at ¶¶ 9(a-b.). Mr. Dinwiddie knew Plaintiff in January 1993 and would have been able to identify him. *See id.* at ¶ 9(c.).

On February 4, 1993, Mr. Dinwiddie again told Detective Piree that Plaintiff "stood inside by the front door with the shotgun" while Plaintiff's father shot, robbed, and murdered

Harry James.  *See id.* at ¶ 10.  One week later, an arrest warrant was issued for Plaintiff for assisting his father in the gunshot murder and robbery of Harry James.  *See id.* at ¶ 11.  On February 15, 1993, Plaintiff successfully fled from Philadelphia Police Officers James Gist and Valerie Watson.  *See id.* at ¶ 12.  On February 17, 1993, Plaintiff was arrested by Detectives Devlin and Worrell for the gunshot murder-robbery of Harry James.  *See id.* at ¶ 13.  A federal court subsequently determined that probable cause existed for this arrest, and Plaintiff's father was convicted of murder for his role in the killing of Mr. James.  *See id.* at ¶¶ 14-15.

As the foregoing investigations progressed, the Thomas family became connected to a third gunshot robbery-murder of an elderly business owner.  At the time he was robbed, shot, and murdered, Mr. Martinez was 78 years old and owned several check cashing businesses in Philadelphia.  *See id.* at ¶¶ 1, 3.  On February 8, 1992, Nathaniel Stallworth was interviewed by Philadelphia Police Detectives Dougherty and Mangoni and implicated Mustafa Thomas, Plaintiff, John and William Stallworth, and two other individuals in the Martinez murder.  *See id.* at ¶¶ 16, 16(a.).  Then, on October 27, 1992, John Stallworth told Detectives Worrell and Devlin that he, Plaintiff, William Stallworth, Mustafa Thomas, and two other individuals followed Mr. Martinez from a bank in two cars, and that – in the same method used in the Harry James murder – Plaintiff blocked Mr. Martinez's route of escape while an older family member, Mustafa Thomas, shot and robbed Mr. Martinez.  *Id.* at ¶ 17.  John Stallworth reaffirmed Plaintiff's participation in the murder on July 6, 1993, when Mr. Stallworth – *in the presence of his own attorney* – gave a second statement to Detectives Devlin and Worrell in the Philadelphia District Attorney's Office.  *Id.* at ¶ 18, ¶ 18 (a-b.).

After John Stallworth made his two statements, Detective Worrell completed an affidavit of probable cause and an arrest warrant was issued for Plaintiff.  *Id.* at ¶ 19.  John and William

Stallworth then pled guilty to helping murder Mr. Martinez and agreed to testify against Plaintiff as a co-conspirator in the murder. *See id.* at ¶ 20. William Stallworth also gave a statement at the District Attorney's Office, after talking to his attorney, in which he confirmed that Plaintiff participated in the murder by blocking Mr. Martinez's route of escape while Mustafa shot and killed Mr. Martinez. *See id.* at ¶ 21. Additionally, William Stallworth stated that he had not been coerced to give his statement. *See id.* at ¶ 21(a.).

At Plaintiff's trial, John Stallworth promised that he would not "falsely implicate any person" and that he would "testify truthfully and completely," acknowledged that he could "be prosecuted for perjury if he knowingly [made] any false material statement under oath," and testified that the police had not "threaten[ed] him in any way" and that he had given his statements "voluntarily without any coercion or pressure put on [him]." *Id.* at ¶ 22. He also testified that he had known Plaintiff for 5-6 years, that he met his brother William, Plaintiff, and Mustafa Thomas the evening before Mr. Martinez was murdered, and that they decided to rob someone the next day. *See id.* at ¶ 22(a.). He testified that he, Plaintiff, and four other criminals assembled together on the morning of the murder and then left in two cars, with William Stallworth, Plaintiff, and a man named "Nasir" in one of the two cars. *See id.* at ¶ 22(b.). The two cars drove to a bank, waited until Mr. Martinez "put the money in the trunk" of his vehicle, and then followed Mr. Martinez's vehicle. *See id.* at ¶ 22(c.). Eventually, Mr. Stallworth "felt a bump," at which point Mustafa Thomas said "showtime," Plaintiff's car drove around and came "to a stop in front of the victim's car," and Mustafa Thomas exited his vehicle and shot Mr. Martinez. *See id.* at ¶ 22(d.).

William Stallworth also testified at Plaintiff's trial. He promised that he would not "falsely implicate any person" and that he would "testify truthfully and completely," and

acknowledged that he could be "prosecuted for perjury if he knowingly [made] any false material statement." *See id.* at ¶ 23.  Mr. Stallworth stated that he had known Plaintiff for six years, that he met with his brother John, Plaintiff, and Mustafa Thomas the evening before Mr. Martinez was murdered and talked about how "we need money," and that they then met with two additional individuals the morning of the murder to "go out and play a bank and see who got the money, so we could rob them." *See id.* at ¶ 23(a.).  The gang of six criminals left in two cars, with William Stallworth, Plaintiff, and a man named "Nasir" in one of the two cars.  *See id.* at ¶ 23(b.).  The two cars drove to a bank and then followed Mr. Martinez until one of their cars "bumped" Mr. Martinez's car, at which point the car with Plaintiff and William Stallworth "pulled in front" of Mr. Martinez's car.  *See id.* at ¶ 23(c.).  Plaintiff then said, "Look, my brother got a gun," at which point Mustafa Thomas shot Mr. Martinez and the car carrying Plaintiff and William Stallworth drove away.  *See id.* at ¶ 23(d.).

On December 19, 1994, after hearing the testimony of the Stallworth brothers that Plaintiff's car blocked Mr. Martinez's route of escape while Plaintiff's brother shot and killed Mr. Martinez, a jury convicted Plaintiff of the murder.  *See id.* at ¶ 24.

On June 13, 2017, the Philadelphia District Attorney's Office ("DAO") moved to nolle prosequi the charges against Plaintiff.  *See id.* at ¶ 25.  Kathleen Martin, who was overseeing the entire DAO as of June 13, 2017, has stated that the transcript of the June 13 hearing "fully and accurately reflects the position of the [DAO] regarding why it moved to nolle prosequi the charges against [Plaintiff]."  *See id.* at ¶ 25(a.).  Importantly, the DAO did not nolle prosequi the charges based on Plaintiff's innocence, because it could not "determine Mr. Thomas's actual innocence."  *See id.* at ¶ 25(b.).  Nor did the DAO nolle prosequi the charges based on Plaintiff's supposed alibi, because it found that "the evidence does not establish an absolute alibi."  *See id.*

at ¶ 25(c).  Instead, the DAO moved to nolle prosequi the charges "based on the totality of the circumstances," including Plaintiff's "age at the time of the crime, the fact that he was not the shooter and . . . the time he [had] already spent in prison."  *See id.* at ¶ 25(d).

### B.  Plaintiff's Supposed "Alibi"

Brian Coen, who worked at the Youth Study Center in 1990, was called to the stand by Plaintiff's counsel at the 1994 trial, reviewed relevant paperwork, and testified that Plaintiff was likely interviewed at the Youth Study Center on the date of Mr. Martinez's murder, but that he could not determine whether the interview occurred "at 9:00 [a.m.] or 12:00 [p.m.] or whether [Plaintiff arrived] at 2:55 p.m."  *See id.* at ¶ 26.  In his closing argument, prosecutor Randolph Williams thus contended that Plaintiff "went out and robbed [Mr. Martinez] and then went in later to give his intake interview" at the Youth Study Center.  *See id.* at ¶ 27.  The jury agreed and convicted Plaintiff after hearing this argument.

Moreover, the evidence adduced during discovery shows that Plaintiff has no independent "alibi."  Plaintiff has testified that he was interviewed by Doris Williams at the Youth Study Center on the date of Mr. Martinez's murder.  *See id.* at ¶ 28.  For her part, Doris Williams does not recall interviewing Plaintiff, but has testified that if she "hadn't finished [her] interviews for the day by 1:00 p.m. and a juvenile came in at 1:00 p.m., [she would] still interview him," that "it was not uncommon for [her] to still be interviewing people as late as 1:00 p.m. in the day."  *See id.* at ¶ 29.  Likewise, Bruce Berger, Ms. Williams's supervisor in 1990, has stated that "in 1990, if a juvenile was told to come in to the Youth Study Center at 9:00 a.m., but instead arrived in the early afternoon, the juvenile would still be interviewed by a Youth Study Center employee."  *See id.* at ¶ 30.  And Joe Canuso, Plaintiff's attorney at the 1994 trial, has testified that, based on the records that existed at the time he represented Plaintiff, "there was no way to determine the time that Mr. Thomas was at the Youth Study Center on the

day of the murder…[A]s far as he got there at 9:00, he left at [noon] or whatever, the records could not give us those specifics." *See id.* at ¶ 31.

Faced with multiple witnesses who could not provide him an alibi, Plaintiff received permission from this Court to subpoena the juvenile files of eleven individuals who were interviewed at the Philadelphia Youth Study Center in November 1990. *See id.* at ¶ 32. None of the first three files that Plaintiff obtained set forth the time at which the juveniles were interviewed at the Youth Study Center. *See id.* at ¶ 33.[1] Plaintiff has no independent alibi, and while his guilt or innocence is not the issue raised in this motion, the evidence adduced during discovery clearly indicates that the jury reached the correct decision when it convicted him in 1994. Moreover, Plaintiff did not receive a favorable termination to his criminal proceeding in June 2017, and absent a favorable termination he cannot bring this suit.

### C.    Procedural History

On September 20, 2017, Plaintiff filed suit against Detectives Devlin and Worrell and the City of Philadelphia. *See* Docket No. 1. The Court subsequently granted the Defendants' partial motion to dismiss, leaving Plaintiff with three underlying claims: a Fourth Amendment malicious prosecution claim (Count 1), a state-law malicious prosecution claim (Count 6), and a Fourteenth Amendment fabrication of evidence claim (Count 2). *See* Docket Nos. 1, 26. As discussed below, all these claims fail because Plaintiff did not receive a favorable termination to his criminal proceeding, and because he has not identified evidence from which a reasonable jury could conclude that Detectives Devlin and Worrell violated his constitutional rights. Moreover, Plaintiff's claim against the City fails for an additional reason: he has failed to adduce evidence showing that the City's customs caused him to suffer a constitutional violation or that the City

---

[1] Plaintiff then ceased to seek the production of the remaining eight files.

had notice in 1994 that its customs were likely to cause malicious prosecutions or fabrications of evidence.

## II.    ARGUMENT

### A.    The Court Should Dismiss this Suit Because Plaintiff Did Not Receive a Favorable Termination.

Plaintiff cannot proceed to trial on any of his claims because he failed to receive a favorable termination to his criminal proceeding.[2]  An "'element that must be alleged and proved in a malicious prosecution action is the termination of the prior criminal proceeding in favor of the accused.'"  *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)); *Junod v. Bader*, 458 A.2d 251, 253 (Pa. Super. Ct. 1983) (holding that the tort of malicious prosecution requires a showing that "the underlying proceedings terminated favorably to the accused").  Likewise, Plaintiff must show he received a favorable termination to prevail on his fabrication of evidence claim, because he has brought suit under 42 U.S.C. § 1983, and section 1983 "creates a species of tort liability."  *Heck*, 512 U.S. at 483. Courts thus must "look first to the common law of torts" to discern the requisite elements of a section 1983 claim, including a fabrication of evidence claim.  *See id.*

As this Court has held, fabrication of evidence claims are "most analogous to the tort of malicious prosecution."  *Wright v. City of Phila.*, 229 F. Supp. 3d 322, 331 (E.D. Pa. 2017) (Pratter, J.).  Since fabrication of evidence and malicious prosecution are similar claims, and

---

[2] A court may grant summary judgment if the moving party shows that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).  A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in that party's favor.  *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

malicious prosecution requires the plaintiff to show a favorable termination, *Heck* teaches that the favorable termination requirement also applies to fabrication of evidence claims. In fact, the Third Circuit Court of Appeals has held that "fabrication of evidence claims do not accrue until the criminal proceedings have terminated in [plaintiff's] favor," because a favorable termination is a requisite element of a fabrication of evidence claim. *See Floyd v. Attorney Gen. of Pa.*, 722 F. App'x 112, 114 (3d Cir. 2018).

Since both of Plaintiff's claims require him to prove he received a favorable termination, he cannot proceed to trial on either of them. In *Donahue*, the plaintiff's conviction was overturned on appeal and the case was remanded to the trial court. *See Donahue*, 280 F.3d at 374-375. The Berks County District Attorney's Office then moved to "enter a nolle prosequi ('nol pros'), thereby terminating [the plaintiff's] prosecution." *Id.* at 375. The plaintiff subsequently sued, but the Third Circuit affirmed summary judgment for the defendants because the plaintiff could not establish that the nolle prosequi was a favorable termination. *Id.* at 372, 384. The Third Circuit first noted that "not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably," holding that a nolle prosequi only qualifies as a favorable termination if it "indicate[s] the innocence of the accused." *Id.* at 383. The court then analyzed whether the nolle prosequi in the case before it constituted a favorable termination by looking at the nolle prosequi motion of the Berks County District Attorney's Office. *See id.* at 384. In that motion, the Berks County DAO stated that its request to nolle prosequi the case was being made "in the interest of judicial economy" and because the plaintiff had already served more than two years in prison. *Id.* Given this stated reason for the nolle prosequi, the Third Circuit held that the plaintiff could not show a favorable termination and affirmed the

granting of summary judgment against him.  *Id.*[3]

The Third Circuit Court of Appeals also affirmed summary judgment on a malicious prosecution claim in *Morris v. Verniero*, 453 F. App'x 243 (3d Cir. 2011).  In that case, when the prosecutor dismissed the charges against the plaintiff, he explicitly noted that he had not concluded that the plaintiff was innocent.  *See id.* at 246.  The court thus held that the plaintiff could not establish that "the dismissal of his case constituted a favorable termination because it was not indicative of his innocence of the crimes charged."  *Id.*

This case is on all fours with *Donahue* and *Morris.*  In *Donahue*, summary judgment was granted because the prosecutor moved to nolle prosequi the charges "in the interest of judicial economy" and because the plaintiff had already served more than two years in prison.  *See Donahue*, 280 F.3d at 384.  Likewise, the transcript of the nolle prosequi hearing shows that the DAO dropped the charges against Plaintiff "based on the totality of the circumstances," including Plaintiff's "age at the time of the crime, the fact that he was not the shooter and . . . the time he [had] already spent in prison."  *See* SUMF at ¶ 25(d).  In fact, the DAO stated on the record – and Kathleen Martin, the head of the DAO at the time of the nolle prosequi, has subsequently reaffirmed – that it "could not determine Mr. Thomas's actual innocence."  *See id.* at ¶ 25(b).  *Donahue* instructs that such a nolle prosequi does not constitute a favorable termination.

Similarly, *Morris* affirmed summary judgment on a malicious prosecution claim because the prosecutor, in dismissing the plaintiff's charges, explicitly noted that he was not concluding that the plaintiff was innocent.  *See Morris*, 453 F. App'x at 246.  Here too, the DAO stated at the nolle prosequi hearing that it could not conclude that Plaintiff was innocent, and Ms. Martin

---

[3] The Third Circuit reached its decision by analyzing the Second Restatement of Torts and noted that Pennsylvania follows the Second Restatement with respect to malicious prosecution.  *Id.* at 383, 383 n.20.

has since reaffirmed that the DAO never reached such a conclusion.  *See* SUMF at ¶ 25(b).  In light of such undisputed facts, Plaintiff did not receive a favorable termination, and his case cannot proceed.[4]

> **B.      The Court Should Dismiss this Suit Because No Reasonable Jury Could Find that the Detectives Lacked Probable Cause to Arrest Plaintiff or Fabricated Evidence.**

Plaintiff's claims also fail because he cannot identify evidence from which a reasonable jury could conclude that Detectives Worrell and Devlin lacked probable cause to arrest him or fabricated evidence against him.  Plaintiff cannot proceed on his state or federal malicious prosecution claims if probable cause existed for his arrest.  See *Donahue*, 280 F.3d at 379; *Junod*, 458 A.2d at 253.  Moreover, the Supreme Court recently held that "[p]robable cause is not a high bar" for a civil defendant to meet.  *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation omitted).  Indeed, if a "reasonable officer <u>could</u> conclude" that there "was a substantial chance of criminal activity" by the plaintiff, then probable cause exists as a matter of law and the officer is "entitled to summary judgment."  *Id*. at 588-589 (internal quotation omitted) (emphasis added).

Based on the two statements made by John Stallworth prior to Plaintiff's arrest, a reasonable officer could conclude that there was a substantial chance that Plaintiff helped murder Mr. Martinez, particularly since Plaintiff was already under arrest for helping murder Harry James, a second elderly businessman, by blocking his escape route, while Mustafa Thomas was

---

[4] The conspiracy, failure to intervene, and municipal liability claims brought by Plaintiff in Counts 3-5 cannot proceed absent a valid underlying claim.  *See, e.g.*, *Manolovich v. Park*, 461 F. App'x 187, 191 (3d Cir. 2012) (holding that a § 1983 municipal liability claim requires the plaintiff to demonstrate an underlying constitutional violation); *Ashton v. City of Uniontown*, 459 F. App'x 185, 191 (3d Cir. 2012) (holding that a § 1983 conspiracy claim requires a valid underlying claim); *Adams v. Selhorst*, 449 F. App'x 198, 204 (3d Cir. 2011) ("Adams failed to demonstrate that her underlying constitutional rights were violated.  Therefore, she cannot maintain a claim for failure to intervene.").

already convicted of shooting, robbing, and murdering Harvey Bryant, a third elderly

businessman. *See United States v. Stearn*, 597 F.3d 540, 557 (3d Cir. 2010) (holding that a

suspect's prior arrests can help establish probable cause, especially if "the previous arrest . . .

involves a crime of the same general nature") (internal quotation omitted).[5]  Therefore, Plaintiff

can only survive summary judgment on his malicious prosecution claims by identifying evidence

from which a reasonable jury could conclude that Detectives Devlin and Worrell fabricated John

Stallworth's two statements.

　　　　As for his fabrication of evidence claim, Plaintiff must show that: (i) his criminal

proceeding terminated in his favor; (ii) fabricated evidence was used at his 1994 trial; and (iii)

"there is a reasonable likelihood that, without the use of that evidence, [he] would not have been

convicted." *See Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014); *see also* Section II.A.

Plaintiff has already conceded that he "was convicted solely upon the testimony of two brothers,

John and William Stallworth." *See* Docket No. 37 at page 3 of 10.  Therefore, to survive

summary judgment on his fabrication of evidence claim, Plaintiff must identify evidence from

which a reasonable jury could conclude that Detectives Devlin and Worrell fabricated John and

William Stallworth's trial testimony.

　　　　Plaintiff will likely argue that two affidavits recently signed by John and William

Stallworth constitute evidence from which a reasonable jury could conclude that their trial

testimony, as well as John Stallworth's two statements, was fabricated.  In their affidavits, both

Stallworths deny that they helped murder Mr. Martinez, thereby contradicting their convictions

for the murder.  *See* SUMF at ¶¶ 45-46.  Moreover, William Stallworth states in his affidavit that

he fabricated his 1994 trial testimony because unknown detectives pressured him in an

---

[5] In the early 1990s, Detectives Devlin and Worrell would check if a homicide suspect they were investigating had been previously arrested for murder, and determine whether such a murder was similar to the murder they were investigating.  *See* SUMF at ¶ 47.

unspecified room at an unknown date and location, while John Stallworth states that he fabricated his trial testimony due to coercion applied by Detectives Devlin and Worrell.

*Morris v. Verniero*, 453 F. App'x 243 (3d Cir. 2011), precludes Plaintiff from relying on these affidavits to escape summary judgment.  In *Morris*, a § 1983 plaintiff attempted to create an issue of fact and evade summary judgment by claiming that the officers he was suing planted drugs on him.  *Id.* at 246.  The Third Circuit Court of Appeals rebuffed this attempt, holding that "no rational juror could have credited [plaintiff's] belated assertion that the drugs were planted." *Id.*  The court gave three reasons for its decision.  First, the plaintiff never claimed during his criminal case that the drugs were planted.  *See id.*  Second, he waited until six years after his arrest to allege that police had planted the drugs.  *Id.*  And third, the factfinder in his criminal case determined that the officer who supposedly planted the drugs appeared trustworthy and credible.  *See id.*

The Third Circuit's logic in *Morris* fully applies to this case.  In fact, this matter presents an even clearer example of a situation in which no reasonable jury could credit Plaintiff's evidence.  Consider the following:

- *Morris* held that no rational juror could credit the witness-plaintiff because the witness failed to testify about the supposed drug planting at his criminal trial or criminal suppression hearing.  *See id.* at 244, 246.  Here, the Stallworths <u>did</u> testify at the criminal trial – and they both stated under oath that they were not falsely implicating anyone and that Plaintiff helped commit the Martinez murder.  *See* SUMF at ¶¶ 22-23.  In fact, John Stallworth explicitly testified that the police had not "threaten[ed] him in any way" and that he had given his statements "voluntarily without any coercion or pressure put on [him]."  *See* SUMF at ¶ 22.

- *Morris* held that no reasonable juror could credit a witness who waited six years to claim that police planted drugs. *Morris*, 453 F. App'x at 246. Here, the Stallworths waited <u>24</u> years to change their story and sign affidavits stating that they fabricated their 1994 testimony.

- The *Morris* court partially based its decision on a credibility determination made by the factfinder in the criminal case. *See id.* Here too, twelve Philadelphia jurors listened to the Stallworths' 1994 testimony and found it highly credible, because they convicted Plaintiff of murder beyond a reasonable doubt based solely on the Stallworths' trial testimony.

Moreover, this case involves an additional factor not at play in *Morris*: the plaintiff-witness in *Morris* was never convicted of drug dealing, *see id.* at 244-245, but the Stallworths both remain convicted of murdering Domingo Martinez, *see* SUMF at ¶¶ 45-46. Under *Heck*, a "trier of fact" in a civil case cannot "base its verdict on findings not consistent with the conclusion . . . reached in [a] criminal case." *See Nelson v. Jashurek*, 109 F.3d 142, 146 (3d Cir. 1997) (citing *Heck*); *Jacobs v. Bayha*, No. 07-237, 2011 WL 1044638, at *2 (W.D. Pa. March 18, 2011) ("[F]actual allegations that are inconsistent with the validity of a conviction cannot be used to support a civil action.") (citing *Heck*); *see also Jackson v. City of Pittsburgh*, No. 07-111, 2011 WL 3443951, at *4 (W.D. Pa. Aug. 8, 2011) (citing *Heck* and holding same). *Nelson* and *Heck* would thus require this Court to instruct a jury that William and John Stallworth murdered Domingo Martinez. *See Nelson*, 109 F.3d at 146 (requiring the district court to instruct the jury of facts established by a witness's conviction). Yet in their affidavits, both Stallworths deny murdering Mr. Martinez. No reasonable jury, upon hearing an instruction that a witness

committed murder, would credit an affidavit in which the witness denied participating in the murder.

Simply put, since the Third Circuit concluded that no rational juror would credit the drug-planting story offered in *Morris*, this Court should find that no rational jury would credit a story created by the Stallworths nearly 25 years after they testified at trial, particularly since their new story completely contradicts their trial testimony and contravenes their murder convictions in a manner barred by *Heck* and *Nelson*. The Court should thus follow *Morris* and dismiss this suit.

**C.  The Court Should Dismiss the Claims Against the City of Philadelphia.**

**1.  Plaintiff Cannot Proceed to Trial on a Policy-Based Municipal Liability Claim.**

Even if the court finds that Plaintiff may proceed on his claims against the individual Defendants, it should dismiss the municipal liability claim set forth in Count 5 of his complaint. Under "§ 1983, municipal defendants cannot be held liable under a theory of *respondeat superior*." *Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998). Rather, "municipal liability only arises when a constitutional deprivation results from an official custom or policy." *Id.*; *see Hernandez v. Borough of Palisades Park*, 58 F. App'x 909, 912 (3d Cir. 2003) (holding same). A policy only exists if a municipal policymaker – someone with "final and unreviewable authority to make a decision" – issues "an official proclamation or decision." *Id.* Plaintiff has adduced no evidence that a City policymaker issued an official proclamation or decision that caused a violation of his constitutional rights, so he cannot proceed to trial under a policy-based theory.

> **2.    Plaintiff Cannot Proceed to Trial on a Custom-Based Municipal Liability Claim.**

Likewise, Plaintiff cannot bring a custom-based municipal liability claim against the City.  To begin with, Plaintiff has not even adduced evidence that a relevant municipal custom existed in the Philadelphia Police Department in the early 1990s.  A custom only exists if a police department's practices are "so permanent and well-settled as to virtually constitute law." *Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (citations and internal quotations omitted).  Despite having a year to take discovery, Plaintiff has not adduced any evidence of a permanent and widespread custom among the thousands of homicide investigations that occurred in Philadelphia in the early 1990s.  *See* SUMF at ¶ 48 (noting that over 2,200 homicides occurred in Philadelphia from 1990-1994); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (affirming summary judgment on a municipal liability claim because evidence that misconduct occurred in 11 out of 500 incidents cannot create a triable issue as to the existence of a widespread custom); *see also Jones v. Muskegon County*, 625 F.3d 935, 946-947 (6th Cir. 2010) (holding that five instances of misconduct in a county jail cannot create a triable issue as to the existence of a widespread custom); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851-852 (5th Cir. 2009) (holding that 27 complaints of excessive force over a four-year period did not establish a triable issue as to whether a permanent and widespread custom of tolerating excessive force existed in a large urban police department).

Second, even if Plaintiff could adduce evidence of the existence of a custom, his claim would fail because he lacks evidence that the custom exhibited "deliberate indifference to the rights of persons with whom the police come into contact."  *See De Simone*, 159 F.3d at 126-127.  A plaintiff must demonstrate such "deliberate indifference" in order to sue a municipality based on its custom.  *See Mann v. Palmerton Area Sch. Dist.*, 189 F. Supp. 3d 467, 480 (M.D.

Pa. 2016).  To show deliberate indifference, a plaintiff generally must show: (i) "knowledge of a prior pattern of similar incidents" involving police officers; and (ii) "circumstances under which [a] supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate."  *See De Simone*, 159 F.3d at 127; *Briscoe v. Jackson*, 2 F. Supp. 3d 635, 646 (E.D. Pa. 2014) (holding same).  In fact, this Court cited these two requirements in dismissing a municipal liability § 1983 claim just five years ago, and the Third Circuit Court of Appeals subsequently upheld the Court's decision.  *See Bell v. O'Connor*, No. 12-2625, 2014 WL 6606410, at *5 (E.D. Pa. Nov. 20, 2014) (Pratter, J.), *aff'd*, 629 F. App'x 214 (3d Cir. 2015). Moreover, the plaintiff must demonstrate that a policymaker had knowledge of the prior pattern of similar incidents, *see Hernandez*, 58 F. App'x at 912-915, and that the policymaker possessed such knowledge before the plaintiff's constitutional rights were violated, *id.* at 914 (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 137 (3d Cir. 2001).

Here, Plaintiff has failed both the requirements of the deliberate indifference test.  He has adduced no evidence showing that a supervisor of Detectives Devlin and Worrell "communicated a message of approval" regarding their alleged conduct.  *See De Simone*, 159 F.3d at 127; *Raab v. City of Ocean City*, No. 11-6818, 2014 WL 3894061, at *12 (D.N.J. Aug. 8, 2014) (granting summary judgment as to a custom-based municipal liability claim because the plaintiff failed to show "any message of approval by [the individual defendant's] supervisors").  And he cannot show that, prior to Plaintiff's arrest, a Philadelphia policymaker had "knowledge of a prior pattern of similar incidents" in which homicide detectives fabricated evidence.  *See De Simone*, 159 F.3d at 127; *Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 387 (E.D. Pa. 2018) (Pratter, J.) (dismissing municipal liability claim because "Mr. Thomas has only alleged one

other instance of a *Brady* violation," rather than a pattern of such violations).  The Court should thus dismiss Count 5.

Third, even if Plaintiff shows that a custom existed in the Philadelphia Police Department in the early 1990s, and even if he demonstrates that the custom exhibited "deliberate indifference" to the rights of citizens, he still cannot succeed on Count 5 given his failure to adduce evidence showing that such a custom caused his constitutional injuries.  Civil rights plaintiffs cannot sue a municipality unless its actions were the "moving force" behind their alleged injuries, such that a "direct causal link [connects] the municipal action and the deprivation of federal rights."  *See Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).  This rule means that where, as here, "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, *rigorous standards* of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Id.* at 405 (emphasis added).  Yet in this case, Plaintiff has failed to adduce evidence from which a reasonable jury could conclude that a City custom caused his alleged constitutional injuries.

Finally, Plaintiff cannot bring a municipal liability claim because he has failed to adduce evidence showing that a City policymaker personally and knowingly acquiesced to a custom that injured him.  In *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir. 1990), *superseded by statute on other grounds as stated in Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 214 (3d Cir. 2017), the oldest Third Circuit case to address this issue, the court held that a plaintiff must show that a "policymaker is responsible either for the policy or, through acquiescence, for the custom" that caused her to suffer constitutional harm.  *Id.* at 1480.  The Third Circuit noted that a policymaker is an official with "final, unreviewable discretion to make a decision or take an

action." *Id.* at 1481.  The court then held that because there was no evidence that a policymaker "knowingly acquiesce[d] to departmental sexual discrimination," the City of Philadelphia could not be held liable based on a custom of such discrimination.  *Id.* at 1481-1482.  In fact, the court stated that a municipality can only be liable for its custom if a policymaker "personally . . . observe[d] or acquiesce[d]" to the custom."  *Id.* at 1481.

Here, Plaintiff has not even bothered to adduce evidence of the actions or knowledge of City policymakers from 1990-1994, the years covering his case.  And he has certainly not identified any evidence showing that a policymaker in those years knowingly and personally acquiesced to a custom (or authorized a policy) that caused him to suffer a constitutional injury. *Id.*  The Court should thus dismiss Count 5 based on Plaintiff's failure to show that a relevant custom existed, that such a custom demonstrated deliberate indifference, that such a custom caused the deprivation of his constitutional rights, and that a policymaker knowingly and personally acquiesced to such a custom.

## III.    CONCLUSION

For the foregoing reasons, the Court should dismiss this suit with prejudice.

Date:  April 4, 2019                                Respectfully submitted,


                                                    /s/ Michael R. Miller
                                                    Michael R. Miller
                                                    Deputy City Solicitor
                                                    Pa. Attorney ID No. 315759
                                                    City of Philadelphia Law Department
                                                    1515 Arch Street, 14th Floor
                                                    Philadelphia, PA 19102
                                                    215-683-5433 (phone)
                                                    215-683-5397 (fax)
                                                    michael.r.miller@phila.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **SHAURN THOMAS,** | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 17-4196** |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants.** | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on the date below, pursuant to the Court's instructions at the April 2, 2019 Chambers Conference, the Defendants' Motion for Summary Judgment was filed directly with Chambers and was also sent by electronic mail to Plaintiff's counsel.

Date:  April 4, 2019                                    Respectfully submitted,

/s/ Michael R. Miller
Michael R. Miller
Deputy City Solicitor
Pa. Attorney ID No. 315759
City of Philadelphia Law Dep't
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
215-683-5433 (phone)
215-683-5397 (fax)
michael.r.miller@phila.gov