IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHAURN THOMAS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No.  2:17-CV-04196-GEKP |
| -v.- | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| MARTIN DEVLIN, PAUL | : | |
| WORRELL, and JAMES | : | |
| GIST, | : | |
| | : | |
| Defendants. | : | |

## ORDER

AND NOW, this _____ day of _____, 2019, upon consideration

of Defendants' Motion for Summary Judgment, and Plaintiff Shaurn Thomas's Opposition thereto,

it is hereby ORDERED that the Defendants' Motion for Summary Judgment is DENIED.


BY THE COURT:


_____
The Honorable Gene E.K. Pratter

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAURN THOMAS,                          :
                                        :
                    Plaintiff,          :
                                        :        Case No.  2:17-CV-04196-GEKP
        -v.-                            :
                                        :
CITY OF PHILADELPHIA,                   :
MARTIN DEVLIN, PAUL                     :
WORRELL, and JAMES                      :
GIST,                                   :
                                        :
                    Defendants.         :

## PLAINTIFF SHAURN THOMAS'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Stephen D. Brown
James Figorski
Tiffany Engsell
Stefanie A. Tubbs
**DECHERT LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

Paul Messing
**KAIRYS, RUDOVSKY, MESSING, FEINBERG, LIN**
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Attorneys for Plaintiff Shaurn Thomas*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

   I.   MR. MARTINEZ'S MURDER AND THE WHEREABOUTS OF SHAURN THOMAS ...................... 3

      A.   *The Murder of Mr. Martinez* .................................................................................. 3

      B.   *Shaurn Thomas was at the Youth Study Center when Mr. Martinez was killed.* ........... 3

   II.   THE INVESTIGATION ............................................................................................... 4

      A.   *Defendants Devlin and Worrell's Roles in the Investigation* ........................................ 4

      B.   *The Crime Scene Investigation* .................................................................................. 5

      C.   *The Eyewitnesses to the Murder of Mr. Martinez* ........................................................ 5

      D.   *The Chevy Nova Traffic Stop Only 3 Days after the Murder – Exculpatory Evidence that Was Withheld for more Than 26 Years* ............................................................... 6

      E.   *Defendants Begin Pursuing an Unexplained "Blue Car" Theory* ................................. 8

      F.   *1992-1993 – Investigation Continues* ...................................................................... 9

      G.   *Defendant Worrell Submits an Affidavit of Probable Cause for Mr. Thomas's Arrest on July 27, 1993 With Glaring Omissions* ............................................................... 15

      H.   *Defendants Devlin and Worrell Coerce William Stallworth to Adopt the Facts They Fed to John Stallworth* ........................................................................................... 17

   III.   THE TRIAL ............................................................................................................ 18

   IV.   THE CRU VACATES SHAURN THOMAS'S CONVICTION AND DECIDES TO DISMISS THE CASE ............................................................................................................... 19

   V.   FACTS RELATED TO *MONELL* CLAIM ................................................................... 23

LEGAL STANDARD .............................................................................................................. 25

ARGUMENT ............................................................................................................................ 26

   I.   THERE ARE NUMEROUS GENUINE ISSUES OF MATERIAL FACT REGARDING PLAINTIFF'S MALICIOUS PROSECUTION CLAIM. ...................................................................... 26

      A.   *The* nol pros *in Mr. Thomas's criminal case constitutes a "favorable termination" under Third Circuit law.* .......................................................................................... 26

      B.   *Defendants have failed to show that there is no genuine issue of material fact regarding whether they had probable cause to arrest Mr. Thomas.* ........................... 31

      C.   *Summary judgment is not appropriate on Plaintiff's fabrication of evidence claim.* ... 37

   II.   MUNICIPAL LIABILITY ........................................................................................ 44

      A.   *Unconstitutional Policies and Customs in the PPD* ................................................. 44

      B.   *The City's Deliberate Indifference* ........................................................................... 56

      C.   *Systemic deficiencies in the PPD's internal disciplinary mechanism* ......................... 63

      D.   *Actual or Constructive Knowledge of City Policymakers* ........................................... 70

      E.   *Causation* ................................................................................................................ 71

CONCLUSION ......................................................................................................................... 73

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................25

*Anela v. City of Wildwood*,
790 F.2d 1063 (3d Cir. 1986)................................................................................61

*Arrington v. City of Philadelphia*,
Civil Action No. 88-2264 (E.D. Pa. 1988) ...........................................................24

*Austin v. Hill*,
No. 11-2847, 2014 WL 1386338 (E.D. Pa. Apr. 9, 2014)....................................70

*Avery v. Burke Cnty.*,
660 F.2d 111 (4th Cir. 1981) .................................................................................61

*Avery v. City of Milwaukee*,
847 F.3d 433 (7th Cir. 2017)..................................................................................47

*Estate of Bailey by Oare v. County of York*,
768 F.2d 503 (3d Cir. 1985)...................................................................................71

*Ballard v. City of Phila.*,
No. 14-4740, 2015 WL 6467925 (E.D. Pa. Oct. 26, 2015) ........................26, 33, 34

*Baptiste v. J.C. Penney Co.*,
147 F.3d 1252 (10th Cir. 1998) .............................................................................56

*Bd. of Cnty. Comm'rs v. Brown*,
520 U.S. 397 (1997)................................................................................................66

*Beck v. City of Pittsburgh*,
89 F.3d 966 (3d Cir. 1996)...............................................................................61, 66

*Berg v. Allegheny Cnty.*,
219 F.3d 261 (3d Cir. 2000)...............................................................................46, 61

*BeVier v. Hucal*,
806 F.2d 123 (7th Cir. 1986) .................................................................................55

*Bielevicz v. Dubinon*,
915 F.2d 845 (3d Cir. 1990)........................................................................61, 70, 71

*Big Apple BMW Inc. v. BMW of N. Am., Inc.*,
  974 F.2d 1358 (3d Cir. 1992) ................................................................26

*Black v. Montgomery Cnty.*,
  835 F.3d 358 (3d Cir. 2016) ..............................................................38, 39, 40

*Bordanaro v. McLeod*,
  871 F.2d 1151 (1st Cir. 1989) ................................................................57, 68

*Boyden v. Township of Upper Darby*,
  5 F. Supp. 3d 731 (E.D. Pa. 2013) ................................................................70

*Brady v. Maryland*,
  373 U.S. 83 (1963) ................................................................48, 49

*Briscoe v. Jackson*,
  2 F. Supp. 3d 635 (E.D. Pa. 2014) ................................................................56

*Brown v. Bryan County*,
  219 F.3d 450 (5th Cir. 2000) ................................................................67, 72

*Brown v. Ridley Twp.*,
  No. 14-5871, 2015 WL 568640 (E.D. Pa. Feb. 10, 2015) ....................................70

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................25

*City of Canton v. Harris*,
  489 U.S. 378 (1989) ................................................................44, 45, 47, 71

*City of Oklahoma City v. Tuttle*,
  417 U.S. 808 (1985) ................................................................60

*Cliett v. City of Philadelphia*,
  Civil Action No. 85-1846 (E.D. Pa. 1985) ...........................................................24

*Clipper v. Takoma Park, Md.*,
  876 F.2d 17 (4th Cir. 1989) ................................................................56

*Coggins v. Cnty. of Nassau*,
  254 F. Supp. 3d 500 (E.D.N.Y. 2017) ................................................................67

*Dempsey v. Bucknell Univ.*,
  834 F.3d 457 (3d Cir. 2016) ................................................................31, 53

*Dennis v. Sec'y Pa. Dep't of Corrs.*
  58834 F.3d 263 (3d Cir. 2016) ................................................................58

*D.C. v. Wesby*,
    138 S. Ct. 577 (2018) ......................................................................................32, 33

*Donahue v. Gavin*
    280 F.3d 371 (3d Cir. 2000) .............................................................................30, 31

*Drumgold v. Callahan*,
    707 F.3d 28 (1st Cir. 2013) ....................................................................................49

*Floyd v. Attorney Gen. of Pa.*,
    722 F. App'x 112 (3d Cir. 2018) ............................................................................39

*Foley v. City of Lowell, Mass.*,
    948 F.2d 10 (1st Cir. 1991) ....................................................................................57

*Gardenhire v. Schubert*,
    205 F.3d 303 (6th Cir. 2000) ............................................................................55, 56

*Garnett v. Undercover Officer COO39*,
    838 F.3d 265 (2d Cir. 2016) ...................................................................................38

*Geness v. Cox*,
    902 F.3d 344 (3d Cir. 2018) .......................................................................... *passim*

*Gentile v. Cnty. of Suffolk*,
    926 F.2d 142 (2d Cir. 1991) ...................................................................................45

*Glisson v. Indiana Dep't of Corr.*,
    849 F.3d 372 (7th Cir. 2017) ..................................................................................60

*Grandstaff v. City of Borger*,
    767 F.2d 161 (5th Cir. 1985) ......................................................................67, 68, 72

*Gregory v. City of Louisville*,
    444 F.3d 725 (6th Cir. 2006) ............................................................................47, 48

*Haley v. City of Boston*,
    657 F.3d 39 (1st Cir. 2011) ............................................................................49, 50

*Halsey v. Pfeiffer*,
    750 F.3d 273 (3d Cir. 2014) ........................................................................ *passim*

*Harris v. City of Pagedale*,
    821 F.2d 499 (8th Cir. 1987) ..................................................................................45

*Heck v. Humphrey*,
    512 U.S. 477 (1994) ..............................................................................38, 39, 43

*Henderson v. City of Philadelphia*,
   No. 06-532, Order at 4-5 (E.D. Pa. Jan. 30, 2007) .................................................69

*Henry v. Cnty. of Shasta*,
   132 F.3d 512 (9th Cir. 1997) .......................................................................57, 68

*Hill v. City of Scranton*,
   411 F.3d 118 (3d Cir. 2005).................................................................................25

*Illinois v. Gates*,
   462 U.S. 213 (1983)..............................................................................................32

*A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*,
   372 F.3d 572 (3d Cir. 2004)..................................................................................71

*Jackson v. City of Pittsburgh*,
   No. 07-111, 2011 WL 3443951 (W.D. Pa. Aug. 8, 2011)......................................43

*Jacobs v. Bayha*,
   No. 07-237, 2011 WL 1044638 (W.D. Pa. Mar. 18, 2011) ...................................43

*Jeffes v. Barnes*,
   208 F.3d 49 (2d Cir. 2000)....................................................................................45

*Jett v. Dallas Indep. Sch. Dist.*,
   491 U.S. 701 (1989)..............................................................................................69

*Jones v. Muskegon County*,
   625 F.3d 935 (6th Cir. 2010) ...............................................................................62

*Kelly v. Jones*,
   148 F. Supp. 3d 395 (E.D. Pa. 2015) ...................................................................56

*Kingsland v. City of Miami*,
   382 F.3d 1220 (11th Cir. 2004) ...........................................................................56

*Kingsmill v. Szewczak*,
   117 F. Supp. 3d 657 (E.D. Pa. 2015) ...................................................................70

*Kneipp v. Tedder*,
   95 F.3d 1199 (3d Cir. 1996)..................................................................................70

*Kossler v. Crisanti*,
   564 F.3d 181 (3d Cir. 2009)..................................................................................26

*Kuehl v. Burtis*,
   173 F.3d 646 (8th Cir. 1999) ...........................................................................55, 56

v

*Lance Felder v. Detective Dennis Dusak, et al*,
    E.D. Pa. No. 16-cv-2986 ...............................................................................50

*Limone v. Condon*,
    372 F.3d 39 (1st Cir. 2004) ......................................................................48, 49

*Long v. Cnty. of Los Angeles*,
    442 F.3d 1178 (9th Cir. 2006) .........................................................................61

*Lyons v. City of Philadelphia*,
    No. 06-5195, 2007 WL 3018945 (E.D. Pa. October 12, 2007) ........................68

*Malcomb v. McKean*,
    535 F. App'x 184 (3d Cir. 2013) ..................................................................26, 28

*Moldowan v. City of Warren*,
    578 F.3d 351 (6th Cir. 2009) ..........................................................................47

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978)............................................................................... *passim*

*Mooney v. Holohan*,
    294 U.S. 103 (1935)....................................................................47, 48, 49, 50

*Morris v. Verniero*
    453 F. App'x 243, 245 (3d Cir. 2011) ...........................................................31, 42

*NAACP, et al. v. City of Philadelphia*,
    E.D. Pa. No. 96-6045 ...................................................................................24, 63

*Natale v. Camden County Correctional Facility*,
    318 F.3d 575 (3d Cir. 2003)..........................................................................60, 61

*Nelson v. Jashurek*,
    109 F.3d 142 (3d Cir. 1997)...........................................................................43

*Norfolk S. Ry. Co. v. Baseball USA, Inc.*,
    512 F.3d 86 (3d Cir. 2008)..............................................................................25

*Olivieri v. County of Bucks*,
    502 F. App'x 184 (3d Cir. 2012) .....................................................................70

*Orsatti v. New Jersey State Police*,
    71 F.3d 480 (3d Cir. 1995).............................................................................32

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986).......................................................................................60

*Peterson v. City of Fort Worth,*
    588 F.3d 838 (5th Cir. 2009) ...........................................................62

*Pineda v. City of Houston,*
    291 F.3d 325 (5th Cir. 2002) ...........................................................62

*Pitt v. D.C.,*
    491 F.3d 494 (D.C. Cir. 2007)..........................................................56

*Pyle v. Kansas,*
    317 U.S. 213 (1942)......................................................................48, 49

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000)......................................................................42, 43

*Ricciuti v. N.Y.C. Transit Auth.,*
    124 F.3d 123 (2d Cir. 1997)..........................................................47, 48

*Estate of Roman v. City of Newark,*
    914 F.3d 789 (3d Cir. 2019).........................................45, 57, 63, 68

*Ruvalcaba v. City of Los Angeles,*
    167 F.3d 514 (9th Cir. 1999) ........................................................60, 71

*Sevigny v. Dicksey,*
    846 F.2d 953 (4th Cir. 1988) ...........................................................56

*Simmons v. City of Philadelphia,*
    947 F.2d 1042 (3d Cir. 1991).............................................................69

*Sims v. Mulcahy,*
    902 F.2d 524 (7th Cir. 1990) ............................................................61

*Smith v. Holtz,*
    87 F.3d 108 (3d Cir. 1996)........................................................26, 29, 39

*Sornberger v. City of Knoxville, Ill.,*
    434 F.3d 1006 (7th Cir. 2006) ..........................................................53

*Spring Garden United Neighbors v. City of Philadelphia,*
    614 F.Supp. 1350 (E.D. Pa. 1985) ....................................................24

*Streit v. Cnty. of Los Angeles,*
    236 F.3d 552 (9th Cir. 2001).............................................................53

*Thomas v. Cumberland Cnty.,*
    749 F.3d 217 (3d Cir. 2014)..............................................................71

*Tillman v. Burge,*
    813 F. Supp. 2d 946 (N.D. Ill. 2011) ..................................................................53

*Tolan v. Cotton,*
    572 U.S. 650 (2014).............................................................................................25

*United States v. Mena,*
    933 F.2d 19 (1st Cir. 1991)..................................................................................57

*United States v. Stearn,*
    597 F.3d 540 (3d Cir. 2010).................................................................................36

*Vann v. City of New York,*
    72 F.3d 1040 (2d Cir. 1995).................................................................................72

*Vineyard v County of Murray, Ga.,*
    990 F.2d 1207 (11th Cir. 1993) .....................................................................68, 71

*Wallace v. Kato,*
    549 U.S. 384 (2007).............................................................................................26

*Warren v. Dist. of Columbia,*
    353 F.3d 36 (D.C. Cir. 2004)...............................................................................61

*Washington-Pope v. City of Philadelphia,*
    No. 12-4300, 2015 WL 7450522 (E.D. Pa. Nov. 24, 2015) ................................70

*Whiteley v. Warden, Wyo. State Penitentiary,*
    401 U.S. 560 (1971).......................................................................................36, 37

*Wilkins v. DeReyes,*
    528 F.3d 790 (10th Cir. 2008) .......................................................................36, 37

*Wilson v. City of Philadelphia,*
    177 F. Supp. 3d 885 (E.D. Pa. 2016) ..................................................................70

*Wilson v. Russo,*
    212 F.3d 781 (3d Cir. 2000)......................................................................32, 35, 56

*Wright v. City of Phila.,*
    229 F. Supp. 3d 322 (E.D. Pa. 2017) ...................................................1, 11, 27, 39

*Zahrey v. Coffey,*
    221 F.3d 342 (2d Cir. 2000).................................................................................49

**Statutes**

42 U.S.C. § 1983...................................................................................... *passim*

## INTRODUCTION

Shaurn Thomas spent 24 years in prison for a crime he did not commit.  The defendant officers fabricated material evidence, coerced witnesses to falsely incriminate Mr. Thomas, and concealed evidence that exculpated Mr. Thomas and pointed to the guilt of more likely suspects in the murder.  The liability of the City of Philadelphia is shown by evidence that these unlawful practices have long been tolerated by municipal policymakers, and that the City has failed to take measures to remedy the misconduct.  Indeed, the dysfunctional disciplinary system of the Philadelphia Police Department ("PPD") led officers to believe that they could violate constitutional rights and accepted police practices without fear of any disciplinary action.

Defendants' Motion for Summary Judgement is the latest chapter in the City's stated campaign "to avoid a second Anthony Wright type case."  When the City heard of Mr. Thomas's pending release from prison in May 2017, it took the questionable step of suggesting that the District Attorney's ("DA") Office ask that Mr. Thomas to plead guilty or to waive any civil claims, despite the fact that the DA's Office had determined that Mr. Thomas was most likely innocent because he was somewhere else at the time of the murder.  This is not to say that the City's concern about a "second Anthony Wright type case" is unwarranted because Mr. Thomas's claims parallel those made by Mr. Wright, with the same detective (Defendant Detective Devlin) alleged to have engaged in similar conduct, resulting in a quarter-century of a young man's life wasted in jail— conduct that caused the City to pay almost $10 million dollars to settle the *Wright* case.

The City makes three arguments to avoid the same result in this case.  Each argument fails, both as a factual and legal matter.  First, Defendants argue that Mr. Thomas cannot prove "favorable termination," but in so doing inexplicably ignore the Third Circuit's recent precedent that "favorable termination" does not require a finding of actual innocence; rather, the

determination is fact-based and contextual and mandates only a substantial likelihood of innocence. *Geness v. Cox*, 902 F.3d 344, 356 (3d Cir. 2018).

Second, Defendants argue that Plaintiff has not identified "evidence from which a reasonable jury could conclude that [the Defendants] violated [Mr. Thomas's] constitutional rights." Defs' Mot. at 5. Yet the record, detailed below, shows that Defendant Detectives Devlin and Worrell conspired to present false and misleading facts in support of the arrest warrant for Mr. Thomas. Further, in violation of settled Fourth Amendment principles, Defendants Devlin and Worrell failed to include crucial exculpatory facts of which they were aware, both from eyewitnesses and of a forensic nature, the combination of which painted a wholly false picture of probable cause. Defendants focus extensively on unrelated allegations against Mr. Thomas and his family. But Defendant Worrell did ***not*** include any of these allegations in his affidavit of probable cause because they were (and are) irrelevant and/or he did not even know about them. Defendants' reliance on these allegations now is an attempt to distract the Court from Defendants' own wrongdoing and smear Mr. Thomas and his family.

Finally, with respect to the *Monell* claim, the motion for summary judgement fails to come to grips with overwhelming evidence that the City failed for decades to properly monitor, supervise, and take necessary remedial action with respect to the practices of homicide detectives and other PPD officers that were knowingly and intentionally used to secure wrongful arrests, prosecutions, and incarceration of innocent people. The City's deliberate indifference allowed officers—Defendants Devlin and Worrell in particular—to violate citizens' Fourth and Fourteenth amendment rights by fabricating and concealing evidence, using coercive interrogation methods, and submitting false and misleading affidavits of probable cause. In addition, as documented by

Plaintiff's expert, the City has long tolerated a dysfunctional internal disciplinary system that leads officers to believe they can engage in misconduct without fear of adverse consequences.

## FACTUAL BACKGROUND[1]

### I.   Mr. Martinez's Murder and the Whereabouts of Shaurn Thomas

#### A.  *The Murder of Mr. Martinez*

Shortly after 9:00 am on Tuesday, November 13, 1990, 78-year-old Domingo Martinez withdrew $25,000 cash from a Mellon Bank branch at 1201 Spring Garden Street in Philadelphia and headed back to his business in north Philadelphia. (Plaintiff's Counterstatement of Undisputed Material Facts ("SUMF") at ¶¶ 1-3.  After leaving the bank, Domingo Martinez was driving east in the 800 block of West Sedgley Avenue in Philadelphia, about three miles from the Mellon Bank, when a single car driving behind Mr. Martinez sped up and struck Mr. Martinez's car on the driver's side, causing significant damage. (*Id.* ¶¶ 5, 28).

Eyewitnesses observed Mr. Martinez's car and the striking car both stop and three men get out of the striking car. (*Id.* ¶ 6). One of the three men shot Mr. Martinez through the windshield of his car and dragged him into the street, leaving him there to die. (*Id.*) The shooter then jumped in Mr. Martinez's car and drove the car and the $25,000 away. (*Id.* ¶ 7). Mr. Martinez died within an hour. (*Id.* ¶ 8).

#### B.  *Shaurn Thomas was at the Youth Study Center when Mr. Martinez was killed.*

On November 12, 1990, the day before the Martinez murder, 16-year-old Mr. Thomas was arrested in Center City Philadelphia and charged with attempted theft of a motorcycle. (*Id.* ¶ 11). Mr. Thomas was held in a juvenile holding cell overnight into November 13, 1990, in the

---

[1]     For the Court's convenience, Plaintiff has included a succinct chronology of key events as Exhibit A.

Philadelphia Police Department's 9th Police District, then located at 20th Street and Pennsylvania Avenue, while police prepared arrest and investigative paperwork. (*Id.* ¶¶ 12, 13).

On November 13, 1990, sometime after sunrise, Mr. Thomas was released from police custody to his mother, Hazeline Thomas.  (*Id.* ¶¶ 14, 15).  Police instructed Ms. Thomas to take Mr. Thomas a block away to the YSC for a 9 a.m. Intake Conference and that is what they did. (*Id.* ¶ 15).  The YSC in 1990 was, among other things, a place for juvenile probation officers (known as intake officers) to determine whether a juvenile should be formally charged (known as the Intake Conference) and whether the juvenile should be held in custody or released. (*Id.* ¶ 16). At the time that Mr. Martinez was leaving the bank, driving through Philadelphia, and being killed, Mr. Thomas and his mother were inside the YSC waiting to be interviewed or in an interview room. (*Id.* ¶ 17).

After waiting for some time, Mr. Thomas was summoned to a room where he was interviewed by juvenile probation employee Doris Williams.  (*Id.* ¶ 18).  Ms. Williams made handwritten changes on Mr. Thomas's file. (*Id.* ¶ 19).  At the end of Mr. Thomas's interview at the YSC, Ms. Williams asked Mr. Thomas to sign a subpoena ordering him to appear for his next court date. (*Id.*)  Mr. Thomas signed the subpoena. (*Id.*) Early in the afternoon of November 13, 1990, Mr. Thomas was released from the YSC and returned home with his sister, Elaine Thomas. (*Id.*)

## II.     The Investigation

### A.  Defendants Devlin and Worrell's Roles in the Investigation

Defendant Devlin was the assigned detective on the Martinez homicide.  As such, he was responsible for maintaining the homicide file (the "H-file"), and ensuring that all documents and witness statements were kept in the file. (*Id.* ¶ 20).  According to Defendants Devlin and Worrell, any developments in the case should have been noted or placed in the H-file. (*Id.* ¶ 22). Defendant

Devlin was also responsible for coordinating and knowing what was happening with all aspects of the investigation. (*Id.* ¶¶ 20, 22).

### B.  The Crime Scene Investigation

Philadelphia Police Officer William McDowell, assigned to the Mobile, Crime Detection Unit, processed Mr. Martinez's car for evidence on the day of the murder.[2]  (*Id.* ¶ 23). Officer McDowell was responsible for gathering any evidence relevant to the investigation. (*Id.*)

Officer McDowell took several photographs of Mr. Martinez's car showing the damage to the driver's side. (*Id.* ¶ 28). He also removed a "sample of white paint" "from the left front fender" of the victim's car in the damaged area and removed "one piece of chrome stripping . . .  from the left rear wheel well" of the victim's car. (*Id.* ¶ 29). The chrome stripping "contained white paint." (*Id.* ¶¶ 28, 29) Officer McDowell did not find any blue paint on the victim's car. [3] (*Id.* ¶¶ 32-33).

### C.  The Eyewitnesses to the Murder of Mr. Martinez

Four people witnessed the murder of Mr. Martinez on Sedgley Avenue. (*Id.* ¶ 39). The eyewitnesses all agreed:

1. Only two cars drove away after the incident (*i.e.*, the striking car and Mr. Martinez's car driven by the shooter)—there was no third car; (*Id.* ¶ 47).

---

[2]     Police recovered Mr. Martinez's car at 2100 N. 2nd Street (2nd and Diamond Streets) in Philadelphia, about 10 minutes away from the murder scene, after residents of that block discovered the car with the trunk open and a bullet hole in the window. (SUMF ¶ 9).

[3]     Officer McDowell lifted ten latent fingerprints from several areas of the victim's car. (*Id.* ¶ 25).  There is no record that anyone ever compared the latent fingerprints to any suspects, and when Plaintiff sought to run the prints through the AFIS system that did not exist in 1993 (comparing prints to all persons arrested in the country), he was told the prints were unable to be found. (*Id.* ¶¶ 26, 27).

Police Officer James Caldwell of the Mobile Crime Detection Unit also processed the crime scene on Sedgley Avenue. (*Id.* ¶ 37). Caldwell took photographs of tire marks in the street and recovered four pieces of broken red plastic light cover from a car's tail light, among other items.  (*Id.*)  Neither the tire marks nor the tail light cover were connected to any vehicle Mr. Thomas ever owned, drove or occupied. (*Id.* ¶ 38).

2.  The striking car was a 1976-1978 Buick Skylark or Chevy Nova, either red-and-white or gray.  Mr. Martinez was driving a grey car and there was no blue car involved in any way; (*Id.* ¶ 41) and

3.  Only three people were involved in the murder of Mr. Martinez, all of whom were Hispanic or black. (*Id.* ¶ 46).

Three of the witnesses agreed (and the fourth did not contradict) that there was only one shooter of Mr. Martinez, and that person was 6 feet or 6 feet 1 inches tall with a medium or stocky build and was wearing a red jacket.[4] (*Id.* ¶ 44).

### D.  The Chevy Nova Traffic Stop Only 3 Days after the Murder – Exculpatory Evidence that Was Withheld for more Than 26 Years

On November 16, 1990, three days after the Martinez murder, Philadelphia Police stopped a primer gray-colored Chevrolet Nova only six blocks from the Martinez murder scene because it fit the exact description of the car used in the Martinez murder.[5]  (*Id.* ¶ 55). Three African-American males named Oliver Walthour, Lloyd Hicks, and Bobby Harris were in the car and a gun was recovered inside the car. (*Id.* ¶¶ 56, 64).  Police transported all three men to the Homicide Unit where Defendant Devlin interrogated them. (*Id.* ¶ 56, 58). All three admitted they knew the victim, Domingo Martinez. (*Id.* ¶ 57). Walthour claimed the Nova belonged to Hicks, but that Hicks' cousin, John Lewis, often drove the Nova. (*Id.* ¶ 59). Walthour further claimed that Lewis

---

[4]      Ron Smith was one of the eyewitnesses who saw the murder from a few feet away, closer than anyone else, and could confirm that there was no car allegedly carrying Mr. Thomas following the striking car.  Despite this, Defendants ignored him in their investigation and purposefully called him off.  Several months after the murder, Mr. Smith called the homicide division to see if they needed more information from him. (*Id.* ¶¶ 97, 97, 103, 104).  Defendant Devlin informed him that he was not needed as a witness because his description did not match the suspects in the case. (*Id.* ¶ 104). The homicide detective also told Mr. Smith that his description of the killer was different than the descriptions provided by other witnesses, which was untrue.  (*Id.*)

[5]      The Nova police stopped on November 16, 1990 was actually primer gray with a brown driver's side door. (*Id.* ¶ 55). The eyewitnesses to the murder saw either a primer gray Nova, or a white and red Nova or Skylark. (*Id.* ¶¶ 42, 43).

may have been the killer because the day after the Martinez murder, he saw Lewis "flashing around a lot of money" in a bar at 8th and Venango Streets. When Walthour asked Lewis where he got all the money, Walthour told Defendant Devlin that Lewis said that he "robbed this old Puerto Rican guy between 7th and Tioga and Sedgley." (*Id.* ¶ 59).

Walthour also claimed Lewis told him "they followed him [the Puerto Rican man] in a car and they hit the dude's car, and when they stopped he said he [Lewis] jumped out the car.  He was acting like it was the other dude's fault." (*Id.*) Walthour told Defendant Devlin that Lewis always carries a gun and "always told me that he made his money going into banks and watching people get money and when the people left the bank they would follow them and rob them." (*Id.*) As for his location at the time of the murder, Walthour stated he slept until the afternoon and then accompanied a friend to a house at Broad Street and Erie Avenue.[6] (*Id.* ¶ 73).

Officers Eberhardt and McDowell of the Mobile Crime Detection Unit processed the Nova stopped on November 16, 1990 for evidence related to the Martinez murder. *Id.* ¶¶ 65, 66).  The officers collected paint scrapings of another type of gray paint from the passenger side of the Nova. (*Id.* ¶ 65). Photographs of the Nova were taken documenting the passenger's side of the car, but these photographs are missing from the Homicide file and the D.A.'s file, so there is no record of whether the Nova had damage on the right front corner of the car. (*Id.* ¶ 70). Despite a request to compare the paint scrapings Officers Eberhardt and McDowell recovered to the victim's car, the comparison was never made. (*Id.* ¶ 69).

---

[6]     A transcript of a 911 call provided to Mr. Thomas in criminal discovery revealed that on November 21, 1990, a caller claimed that three men who "killed the Puerto Rican millionaire" were hiding in a house for several days at Broad and Erie.  (*Id.* ¶ 72).

Four months after the Nova was stopped and Walthour, Hicks, and Harris were interrogated, Walthour and Harris robbed and killed storeowner Rene Cardona on March 20, 1991 at 3523 N. 8th Street, two blocks from the Martinez murder scene. (*Id.* ¶¶ 74-82). Walthour was convicted of Mr. Cardona's murder on May 16, 1994 and is serving a life sentence for that crime. *Id.* ¶ 93).

On May 1, 1991, Defendant Devlin again interrogated Walthour, this time because a review conducted by the Homicide Division identified the Cardona murder as having "some similarities" to the Martinez murder. (*Id.* ¶ 90). Walthour told Defendant Devlin yet another version of the Martinez murder story, this time informing Devlin that he heard "Shawn" and "T-Bop" from 7th and Butler killed Martinez. (*Id.* ¶ 91). Shaurn Thomas never lived near or frequented the area of 7th and Butler. (*Id.* ¶ 92). Nevertheless, Defendants Devlin and Worrell, who knew all of the information concerning the stop of the gray Nova and the similarities of the Cardona and Martinez murders, did nothing more with the information they had concerning the suspects in the gray Nova. Defendants Devlin and Worrell never told to the D.A.'s Office or to Shaurn Thomas's defense counsel any information at all concerning the stop of the Nova, the interrogation of the suspects, the evidence recovered, or the similarities of the Cardona and Martinez murders. (*Id.* ¶¶ 94, 95, 96). Plaintiff's brother, Mustafa Thomas, also received PCRA relief and had his conviction vacated due in part to the Defendants' failure to disclose the extensive exculpatory evidence in their possession. (*Id.* ¶ 273).

### E. Defendants Begin Pursuing an Unexplained "Blue Car" Theory

Ignoring the consistent descriptions provided by eyewitnesses and the physical evidence gathered by Officer McDowell, all of which indicated that the killers drove either a red-and-white or a gray Nova or Skylark, Defendants Devlin and Worrell—without any stated reason, now or then—started investigating blue cars in January 1991.  During January 1991, Defendants Devlin

and Worrell brought in blue cars and did a full work-up of them, including taking paint scrapings to analyze for transfer paint. (*Id.* ¶¶ 106-117). In their depositions, neither Defendant Devlin nor Worrell could explain why they were interested in blue cars. (*Id.* ¶ 117). There were no documents, forensic reports, or photos to show that a blue car was involved in the murder at all.[7]

### F. 1992-1993 – Investigation Continues

#### 1. Nathaniel Stallworth Gives a False Statement in February 1992

On February 8, 1992, Detectives Dougherty and Mangoni interrogated Nathaniel Stallworth. (*Id.* ¶ 121). Nathaniel Stallworth was in jail, and Dougherty and Mangoni told Nathaniel that if Nathaniel told them what they wanted to hear, Nathaniel could get out of jail to see his girlfriend have a baby. (*Id.* ¶¶ 121, 123).

In this statement Nathaniel Stallworth falsely told Detectives Dougherty and Mangoni that Shaurn Thomas took part in the Martinez robbery. (*Id.* ¶ 122). Nathaniel Stallworth also allegedly named his cousins, John and William "Sean" Stallworth as participants in the Martinez murder. (*Id.* ¶¶ 122, 124). Nathaniel also identified, via photographs shown to him by the detectives, two

---

[7]     On January 5, 1991, less than three months after the murder, Defendant Devlin confiscated a blue 1977 Chevrolet Caprice Classic automobile and transported it to the Police Garage. (SUMF ¶ 106). This car was photographed by Officer James Caldwell of the Mobile Crime Detection Unit and identified on police reports as being involved in the Martinez murder. (*Id.* ¶¶ 106, 109). On or about February 8, 1991, Defendant Devlin requested that Police Officer James Caldwell of Mobile Crime Detection Unit process and document evidence taken from the blue 1977 Caprice. (*Id.* ¶ 109). The property receipt on which the evidence was documented was not turned over to Plaintiff's counsel. (*Id.* ¶ 224).
         The evidence removed from the 1977 Caprice Classic included chrome trim taken from the passenger side wheel well containing "blue-gray transfer paint," a broken light cover taken from the car's tail light, and a red face mask. (*Id.* ¶¶ 109, 111). Police Officer Caldwell also took fourteen black and white photographs of the 1977 Caprice Classic that he gave to Defendant detectives. (*Id.* ¶ 109).

other participants in the murder:  Raynard Hardy of Cleveland, Ohio, and Jimall (Jamal) Randall.

(*Id.* ¶ 126).

## 2.   John Stallworth Makes a False Confession in October 1992

In 1992, Defendants Devlin and Worrell had still not arrested anyone for the Martinez

murder and they hatched a plan to bring John Stallworth to Philadelphia from New Jersey and

question him concerning the Martinez murder. (*Id.* ¶¶ 127, 128). On October 27, 1992, federal

authorities delivered Stallworth to Defendants Devlin and Worrell notwithstanding the specific

instructions from John Stallworth's lawyer that Stallworth had invoked his right to be silent and

should not be questioned without the lawyer present. (*Id.* ¶¶ 129-132).  Defendants Devlin and

Worrell ignored the invocation of the right to remain silent and admonition that John Stallworth

should not be interrogated without his counsel and brought Stallworth to the interrogation room.

(*Id.* ¶¶ 131, 133).

While he was handcuffed to a chair in an interrogation room, Defendants Devlin and

Worrell threatened and subjected John Stallworth to physical assault, including hitting him with a

telephone book and squeezing his testicles. (*Id.* ¶¶ 132, 135, 136). They told Stallworth that he

would be free to leave as soon as he told them what they wanted to hear. (*Id.* ¶ 134). Relying on

Defendants' promise that he could leave if he said what Defendants wanted to hear, John

Stallworth named himself, his brother William Stallworth, Shaurn Thomas, Mustafa Thomas, and

others in the Martinez murder. (*Id.* ¶ 138).  He did so only to end the abuse.  (*Id.*) In his false

confession, John Stallworth "confirmed" the story fed to him by Defendants, *i.e.*, that six men in

two cars (a blue car and a gray car) robbed Mr. Martinez at random. (*Id.* ¶ 140). Stallworth had no

personal knowledge of the events detailed in his signed October 27, 1992 statement and the facts contained in that statement.[8] (*Id.* ¶ 139).

John Stallworth's confession named himself, his brother William Stallworth, Shaurn Thomas, Mustafa Thomas, "Nasir," and Louis Gay in the murder. (*Id.* ¶¶ 138, 141, 142). In this first version of his confession, John Stallworth claimed that Louis Gay was a key participant in the robbery and murder of Mr. Martinez, who entered the bank and returned to point out the victim for the robbers as Mr. Martinez pick up the $25,000. (*Id.* ¶ 141). As it turned out, the information provided by John Stallworth soon proved to be false and unreliable. (*Id.* ¶ 151).

### 3. Defendants knew that the Louis Gay story was a lie

The day after the Stallworth's October 27, 1992 statement, Defendants Devlin and Worrell learned that Louis Gay was not even in Pennsylvania on the day of the Martinez murder—he was in prison. (*Id.* ¶ 151). John Stallworth had clearly lied about Gay's participation. (*Id.* ¶ 152).

### 4. William Stallworth tells Defendants that he was not involved in the murder

On October 29, 1992, two days after interrogating John Stallworth, Defendants Devlin and Worrell interrogated Stallworth's brother, William Stallworth, whom John had named in his false confession. (*Id.* ¶ 153). William Stallworth told Defendants that he was not involved in the Martinez murder and knew nothing about it. (*Id.* ¶ 154).

### 5. Defendants Devlin and Worrell Learn That Shaurn Thomas Appeared at the YSC on November 13, 1990

---

[8] Defendant Devlin has been accused multiple times of coercing confessions. For example, in the *Wright* case, Mr. Wright testified that Defendant Devlin coerced a false confession from him. (SUMF ¶ 280). Mr. Wright's confession for murder was vacated because DNA proved he could not have raped and murdered the victim. (*Id.*) After being acquitted on retrial, Mr. Wright sued the City of Philadelphia, Defendant Devlin and other detectives because Defendant Devlin coerced Mr. Wright's confession. (*Id.*). In May 2018, the City of Philadelphia and the Defendants settled the case for just under $10 million. (*Id.* ¶ 267).

Consistent with the routine practice of verifying information provided during a confession, Defendant Worrell also sought to determine where Shaurn Thomas was on November 13, 1990. (*Id.* ¶ 158-160, 169). Defendants learned that Shaurn Thomas was a juvenile and appeared at the Youth Study Center on the morning of the murder [November 13, 1990]. (*Id.* ¶¶ 161-166). Defendant Worrell testified at Mr. Thomas's criminal trial that "[a] phone call was made" in Worrell's attempt to determine Mr. Thomas's location on the morning of the murder. (*Id.* ¶ 166). Defendant Worrell testified that he never did anything other than make that one phone call, and he never looked at documents to see whether Mr. Thomas was at the YSC that day. (*Id.*) But contrary to Defendant Worrell's sworn trial testimony, Defendants Devlin and Worrell did far more than make a single phone call to verify Mr. Thomas's whereabouts.  At the very least, they obtained documents showing that Mr. Thomas was YSC on November 13, 1990. (*Id.* ¶¶166-169). Included in the Martinez H-file were:

- A subpoena issued by the YSC for Mr. Thomas's next appearance date, signed by Mr. Thomas on November 13, 1990. (*Id.* ¶ 167).

- Another document showing Mr. Thomas's signature, which was used to compare with his signature on the subpoena in order to prove that  Mr. Thomas was at the YSC on the morning of November 13, 1990. (*Id.* ¶ 168).

- A handwritten list of phone numbers, in Defendant Devlin's handwriting, of other individuals who worked in the YSC or the juvenile court at 1801 Market Street, including Bruce Berger and Michael Carpenter. (*Id.* ¶¶ 160, 161).

Defendant Worrell was unable to explain how these three documents ended up in the Martinez H-file, notwithstanding his testimony that he and Defendant Devlin were responsible for maintaining the homicide file and stored all documents and information they collected during the course of an investigation in that file. (*Id.* ¶¶ 20, 22, 38, 170).

Defendant Worrell claims he cannot recall if he compared the signature on the YSC subpoena with Mr. Thomas's other signature, which was on a document adjacent to the subpoena

in the H-file, but the evidence in the H-file shows that Defendants did compare the signature on the documents. (*Id.* ¶¶ 21, 168). Defendants Devlin and Worrell did not get a handwriting expert to compare the signatures, even though such an expert was available. (*Id.* ¶ 168). They had no recollection of the names with phone numbers in Defendant Devlin's handwritten notes. (*Id.* ¶ 161).

In the spring of 2017 the Conviction Review Unit ("CRU") of the Philadelphia DA's Office[9] called and spoke to Brian Coen (the Director of Pre-trial Services for the Intake Unit of the Family Court of Philadelphia at the time of the murder), other individuals involved in Mr. Thomas's underlying case, and individuals involved with and knowledgeable about the Philadelphia Juvenile Court system in 1990. (*Id.* ¶¶ 233, 234). After this investigation, the CRU concluded that "contrary to the Commonwealth's theory at trial regarding the alibi, it is ***most likely*** that [Shaurn Thomas] appeared in Juvenile Court for an intake interview on the morning of November 13, 1990." (*Id.* ¶ 250 (emphasis added)). The CRU also concluded that, based on a review of documents signed by Mr. Thomas, "it is clear that it was [Mr. Thomas's] signature on the subpoena in question." (*Id.* ¶ 251).

Defendants Devlin and Worrell could have easily conducted the same investigation and obtained the same information regarding Mr. Thomas's whereabouts on the day of the murder as the CRU conducted decades later. In fact, Defendants Devlin and Worrell were in a better position than the CRU to uncover Mr. Thomas's alibi, because they could have accessed police documents that would have shown what time Mr. Thomas's mother picked him up at the 9th District on the morning of November 13, 1990. (*Id.* ¶ 14). Had Defendants Devlin and Worrell not put the brakes

---

[9]    The CRU was renamed the Conviction Integrity Unit ("CIU") in January 2018.  References in this brief to the CRU refer to the unit's activities before January 2018; references to the CIU refer to the unit's activities from January 2018 onward.

on their probe, they would have had to have reached the same conclusion as the CRU: that Mr. Thomas was most likely was at the YSC on the morning of November 13, 1990 and, therefore, could not have participated in the Martinez murder. (*Id.* ¶¶ 237, 242, 250).

Instead, Defendants stopped investigating this potential alibi, because if John Stallworth had misidentified yet another participant, then his credibility was even further undermined. Defendant Worrell admitted that Stallworth's lie about Gay's participation "g[a]ve [him] pause," because "misidentifying people in the cars could have been fatal error to our case. It could have killed the whole thing." (*Id.* ¶ 152).

### 6. Nathanial Stallworth's Second Statement and Subsequent Recantation

On October 31, 1992, following John Stallworth's false confession in which he named "Nasir" and Louis Gay as co-conspirators, Defendants met with Nathaniel Stallworth to interview him a second time because his story was different than John's. (*Id.* ¶ 172). In this second statement, Nathaniel Stallworth, after claiming he did not know the two "friends of Mustafa" and had only seen them for a couple of days before the murder in his first statement, claimed instead in his second statement that "Nas" was a participant in the murder, and that Nathaniel knew "Nas" "for a couple of years before the murder." (*Id.* ¶ 173).

Nathaniel Stallworth said that Raynard Hardy, whom he had positively identified in his February 8, 1992 statement as a participant in the Martinez murder, "could be one of the guys in the cars, I just can't be sure, like I told him [Detective Dougherty]." (*Id.* ¶ 175). However, in his earlier statement, Nathaniel Stallworth never said he was not sure if Raynard Hardy was involved in the Martinez murder, but instead said, "That is the guy," referring to Hardy. (*Id.* ¶ 176).

Nathaniel testified at John Stallworth's preliminary hearing in December 1992, where he recanted on the stand. *Id.* ¶¶ 121, 123, 210). Nathaniel claimed that he could not read the statements that detectives had him sign, and said that he would have agreed with anything anyone said just so

14

he could get out of jail. (*Id.* ¶ 210). Defendants Devlin and Worrell were both present for this recantation.  (*Id.* ¶¶ 211-213).

### 7.   John Stallworth Changes His Story

On July 6, 1993, John Stallworth agreed to change his story to eliminate Louis Gay as a participant in order to obtain a plea agreement and avoid the death penalty for the murder.[10] (*Id.* ¶¶ 189, 190). Stallworth provided a second confession to Defendants Devlin and Worrell, claiming that an unknown man—not Louis Gay, as previously claimed—entered the bank and came back to tell them that Mr. Martinez had withdrawn cash. (*Id.* ¶ 191).  John Stallworth agreed to plead guilty to third degree murder and testify against Mr. Thomas and others at trial. (*Id.* ¶ 190).

### G.  *Defendant Worrell Submits an Affidavit of Probable Cause for Mr. Thomas's Arrest on July 27, 1993 With Glaring Omissions*

In 1993, PPD Directive 139 incorporated the provisions of Pennsylvania Rule of Criminal Procedure 119 and provided that "[t]he issuing authority, in determining whether probable cause has been established, may not consider any evidence outside the affidavits." (*Id.* ¶¶ 193, 194). Further, "[i]f probable cause is based in whole or in part on the statement of a confidential source or informant, it is necessary . . . to establish the source of the informant's reliability and the underlying basis for his information in the Affidavit." (*Id.* ¶ 194).  Consistent with Directive 139, Defendant Worrell conceded that "[y]ou had to put all your information within the four corners that would establish probable cause for the issuance of that warrant." (*Id.* ¶ 195).  Yet, Defendants Devlin and Worrell did not include any exculpatory evidence, including recantations or prior known lies, in the warrant.  (*Id.* ¶ 196).

---

[10]     In granting Mustafa Thomas's PCRA and awarding Mustafa Thomas a new trial, Judge Defino-Nastasi found that "totally incredible."  (*Id.* ¶ 273).

On July 27, 1993, Defendant Worrell wrote the affidavit of probable cause for the arrest warrant for Mr. Thomas, but he believes that he and Defendant Devlin "collaborated" in filling out arrest warrants and both generally contributed to them and would read the warrant after it was typed. (*Id.*)

Defendant Worrell's affidavit of probable cause for Mr. Thomas omits many of the key facts that Defendants Devlin and Worrell learned during the course of their investigation.  The affidavit relied on John Stallworth's October 27, 1992 statement—which included the lie about Louis Gay, not John Stallworth's July 6, 1993 statement. (*Id.* ¶¶ 197, 199, 201). Defendant Worrell's affidavit also relied on Nathaniel Stallworth's information, but does not disclose which version it relies upon, the February 8, 1992 version provided by Nathaniel, or the October, 31, 1992 version provided by Nathaniel. (*Id.* ¶¶ 104, 208, 209).  But the affidavit failed to mention that Nathaniel Stallworth later recanted this statement in full during the preliminary hearing for John Stallworth. (*Id.* ¶ 210).  Defendants Devlin and Worrell knew about Nathaniel Stallworth's recantation because they were present during the entire preliminary hearing. (*Id.* ¶¶ 211-213). Indeed, Defendant Worrell made a "consciousness [*sic*] decision" not to include any exculpatory information in the July 27 affidavit, because he "did not talk about misidentifications" and "would not discuss credibility of a witness" in the affidavit. (*Id.* ¶ 196).

Defendant Worrell's July 27, 1993 affidavit failed to include the following key information:

1.    Defendant Devlin had physically coerced John Stallworth to confess; (*Id.* ¶ 201).

2.    Defendant Devlin and Worrell fed John Stallworth the story about two cars—including one blue car—being involved and including Shaurn and Mustafa Thomas; (*Id.*)

3.    John Stallworth falsely identified Lewis Gay as a participant in the murder, when Gay was actually in prison at the time; (*Id.* ¶ 197).

16

4.      There was no forensic evidence showing blue paint on Mr. Martinez's car; to the contrary, MCDU experts only found white transfer paint on Mr. Martinez's car; (*Id.* ¶ 203).

5.      Contrary to John Stallworth's story, none of the four unbiased eyewitnesses saw two cars, a blue car, or six participants in the murder; (*Id.* ¶¶ 204, 205).

6.      Three different eyewitnesses described the man who shot Mr. Martinez as between 6 feet and 6 feet one inches tall with a medium to heavy-set build and wearing red clothing.  Yet Defendant Worrell had done an identification check showing Mustafa Thomas—the shooter alleged by John Stallworth—was five feet, seven inches tall and 120 pounds; (*Id.* ¶¶ 206, 207).

7.      William Stallworth had denied being involved in the robbery of Mr. Martinez, even though his brother's statement had implicated him; and (*Id.* ¶ 154).

8.      Defendants Devlin and Worrell had learned information showing Mr. Thomas had an appearance at the YSC at the time of the murder, yet they stopped pursuing that information for fear of undermining John Stallworth's already suspect credibility. (*Id.* ¶ 214).

Prior to his arrest for the Martinez murder, Mr. Thomas had been charged with—and was later acquitted of—the murder of Harry James because the only eyewitnesses to that murder testified that Shaurn Thomas was not at the murder scene. (*Id.* ¶¶ 177-188).  Defendants now seek to bootstrap evidence related to the James murder to support the arrest of Mr. Thomas for the Martinez murder.  Yet Defendant Worrell did not include any reference to the Harry James investigation or murder in the July 27, 1993 affidavit. (*Id.* ¶ 196).  Also, the Martinez homicide file does not include any witness statements, investigatory documents, or notes of any conversations with the detectives in the James or Bryant investigations, notwithstanding the fact that similar documents appear in those respective homicide files. (*Id.* ¶ 22).

### H.  Defendants Devlin and Worrell Coerce William Stallworth to Adopt the Facts They Fed to John Stallworth

With no forensic, video, eyewitness, or other independent evidence to support John Stallworth's story, and indeed in possession of evidence contradicting that story, Defendants

Devlin and Worrell's only option was to force William Stallworth to "confirm" John Stallworth's wholly unsupported testimony. (*Id.* ¶ 221).

Defendants told William Stallworth that the prosecutor was seeking the death penalty against his brother John, and John would not get his plea deal if William did not tell the same story as John. (*Id.* ¶ 216). Defendants also told William that John made a deal to testify against William as well as the Thomas brothers, so William would likely be convicted of murder unless he cooperated with the Defendants. (*Id.*)

On January 25, 1994, William Stallworth changed his October 31, 1992 statement and agreed to plead guilty and testify against the Thomas brothers at trial. (*Id.* ¶ 217). As a result of Defendants' pressure and out of fear of execution or spending the rest of his life in prison, William Stallworth adopted a story identical to John Stallworth's—that six men ("Nasir," an unknown male, John and William Stallworth, and Shaurn and Mustafa Thomas) in two cars (a blue car and a gray car) had killed Mr. Martinez. (*Id.*)

In or about September 2011, William Stallworth recanted his confession and said that he was coerced into providing false testimony by Defendants Devlin and Worrell. (*Id.* ¶ 218). In the years since William Stallworth changed his original statement and confessed to participating in the Martinez murder, he has recanted this confession numerous times:  to counsel for Mr. Thomas, the Pennsylvania Board of Probation and Parole, and members of the CRU. (*Id.*)

## III.    The Trial

Shaurn Thomas was convicted of second-degree murder on December 19, 1994.  (*Id.* ¶ 219).  The only witnesses who connected Mr. Thomas to the murder of Mr. Martinez were John

and William Stallworth. (*Id.* ¶ 221). There was no forensic evidence, there were no eyewitnesses, there were no fingerprints, and there were no videos.[11] (*Id.*)

At the time, criminal discovery procedure required homicide detectives to provide the entire H-file to the DA's Office which would then make a copy of the file and turn it over to defense counsel. (*Id.* ¶ 229). Defendants Devlin and Worrell never provided ***any*** property receipts connected to the Martinez murder investigation to the DA's Office, including property receipts documenting cars confiscated in the murder investigation, evidence taken from those cars, and evidence taken from the murder scene. (*Id.* ¶ 224). As a result, no property receipts were provided to Mr. Thomas's attorney as discovery material—including the receipts establishing that there was no blue paint on Mr. Martinez's car. (*Id.*) Defendants also did not give the DA's Office the exculpatory statements from Walthour, Hicks, and Harris. (*Id.* ¶ 96).

## IV.   The CRU Vacates Shaurn Thomas's Conviction and Decides to Dismiss the Case

In January 2017, B.J. Graham-Rubin and Andrew Wellbrock started working at the CRU as the director and assistant director, respectively. (*Id.* ¶ 232).  The CRU's job was "[t]o investigate and identify cases of actual innocence."  (*Id.*). In making a determination of "actual innocence" the CRU used a "clear and convincing standard."  (*Id.*)

Over the next three months, Ms. Graham-Rubin spoke with everyone who understood YSC procedures and paperwork in late 1990, and ended up focusing her on efforts on John Delaney,

---

[11]     The prosecutor did have the Stallworth brothers identify two Polaroid pictures which the Stallworth brothers testified depicted a car up on blocks in Abbottsford Homes, which they claimed had been used in the murder.  There was no testimony that those pictures showed any impact damage consistent with a crash with Mr. Martinez's car, that any tests were done on that car to determine whether there was any transfer paint, or that any police work at all had been done on the car.  (*Id.* ¶¶ 219-228).  In addition, there was no testimony regarding where the photographs came from, when they were taken, or who took them.  (*Id.*)  No one can find these Polaroid pictures today, and the Defendant detectives who claim that they were shown to John Stallworth in his July 1993 interview do not recall the photographs.  (*Id.* ¶ 230).

Deputy of the Juvenile Division of the District Attorney's Office, and Assistant District Attorney Jamie McDermott, who was Chief of the Habitual Offenders Unit in 1990. (*Id.* ¶ 234). After speaking with Mr. Delaney and Mr. McDermott, Ms. Graham-Rubin drafted a memo dated March 22, 2017, in which she wrote that Mr. McDermott and Mr. Delaney agreed that Mr. Thomas "most likely" had his intake interview at the YSC on the morning of November 13, 1990. (*Id.* ¶¶ 235, 237, 238). Ms. Graham-Rubin sent a draft of her memo to Mr. Dermott and Mr. Delaney for their review and comments. (*Id.* ¶ 236). Both reviewed and made comments, and confirmed her conclusion that Mr. Shaurn Thomas was "most likely" at the YSC on the morning of November 13, 1990. (*Id.* ¶ 237).

Ms. Graham-Rubin and Mr. Wellbrock met with William Stallworth on April 11, 2017. (*Id.* ¶ 243). Mr. Stallworth told Ms. Graham-Rubin and Mr. Wellbrock that he played no role in Mr. Martinez's robbery or murder, and, therefore, could not tell them whether Mr. Thomas was there or not.  (*Id.*) Mr. Wellbrock believed William Stallworth but Ms. Graham-Rubin did not. (*Id.*).[12]

On May 3, 2017 the CRU received the H-file.  (*Id.* ¶ 244). Mr. Wellbrock discovered the Walthour, Hicks and Harris statements that were missing from the DA's file. (*Id.*).  Mr. Wellbrock immediately recognized the significance of these statements "[b]ecause it was information that discussed alternate suspects that was identified contemporaneously with the murder."  (*Id.* ¶ 245). Mr. Wellbrock also agreed that the Walthour information was "significant because the alternate suspect was driving a car that fit the description of the eyewitnesses."  (*Id.*)

---

[12]    This was not the first time William Stallworth said he played no role in Mr. Martinez's murder.  He told Marissa Bluestine in September 2011 that he had nothing to do with the Martinez murder and on November 13, 1990, and that he only confessed because two detectives told him that his brother would face the death penalty if William did not adopt John's version. (*Id.* ¶ 218).

As a result of the CRU's investigation into Mr. Thomas's alibi and their conclusion that Mr. Thomas was likely at the YSC on the morning of the murder, the recantation of one of the only witnesses who placed Mr. Thomas at the scene of the murder, and the discovery of the critical exculpatory evidence hidden in Defendants' police files, the CRU and Acting District Attorney Kathleen Martin decided to vacate and dismiss his case. (*Id.* ¶ 247). Mr. Wellbrock memorialized these conclusions and the rationale underlying these factors in a memo dated May 11, 2017:

> [T]he CRU's investigation of [Mr. Thomas's] alibi defense makes it clear that his defense is substantially stronger than that presented by counsel at trial.
>
> Based on our review and investigation, sufficient evidence exists to undermine confidence in the conviction and creates a basis for relief in the interest of justice. Based on the evidence, we do not believe sufficient evidence exists to prove the Petitioner guilty beyond a reasonable doubt. As such, **the CRU recommends agreeing to a new trial and moving to *nolle prosequi* the charges**.

(*Id.* ¶ 254) (emphasis added)]

Mr. Wellbrock, Ms. Graham-Rubin and Ms. Kathleen Martin all reviewed, approved and signed Mr. Wellbrock's May 11 memo. (*Id.* ¶¶ 248, 249). The May 11 memo does not rely on or even mention Mr. Thomas's age, his role in the offense, or the amount of time served. (*Id.* ¶¶ 255, 256).

On May 12, 2017, acting DA Martin wrote to Marissa Bluestine, Executive Director of the Pennsylvania Innocence Project, to inform her that the District Attorney's Office had concluded that "sufficient evidence exists to undermine our confidence in the conviction and creates a basis for relief in the interests of justice." (*Id.* ¶ 260). Therefore, the DA's Office "agree[d] to vacate the conviction." (*Id.*)

On May 23, 2017, Mr. Thomas was released from SCI Frackville, a maximum security prison. (*Id.* ¶ 261). He had been in jail or in prison for nearly twenty four years, since July 1993.

On the same day that Mr. Thomas was released from prison, May 23, 2017, the City started its campaign to avoid liability. First Assistant Deputy Solicitor Craig Straw wrote to Michael Miller, the Assistant City Solicitor who handled the Anthony Wright case, and Armando Brigandi, the Chief of the Civil Rights Unit, attaching a copy of Philly.com's article regarding Mr. Thomas's release. (*Id.* ¶ 265).

Almost immediately, Mr. Miller wrote to Bryan Hughes from the DA's Office stating that "[i]t would be nice to avoid a second Anthony Wright-type case and to get a *nolo contendere* plea." (*Id.* ¶ 268). Mr. Hughes relayed Mr. Miller's email to acting DA Martin. (*Id.* ¶ 269). At the same time, Mr. Straw spoke to Ms. Martin several times and suggested that she get a waiver of civil liability if there was not a finding of actual innocence. (*Id.* ¶ 270). Ms. Martin then had a June 8, 2017 conversation with Ms. Bluestine and Jim Figorski, Mr. Thomas's lawyers, to discuss whether the DA's Office was going to *nolle prosequi* ("*nol pros*") the Mr. Thomas's case. (*Id.* ¶ 271). When Ms. Bluestine asked Ms. Martin whether the DA's Office was going to retry Mr. Thomas, Ms. Martin responded, "You are going to bankrupt the City," and then asked whether Mr. Thomas would waive any civil actions. (*Id.*) Mr. Thomas's lawyers refused to do so. (*Id.*)

What followed was an intense debate about how to package the DA's decision to *nol pros*. On June 13, 2017, Ms. Graham-Rubin appeared before the Honorable Rose Marie Defino-Nastasi to announce the DA's decision to *nol pros* Mr. Thomas's case, which she, acting DA Martin, and Mr. Wellbrock had already agreed to recommend a month before:

> Your Honor, after [review and] further investigation, the District Attorney's Office Conviction Review Unit has determined that it is most likely that Shaurn Thomas was, in fact, at the Youth Study Center sometime during the morning of November 13, 1990. However, the evidence does not establish an absolute alibi. So, therefore, the Conviction Review Unit cannot determine Mr. Thomas's actual innocence. Furthermore, there has been a recent recantation by one of the witnesses who testified, William

Stallworth (ph.)  In his recantation, he recanted his trial testimony but his recantation also does not actually exculpate Mr. Thomas. Mr. Stallworth now claims that he was not present at the time of the crime and, therefore, he does not know, has no firsthand knowledge of who was or was not a participant in the crime.

Although he states he believes Mr. Thomas wasn't there, he states now he has no actual knowledge of who participated because he wasn't there and, finally, as to the statements from Oliver Walthour, these were the statements that were not provided to the District Attorney's Office or to the Defense at the time of trial but on their face, they are both potentially exculpatory and inculpatory.  So they too do not establish any innocence.

However, under present case law, the Conviction Review Unit believes that these statements are discoverable under Brady and, accordingly, Mr. Thomas would be entitled to a new trial.  So that is why we recommended vacating the petitioner's conviction and as this court knows at this time, the District Attorney's Office is faced with considering whether or not we were going to retry Mr. Thomas.

Based on the totality of the circumstances here, including his age at the time of the crime, the fact that he was not the shooter and in consideration of the time that he has already spent in prison, the Conviction Review Unit recommended to the District Attorney's Office, and the District Attorney's Office agrees, that we will not be seeking a retrial and that we will seek to *nol pros* the case.

(*Id.* ¶ 272).  Judge DeFino-Nastasi then *nol pros*'d the case.  (*Id.*)

## V.    Facts Related to *Monell* Claim

As early as the 1970s and continuing well beyond Mr. Thomas's arrest, officers assigned to the PPD Homicide Unit engaged in widespread unlawful practices, including arrests without probable cause, the use of coercion, threats, and physical abuse during interrogations of witnesses and suspects, the fabrication and deliberate concealment of material evidence, and denial of the right to a fair trial.  The City and its policymakers failed to take action to control, remediate or reduce these unconstitutional practices.  (*Id.* ¶ 274).

In 1978, the Philadelphia Inquirer published *The Homicide Files*, a four-part series exposing a pattern of misconduct by officers of the Homicide Unit that mirrored the conduct that

led to the wrongful arrest and prosecution of Shaurn Thomas.  The City failed to take meaningful steps to remedy this misconduct.  Thereafter, on no less than three occasions in the 1980s federal courts intervened to enjoin PPD investigatory practices that violated the U.S. Constitution.[13]  The City again failed to remedy known patterns of police misconduct.  (*Id.* ¶ 275).

In the late 1980s and early 1990s, a series of police misconduct incidents led to hundreds of arrests and prosecutions based on fabricated evidence, false police testimony, and false or concealed evidence.  Ultimately, the District Attorney of Philadelphia agreed to vacate hundreds of convictions, the City agreed to compensate those wrongfully accused in an amount exceeding $6 million, and a number of officers faced federal indictments.  The practices prompted a class action lawsuit, *NAACP, et al. v. City of Philadelphia*, E.D. Pa. No. 96-6045, which led to a Settlement Agreement requiring the City to implement policy and training initiatives to ensure that police officers abide by restrictions on their investigative powers under the U.S. Constitution. (*Id.* ¶ 276).

Dr. R. Paul McCauley, a nationally recognized expert on police and municipal practices, has provided an exhaustive and long-term analysis of the operations of the PPD, including the Homicide Unit.  As found by Dr. McCauley:

> Since at least the 1970s there have been credible and well-documented reports of policies, practices, and customs within the PPD that deviated from generally accepted police procedures… Detectives in the Homicide Unit were found to have engaged in the same types of misconduct that are alleged to have led to the improper arrest and prosecution of Shaurn Thomas, including

---

[13]     *See Cliett v. City of Philadelphia*, Civil Action No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of the unconstitutionality of "Operation Cold Turkey," during which 1,500 individuals were unlawfully subjected to search and arrest); *Spring Garden United Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweep of Latinos in Spring Garden area in aftermath of a shooting of a police officer); *Arrington v. City of Philadelphia*, Civil Action No. 88-2264 (E.D. Pa. 1988) (enjoining the stop and searches of young African American males during investigation of "Center City Stalker").

> fabrication of evidence, coerced statements, concealment of
> material evidence, and similar improper police practices.  The PPD
> failed to take meaningful steps to remedy this misconduct.  As a
> result, the practices persisted for many years thereafter.

(*Id.* ¶ 377).

As more fully discussed in Section II.E, *infra*, there is evidence that the wrongful arrest and prosecution of Shaurn Thomas was caused by the long-standing and widespread unconstitutional customs, policies, and practices analyzed by Dr. McCauley.  Further, and importantly, the City had not maintained an effective disciplinary system to properly monitor compliance with constitutional requirements and accepted police procedures, and failed to remedy the abuses of investigatory functions.

## LEGAL STANDARD

Summary judgment should be denied unless there is no genuine issue of material fact and judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56(a); *Norfolk S. Ry. Co. v. Baseball USA, Inc.*, 512 F.3d 86, 91 (3d Cir. 2008).  Defendants, the moving party, bear the burden of demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A genuine issue of material fact exists if the evidence is such that a reasonable jury could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether this standard has been met, a court cannot weigh competing evidence or resolve credibility questions.  *See Hill v. City of Scranton*, 411 F.3d 118, 131 (3d Cir. 2005).  Moreover, it is a "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party."  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  When the non-moving party's evidence contradicts the moving party's evidence, the non-moving

party's evidence must be taken as true.  *Big Apple BMW Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## ARGUMENT

I.   **There Are Numerous Genuine Issues of Material Fact Regarding Plaintiff's Malicious Prosecution Claim.**

A.   *The **nol pros** in Mr. Thomas's criminal case constitutes a "favorable termination" under Third Circuit law.*

In the Third Circuit, favorable termination for purposes of malicious prosecution claim is demonstrated where "a prior criminal case [was] disposed of in a way that ***indicates*** the innocence of the accused . . . ."  *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009) (emphasis added).  "*Actual innocence is not required* for a common law favorable termination."  *Smith v. Holtz*, 87 F.3d 108, 113 (3d Cir. 1996) (quoting Restatement of the Law of Torts §§ 659, 660 (1938)), abrogated on other grounds by *Wallace v. Kato*, 549 U.S. 384 (2007) (emphasis added).  A *nol pros* can satisfy the favorable termination element of a malicious prosecution claim.  *Geness v. Cox*, 902 F.3d 344, 356 (3d Cir. 2018); *see also Malcomb v. McKean*, 535 F. App'x 184, 187 (3d Cir. 2013) ("Our precedent is clear.  A nolle prosequi disposition is a favorable termination unless the accused has entered into a compromise or surrendered something of value to obtain that outcome.").

In analyzing whether a *nol pros* constitutes a favorable termination, "a district court must conduct a ***fact-based inquiry***, considering, among other things, the underlying facts of the case, the particular circumstances prompting the *nol pros* determination, and the substance of the request for *nol pros* that resulted in the dismissal."  *Geness*, 902 F.3d at 356 (emphasis added) (internal quotations and citations omitted).  Thus, Defendants' argument that the *nol pros* must reflect actual innocence is far off the mark.  To the contrary, it is sufficient that the evidence ***tends*** to indicate that government thought the accused ***might*** be innocent.  *See Ballard v. City of Phila.*, No. 14-

26

4740, 2015 WL 6467925, at *9 (E.D. Pa. Oct. 26, 2015).  Where the circumstances of the case show that the government doubts its ability to meet its burden of proof at trial, a *nol pros* constitutes a favorable termination.  *See Geness*, 902 F.3d at 356.

### 1.  The underlying facts of the case indicate Mr. Thomas's innocence.

The evidence supports the DAO's finding that Mr. Thomas was most likely miles from the scene at the time of the Martinez murder.  As the CRU recognized, Mr. Thomas's trial counsel had failed to properly advance evidence supporting the alibi.  (SUMF ¶ 254).  Most important, Defendants Devlin and Worrell had access to critical evidence supporting the alibi, but concealed that evidence from counsel and the court.  (*Id.* ¶ 241).

Second, John and William Stallworth—the only two witnesses who testified against Mr. Thomas—were coerced by Defendants Devlin and Worrell to adopt a false narrative implicating Mr. Thomas.  (*Id.* ¶¶ 215-218).  Defendant Devlin has coerced witnesses to falsely confess before, as in the *Wright* case and in three other cases currently under review by the CRU.  (*Id.* ¶¶ 280, 283, 286).

Third, even if the Stallworths had not been coerced, their versions of what occurred were contradicted by the forensic evidence and eyewitnesses, and undermined by the deals they cut to reduce their culpability and by the undisclosed exculpatory evidence regarding the car and persons most likely involved in this crime.

### 2.  The particular circumstances prompting the *nol pros* indicate Mr. Thomas's innocence.

In a memo dated March 22, 2017—two months before Mr. Thomas was released—the CRU director Ms. Graham-Rubin wrote that it was "[m]ost likely" that Mr. Thomas was at the YSC on the morning of November 13, 1990.  (*Id.* ¶ 237).  As such, he could not have planned or participated in Mr. Martinez's murder just before 10:00 am.  In a memo dated May 11, 2017—less

27

than two weeks before Mr. Thomas was released—Mr. Wellbrock, the Assistant Director of the CRU, wrote, "Based on a review of [interviews and documents] and contrary to the Commonwealth's theory at trial regarding [Mr. Thomas's] alibi, it is most likely that [Mr. Thomas] appeared in Juvenile Court for an intake interview on the morning of November 13th, 1990." (*Id.* ¶ 250). These memoranda show that the CRU viewed Mr. Thomas's alibi as "most likely" being true, which indicates Mr. Thomas's innocence.

Moreover, the CRU recommended *nol pros* because the DA's Office no longer had confidence in the jury's 1994 verdict and realized that it could not meet its burden at a second criminal trial:

> Based on our review and investigation, sufficient evidence exists to undermine confidence in the conviction and creates a basis for relief in the interests of justice. Based on the evidence, we do not believe sufficient evidence exists to prove [Mr. Thomas] guilty beyond a reasonable doubt. As such, the CRU recommends agreeing to a new trial and moving to nolle prosequi the charges.

(*Id.*) The May 11 memo is signed by Ms. Martin, who was, at the time, acting DA. (*Id.* ¶ 249). These memoranda thus represent the true reasons (or, at a minimum, create a triable issue of fact) as to why the DA's Office decided to release Mr. Thomas and *nol pros* the charges against him. These facts show that the DA's Office released Mr. Thomas due to the circumstances indicating his innocence.[14]

---

[14]    The DA Office's decision to *nol pros* the charges against Mr. Thomas also did not result from a compromise or Mr. Thomas giving up something of value. *See Malcomb*, 535 F. App'x at 187. To the contrary, acting DA Martin asked Mr. Thomas's attorneys to waive any civil claims against the City because otherwise Mr. Thomas would "bankrupt the City." (SUMF ¶ 271). She made this request before anyone at the DA's Office told Mr. Thomas's attorneys that the CRU had already decided to *nol pros* the charges against Mr. Thomas. (*Id.* ¶ 254).

3.  <u>The substance of the District Attorney's request for *nol pros* at the June 2017 hearing does not preclude Mr. Thomas's innocence.</u>

Defendants rely on the DA Office's public statements from a June 13, 2017 hearing—pointing to Mr. Thomas's age, the fact that he was not the shooter and the time he spent in prison—to argue that Mr. Thomas did not receive a favorable termination.  Defs' Mot. at 14.  Ignoring other record evidence regarding the *nol pros*, Defendants erroneously suggest that the reasons constitute the sole reasons for dropping the charges against Mr. Thomas.  *Id.*  First, the hearing transcript itself notes only that "the Conviction Review Unit cannot determine Mr. Thomas's actual innocence."  (SUMF ¶ 272).  But such a statement cannot defeat Mr. Thomas's favorable termination because a determination of actual innocence is ***not*** required in a malicious prosecution claim.  *See Smith*, 87 F.3d at 113.  Also, the CRU had already noted in at least two internal memoranda that Mr. Thomas's alibi evidence was strong and that he was "[m]ost likely" at the YSC at the time of the murder.  (SUMF ¶ 237).  Clearly, Mr. Thomas's strong alibi evidence was a primary basis of the CRU's decision.  Moreover, Mr. Thomas's age, the fact that he was not the shooter, and the time he spent in prison were only ***some*** of the circumstances considered by the DA's Office.  (*Id.* ¶ 272).  The DA's Office also mentioned William Stallworth's recent recantation at the hearing.  (*Id.*)  The reasons stated on the record were not exhaustive and do not nullify the CRU's prior reasons based on Mr. Thomas's alibi evidence.

Moreover, the facts demonstrating the campaign by the City Solicitor's Office "to avoid a second Anthony Wright type case" raise genuine issues of material fact as to whether the reasons for the *nol pros* articulated at the hearing were made in an attempt to avoid civil liability.  Three weeks before the *nol pros* hearing, Assistant City Solicitor Miller e-mailed a link to a philly.com news article regarding Shaurn Thomas's release to Bryan Hughes, Chief of the Civil Litigation Unit in the DA's office asking "what's going on with this case" and writing that "[i]t'd be nice to

avoid a second Anthony Wright type case, and to get a nolo contendere plea." (*Id.* ¶ 268).  Mr. Hughes understood Mr. Miller to be "seeking information regarding whether the Philadelphia District Attorney's Office intended to re-try the case against Mr. Thomas, to attempt to negotiate a plea, or to dismiss the charges against him" and "expressing concern about similar exposure to the City of Philadelphia in Mr. Thomas's case, should his charges be dismissed or should he be acquitted after a re-trial." (*Id.*)

Mr. Hughes forwarded Mr. Miller's email to Acting DA Martin. (*Id.* ¶ 269).  Craig Straw, First Assistant City Solicitor, also spoke with Acting DA Martin about convincing Mr. Thomas to waive his civil claims against the City. (*Id.* ¶ 270).  At a June 8, 2017 meeting, Acting DA Martin told Mr. Thomas's lawyers, "You are going to bankrupt the city" and that her phone had been "ringing off the hook" in reference to the Thomas case. (*Id.* at ¶ 271).  She then asked Mr. Thomas's attorneys if Mr. Thomas would be willing to sign a waiver of civil liability, and that request was refused. (*Id.*)

Internal communications in the DA's Office show a morphing set of reasons for releasing Mr. Thomas and deciding to *nol pros* the charges against him in the time leading up to the hearing. On the day of the hearing, Acting DA Martin wrote a first draft of a press statement that said the DA Office's decision "not to retry Shaurn Thomas" was

> made after a diligent[] and through [*sic*] review of the facts [of the] case as they currently exist *including the CRU's investigation in the 1992 alibi of Mr. Thomas, and the witnesses from the first trial*, as well as taking into consideration the number of years Mr. Thomas ha[d] already spent in prison on this matter.

(*Id.* ¶ 272 (emphasis added)).  Thus, the Acting DA herself said that *nol pros* was appropriate because of Mr. Thomas's alibi evidence and because the witnesses from the first trial had recanted. This evidence undermines the explanation for the *nol pros* Defendants rely upon.

Neither of the cases relied upon by Defendants provides any support for dismissal of this claim. In *Donahue v. Gavin*, some charges against the plaintiff were dismissed due to intervening changes in the law. 280 F.3d 371, 375 (3d Cir. 2000). The district attorney determined that the plaintiff "would not receive any additional incarceration if he were convicted on retrial" of the remaining charges and therefore requested a *nol pros*. *Id.* Accordingly, there was no indication of the plaintiff's innocence in *Donahue*.

In *Morris v. Verniero*, the New Jersey Attorney General moved to dismiss 76 cases, including plaintiff's drug charges, based on allegations of racial profiling by the police 453 F. App'x 243, 245 (3d Cir. 2011). The Attorney General "clearly stated" that the accused in those 76 cases were not innocent: "[L]et's be clear; the defendants in these cases may have prevailed in their motions to suppress, but *they are criminals nonetheless*. *All were carrying some form of contraband for distribution in communities* in this and other states." *Id.* at 246 (emphasis added). The explicit statement in *Morris* of actual guilt is the opposite of the DA Office's statement of "most likely" ***innocence*** at the June 13, 2017 hearing. (*Id.* ¶ 272).

In sum, the DA Office's decision to *nol pros* the charges against Mr. Thomas was based in large part on the DA's belief that Mr. Thomas's alibi was most likely true and that it could not prove this case beyond a reasonable doubt. As a matter of law, the *nol pros* here constitutes a favorable termination. In the alternative, there are genuine issues of material fact regarding the *nol pros* that must be decided by the jury.

### B. Defendants have failed to show that there is no genuine issue of material fact regarding whether they had probable cause to arrest Mr. Thomas.

"Courts should exercise caution before granting a defendant summary judgment in a malicious prosecution case when there is a question of whether there was probable cause for the initiation of the criminal proceeding because, '[g]enerally, the existence of probable cause is a

31

factual issue.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 300 (3d Cir. 2014) (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)); *see also Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016). "It certainly is inappropriate for a court to grant a defendant officer's motion for summary judgment in a malicious prosecution case if there are underlying factual disputes bearing on the issue or if 'reasonable minds could differ' on whether he had probable cause for the institution of the criminal proceedings based on the information available to him." *Halsey*, 750 F.3d at 300 (quoting *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)).

Where a probable cause finding was made by a neutral magistrate in connection with a warrant application, a plaintiff must show that: (1) the officers, with "reckless disregard for the truth, made false statements or omissions that created a falsehood," and (2) "those assertions or omissions were material, or necessary, to the finding of probable cause." *Geness*, 902 F.3d at 356-57. Statements or omissions are made with reckless disregard for the truth if the officer "has obvious reasons to doubt the truth" of a statement or "recklessly omits facts that any reasonable person would know that a judge would want to know." *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000). A court analyzes whether a false statement or omission is material by analyzing whether the "corrected" affidavit, after the "reconstructive surgery" of rebuilding the affidavit without the false statements and with the omitted material, would establish probable cause. *Id.* at 789. "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."[15] *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995).

---

[15]    Defendants suggest that the U.S. Supreme Court recently altered the probable cause standard. *See* Defs' Mot. at 15 (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 588 (2018)). But the *Wesby* Court applied the same "totality of the circumstances" standard that the Supreme Court

In *Geness*, the officer who completed the probable cause affidavit withheld exculpatory evidence showing that the decedent's death was an accident and the fact that the plaintiff could not give a valid confession due to his incompetence. 902 F.3d at 357. The Third Circuit had "little doubt that this information . . . would satisfy the threshold for reckless omissions." *Id.*[16]

In *Ballard v. City of Philadelphia*, No. 14-4740, 2015 WL 6467925 (E.D. Pa. Oct. 26, 2015), the witness initially told detectives that he did not know who attacked him, but in his second statement, he identified the plaintiff. *Id.* at *2, *3. Detectives did not include any information about the first statement in the probable cause affidavit. *Id.* at *4-*5. The court denied the defendants' summary judgment motion on the plaintiff's malicious prosecution claim after determining that there was a genuine issue of material regarding whether detectives pressured the witness to identify the plaintiff in his second statement. *Id.* at *7-*8.

There is ample evidence in this case that presents a genuine issue of material fact as to whether Defendants Devlin and Worrell had probable cause to arrest Mr. Thomas for the Martinez murder.[17]

      1. <u>Defendants' omissions and false assertions were made with reckless disregard for the truth, extinguishing any probable cause for Mr. Thomas's arrest.</u>

---

explicated in its seminal case *Illinois v. Gates*, 462 U.S. 213 (1983). *See Wesby*, 138 S. Ct. at 588 ("[T]he panel majority should have asked whether a reasonable officer could conclude— *considering all of the surrounding circumstances, including the plausibility of the [criminal defendants'] explanation itself*—that there was a 'substantial chance of criminal activity.'" (quoting *Gates*, 462 U.S. at 244 n.13) (emphasis added)).

[16]    However, the court found no evidence on the record that the officer who swore out the affidavit of probable cause knew this information, as plaintiff's counsel failed to depose the officer. *Id.*

[17]    Defendants' argument that Plaintiff should not be allowed to rely on the declarations of John and William Stallworth to establish the absence of probable cause is mistaken. Defs' Mot. at 16-18. These declarations are permitted and appropriate. *See infra*, Section I.C.3.

Defendant Worrell's affidavit of probable cause for Mr. Thomas's arrest included:  bare-bones facts about the murder of Domingo Martinez; information about general interviews with family members; a few details from the statements of Betty Ligon, the bank teller, and Gregory Davis, the bank security guard; details from John Stallworth's first statement; information from Nathaniel Stallworth's statement; and information about where Mr. Martinez's car was located after the murder and the damage that was found to the driver's side.  (SUMF ¶¶ 196-214).

Defendants omitted significant material information from the affidavit:

- Defendants Devlin and Worrell coerced John Stallworth to confess by hitting him with a telephone book and squeezing his testicles.  (*Id.* ¶¶ 135-136).

- Defendants Devlin and Worrell told John Stallworth that "they knew Mustafa Thomas was the shooter" and that John could leave when he "told them what they wanted to hear."  (*Id.* ¶ 134).

- John Stallworth named Louis Gay in his first statement but Defendants Devlin and Worrell knew at the time of the affidavit of probable cause that the statement was false because Gay was in prison at the time of the murder.  (*Id.* ¶¶ 198-199).

- John Stallworth made a second statement on July 6, 1993 in which he admitted that he lied in his first statement.  (*Id.* ¶ 200).

- Defendants Devlin and Worrell had learned information showing Mr. Thomas was at the YSC at the time of the murder and that Defendants Devlin and Worrell stopped pursuing that investigation for fear of completely undermining John Stallworth's credibility.  (*Id.* ¶¶ 160-171).

- Forensic evidence from the "body damage to the left front area" of Mr. Martinez's car, as noted in the affidavit, showed that the perpetrator's car was painted *white*, not blue as John Stallworth said in his October 1992 statement.  (*Id.* ¶¶ 202-203).

- None of the four eyewitnesses, all of whom were unbiased, saw two cars, a blue car or six participants in the murder, as Mr. Stallworth claimed in his statement.  (*Id.* ¶¶ 40-43, 46-47).

- Three different eyewitnesses described the man who shot Mr. Martinez as between 6 feet and 6 feet one inch tall and heavy-set to medium build, and wearing red clothing.  (*Id.* ¶ 44).  Defendant Worrell had done an identification check of Mustafa

Thomas showing that he, the shooter alleged by Mr. Stallworth, was five feet, seven inches tall and 120 pounds.[18]  (*Id.*)

- William Stallworth made a October 29, 1992 statement in which he said he did not know who killed Mr. Martinez and he was never involved in a robbery during which a victim was followed from a bank and then shot.  (*Id.* ¶¶ 153-155).

- The DA sought the death penalty against John Stallworth, leading to the guilty plea noted in the affidavit.  (*Id.* ¶ 189).

- Nathaniel Stallworth, like John, mentioned two cars in his first statement.  (*Id.* ¶ 124).  He also falsely identified Raynard Hardy as a participant in the Martinez murder.  (*Id.* ¶ 209).  He also said later that he was fed the story by detectives.  (*Id.* ¶ 122).  Moreover, Nathaniel Stallworth recanted his statement more than eight months before the probable cause affidavit for Mr. Thomas's arrest, in the presence of both Devlin and Worrell.  (*Id.* ¶¶ 210-213).[19]

Surely, this is information that a "reasonable person would know that a judge would want to know."  *Wilson*, 212 F.3d at 783.

To determine whether these omissions were material, the Court should engage in the "reconstructive exercise" of rebuilding the affidavit with the omitted information to see if probable cause was nevertheless present for the arrest.  A reconstructed affidavit containing the omitted information highlighted above, and excluding the false assertions recklessly included in the affidavit, is attached as Ex. B.

Based on this reconstructed affidavit,[20] no reasonable person would believe that Mr. Thomas was involved in the Martinez murder.  The reconstructed affidavit does not name Mr.

---

[18]    Defendant Worrell admitted in his deposition that he was aware of this discrepancy in height and weight because of the identification checks that he ran.  (*Id.* at ¶ 45).

[19]    Given the recantation and the fact that Nathaniel Stallworth mentioned two cars (versus the unbiased eyewitnesses' unanimous single car) and falsely named a participant, Defendant Worrell had reasons to doubt the veracity of this statement.  Including the information from the statement was, therefore, a false assertion made with reckless disregard for the truth.

[20]    The reconstructed affidavit also omits the false assertions noted above.

Thomas or explain how he was allegedly connected to the crime.  At a minimum, there are questions of fact appropriately left to the jury as to whether there was probable cause to arrest Mr. Thomas for this crime.

>   2. Mr. Thomas's arrest for another murder cannot establish probable cause for
>      his arrest for the Martinez murder.

Defendants mistakenly argue that Mr. Thomas's arrest for the murder of Harry James establishes probable cause for Mr. Thomas's arrest for the Martinez murder. *See* Defs' Mot. at 15-16.

First, Defendant Worrell did not include any information about Mr. Thomas's prior arrest in the affidavit of probable cause.  (SUMF ¶ 196).  A neutral magistrate considering an arrest warrant may look only at information within the four corners of the affidavit.  The U.S. Supreme Court has explained that an "affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate," because "[a] contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless."  *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971).  The Tenth Circuit has applied this rule to malicious prosecution claims under § 1983:

> [B]ecause the officers revealed none of the additional [purportedly inculpatory] material during the institution of the legal process—in this case, during the arrest warrant applications—the officers cannot use this information to escape liability. . . .  [W]e ought not search for probable cause in a pile of unrevealed information.  The Fourth Amendment in the context of a malicious prosecution claim deals with *judicial determinations* of probable cause . . . .  Judicial determination becomes a misnomer if information required to support probable cause remains at all times firmly lodged in the officer's head.

*Wilkins v. DeReyes*, 528 F.3d 790, 802 (10th Cir. 2008) (citing *Whiteley*, 401 U.S. at 565 n.8) (emphasis in original).[21]  If Defendants Devlin and Worrell considered Mr. Thomas's arrest for the James murder to be inculpatory evidence supportive of probable cause for Mr. Thomas's arrest in the Martinez murder, they would, as conceded by Defendant Worrell, have included that information in the probable cause affidavit.  (SUMF ¶ 196).

Second, there is no evidence that Defendants Devlin and Worrell considered Mr. Thomas's prior arrests in any relevant way.  The only mention of the Harry James case in the Martinez homicide file is an activity sheet from the James case regarding Mr. Thomas turning himself in. (Id. ¶ 177).  Defendants Devlin and Worrell happened to be the officers working in homicide at the time Mr. Thomas turned himself in for the James case in February 1993.  (*Id.*)  Thus, by mere happenstance they were the "arresting officers."  (*Id.*)

Defendants lacked probable cause to arrest Mr. Thomas for the Martinez murder.  At a minimum, whether they possessed probable cause is a genuine issue of material fact.  Thus, summary judgment on Mr. Thomas's malicious prosecution claim is not appropriate.

### C.  *Summary judgment is not appropriate on Plaintiff's fabrication of evidence claim.*

#### 1.  Defendants misstate the elements of a fabrication of evidence claim.

Defendants claim that to survive summary judgment on his fabrication of evidence claim, Mr. Thomas must show favorable termination, but they fail to recognize that this term has a far

---

[21]    Defendants cite to *United States v. Stearn*, 597 F.3d 540 (3d Cir. 2010), as purported support for the proposition that Mr. Thomas's prior arrest "can help establish probable cause." Defs' Mot. at 16.  But in that case, narcotics officers executed search warrants for several properties related to Stearn after receiving a tip from an anonymous informant, which the officers corroborated by, inter alia, surveilling the properties.  597 F.3d at 545-546.  Each affidavit of probable cause included Stearns' three prior drug-related arrests. *Id.* at 546-48.  Defendant Worrell did not include any information about Mr. Thomas's prior arrest; thus, it cannot support probable cause.  *See Whiteley*, 401 U.S. at 565 n.8; *Wilkins*, 528 F.3d at 802 ("[O]fficers cannot use [information that was not included in the affidavit] to escape liability.").

different meaning in the context of a fabrication claim than it does with respect to malicious prosecution.  Mr. Thomas need only show that the criminal conviction underlying his § 1983 claim was terminated in such a way that a favorable outcome in the civil case would not invalidate that conviction.

The Third Circuit has repeatedly ruled that to succeed on a fabrication of evidence claim, a plaintiff must show:  (1) persuasive evidence that the evidence in question was fabricated, *i.e.*, "persuasive evidence that the proponents of the evidence are aware that evidence is incorrect or that the evidence is offered in bad faith," and (2) that the fabricated evidence was so significant that it could have affected the outcome of the criminal case.  *Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016) (internal quotation marks omitted); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014).  *See also Garnett v. Undercover Officer COO39*, 838 F.3d 265, 280 (2d Cir. 2016) (investigating official fabricated information that is likely to influence a jury's verdict, forwards that information to prosecutors, and the plaintiff suffers a deprivation of life, liberty, or property as a result).

Defendants' reliance on *Heck v. Humphrey*, 512 U.S. 477 (1994), is both surprising and erroneous.  *Heck* requires only that the plaintiff's criminal conviction have been invalidated in a manner such that a finding in the plaintiff's favor on the § 1983 claim would not imply the invalidity of an outstanding criminal conviction:

> [A] § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87. The policy underlying this rule is that a prisoner should not be able to engage in "collateral attack[s]" on his conviction by proceeding through the direct appeal or habeas procedures while simultaneously seeking damages under § 1983. *Id.* at 485.

The resolution of Mr. Thomas's criminal case fully satisfies the *Heck* favorable termination rule. On May 23, 2017, the Court of Common Pleas of Philadelphia County vacated Mr. Thomas's conviction for the Martinez murder. *See* May 23, 2017 Order. That termination satisfies *Heck*.[22]

By contrast, to satisfy the malicious prosecution favorable termination element, the termination of the plaintiff's criminal case must have occurred under circumstances indicating innocence. *See supra*, Section I.A. The malicious prosecution element focuses on the ***reasoning*** behind the ultimate outcome of the criminal case, not on the ***procedural aspects*** of that termination. Indeed, the Third Circuit itself has foreclosed Defendants' erroneous interpretation of *Heck*: "*Heck* should not be read to incorporate all of the common law of malicious prosecution into the federal law governing civil rights of this kind." *Smith*, 87 F.3d at 113-14.

> 2. <u>Mr. Thomas satisfies the two elements of a fabrication of evidence claim.</u>

Mr. Thomas has presented persuasive evidence of a fabrication that adversely affected the outcome of his criminal trial. *See Halsey*, 750 F.3d at 295; *Black*, 835 F.3d at 372.

> (1) *John Stallworth's October 1992 Statement and Trial Testimony*

---

[22] Defendants cite two cases regarding the statute of limitations for fabrication of evidence to argue that "favorable termination" is an element of a fabrication of evidence claim. *See* Defs' Mot. at 12-13 (quoting *Wright v. City of Phila.*, 229 F. Supp. 3d 322, 331 (E.D. Pa. 2017) (Pratter, J.), and *Floyd v. Attorney Gen. of Pa.*, 722 F. App'x 112, 114 (3d Cir. 2018)). There is no question that Mr. Thomas's claims, including his fabrication of evidence claim, are timely. As such, these cases—which regard the ***accrual*** of such claims—are inapposite. *See Wright*, 229 F. Supp. 3d at 331 (holding that plaintiff's claims accrued when the criminal proceedings terminated in his favor); *Floyd*, 722 F. App'x 114 (affirming dismissal of plaintiff's malicious prosecution and fabrication of evidence claims because they were untimely under the *Heck* favorable termination rule).

Defendant Worrell relied heavily upon John Stallworth's October 27, 1992 statement when completing the probable cause affidavit for Mr. Thomas's arrest. (SUMF ¶ 197). John Stallworth now claims that this statement was false, and that he gave the false statement because he was psychologically coerced and physically abused by Defendants Devlin and Worrell. (*Id.* ¶¶ 133-136). John Stallworth's October 1992 was thus fabricated by Defendants Devlin and Worrell.

John Stallworth asserts that he was put into an interrogation room at the Homicide Division and handcuffed to a metal chair. (*Id.* ¶ 132). He was left in the interrogation for a long time. (*Id.*) Defendants Devlin and Worrell questioned John "from the middle of the afternoon into the night" about the Martinez murder. (*Id.*) John repeatedly denied any knowledge of the Martinez murder. (*Id.* ¶ 133). And yet Defendants Devlin and Worrell told him that they knew he was not the shooter and that Mustafa Thomas was the shooter. (*Id.* ¶ 134). Defendants Devlin and Worrell even said "that they did not really 'want' [John], and that they really 'wanted' Mustafa Thomas." (*Id.*)

After continued questioning, and John's repeated refusal to provide the information that Defendants Devlin and Worrell were looking for, Defendants hit John with a telephone book. (*Id.* ¶ 135). Defendant Devlin also "squeezed [John's] testicles with his hands," which "was very painful." (*Id.* ¶ 136).

Defendants Devlin and Worrell repeatedly promised that John could leave once he told them what they wanted: that he, Mustafa Thomas, Shaurn Thomas, and others—including John's own brother—murdered Mr. Martinez. (*Id.* ¶¶ 134, 138). John parroted back the details that Defendants Devlin and Worrell gave him to implicate himself, Mustafa Thomas, Shaurn Thomas, William Stallworth, Louis Gay, and "Nasir" in the murder. (*Id.*)

John Stallworth has "no personal knowledge of any of the facts in [his] signed October 27, 1992 statement." (*Id.* ¶ 139). He "had no role in the robbery and murder of Domingo Martinez"

and does not know who committed or participated in the murder.  (*Id.*)  All of the facts in John Stallworth's October 27, 1992 statement—which formed the basis of his July 1993 statement and his trial testimony—were provided to him by Defendants Devlin and Worrell.  (*Id.* ¶ 138).

John Stallworth later learned that "it would be very difficult" to prevail at trial because he had given Defendants Devlin and Worrell a contrived and false statement that he was present for the Martinez murder.  (*Id.* ¶ 190).  This belief, coupled with the fact that the District Attorney planned to seek the death penalty against John, led him to accept a plea deal.  (*Id.*)  Pursuant to this plea deal, John Stallworth provided a second false statement to detectives and testified falsely against Mr. Thomas at his December 1994 trial.  (*Id.* ¶¶ 190-191).

### (2)   *William Stallworth's Trial Testimony*

William Stallworth testified at Mr. Thomas's trial that he was in the car with Mr. Thomas during the robbery and murder of Mr. Martinez.  (*Id.* ¶ 225).  However, William Stallworth provided this false testimony only because his brother, John Stallworth, implicated him in the murder.  (*Id.* ¶ 216).  PPD detectives told William that he would also receive a deal if he testified to the same story that John Stallworth would provide at trial, which was based on John's statement to detectives. [23]  (*Id.*).  The detectives told William that if he "did not agree to tell the same story as John was going to tell, John was not going to get his deal and would face the death penalty."  (*Id.*)

---

[23]    While it is true that William Stallworth's declaration does not identify the detectives who coerced him to give his second statement, in which he adopts the story that Defendants Devlin and Worrell provided to John Stallworth, that statement was taken by Defendants Devlin and Worrell. (*Id.* ¶ 215).  There is no record of any other PPD detective or officer speaking with or taking a statement from William Stallworth.  Thus, it must have been Defendants Devlin and Worrell who coerced this statement, and the later false testimony, from William Stallworth.

In reality, William Stallworth "was not involved in the Martinez murder, and . . . was not with Shaurn Thomas on November 13, 1990." (*Id.* ¶ 218). But Defendants Devlin and Worrell needed William's false statement and testimony to bolster John's false statements and testimony. The declarations of John and William Stallworth provide persuasive evidence that Defendants Devlin and Worrell fabricated evidence to frame Mr. Thomas for the Martinez murder.

Moreover, the testimony of John and William Stallworth was the only evidence connecting Mr. Thomas to the murder of Domingo Martinez. Thus, this fabricated evidence affected the outcome of Mr. Thomas's criminal case. At a minimum, Mr. Thomas has produced sufficient evidence to raise a genuine issue of material fact regarding his fabrication of evidence claim.

### 3. The Stallworth affidavits are proper evidence to support Plaintiff's fabrication of evidence claim.

Defendants argue that Mr. Thomas cannot rely on the Stallworth declarations "to escape summary judgment." Defs' Mot. at 17. Defendants rely yet again on the inapposite and non-precedential ruling in *Morris v. Verniero*. There was no affidavit in *Morris*; rather, the plaintiff attempted to prove his malicious prosecution claim (specifically, the favorable termination element) by asserting that the cocaine found on him was actually planted by the arresting officers. *See* 453 F. App'x at 246. The court did not face, and thus did not address, the use of *affidavits* from *third parties* to show other malicious prosecution elements or a fabrication of evidence claim. *See id.*

The issue of the credibility of the Stallworths is for the jury and the Defendants' argument that "no rational jury would credit" the Stallworths' declarations is wrong. "Credibility determinations . . . are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)). The assertions that "no reasonable juror could credit" the Stallworths because they

"waited 24 years to change their story" and that the jury at Mr. Thomas's 1994 criminal trial found the Stallworths' testimony "highly credible . . . because [the jury] convicted Plaintiff," Defs' Mot. at 18, go to the Stallworths' credibility and do not support an argument that Mr. Thomas is not permitted to use the Stallworths' declarations. Defendants chose not to depose John Stallworth or William Stallworth, despite the fact that both Stallworths were listed on Plaintiff's initial disclosures. It should be left to the jury to determine whether the Stallworths' declarations are credible.[24] *See Reeves*, 530 U.S. at 150.

Defendants assert that "the Stallworths both remain convicted of murdering Domingo Martinez" and argue that, "[u]nder *Heck*, a 'trier of fact' in a civil case cannot 'base its verdict on findings not consistent with the conclusion . . . reached in [a] criminal case.'" Defs' Mot. at 18 (quoting *Nelson v. Jashurek*, 109 F.3d 142, 146 (3d Cir. 1997)). But Defendants ignore the crucial distinction between there being an outstanding criminal conviction of a *plaintiff* that can bar a claim, and that of a third-party witness, which does not. *See Nelson*, 109 F.3d at 144 ("While we do not know whether [the *plaintiff*] appealed his criminal conviction, he does not claim that any court has set aside the conviction . . . ."); *Jacobs v. Bayha*, No. 07-237, 2011 WL 1044638, at *7 (W.D. Pa. Mar. 18, 2011) ("[U]nder *Heck*, plaintiff may not make factual allegations that call into question the legitimacy of the verdict of *his* 2005 criminal conviction." (emphasis added)); *Jackson v. City of Pittsburgh*, No. 07-111, 2011 WL 3443951, at *4 (W.D. Pa. Aug. 8, 2011) ("*Plaintiff* pled guilty to failing to use a turn signal and was precluded from taking a contrary position at trial." (emphasis added)). The Stallworths are not plaintiffs here, so it does not matter that their convictions for the Martinez murder still stand.

---

[24]    Defendants' claim that no reasonable jury could credit the declarations is belied by the fact that a member of the CRU found William Stallworth's recantation credible.  (SUMF ¶ 243).

Mr. Thomas is permitted to use these declarations, which, together with other evidence, show that Mr. Thomas has raised genuine issues of material fact regarding whether Defendants Devlin and Worrell fabricated evidence that led to Mr. Thomas's wrongful conviction.

## II.  MUNICIPAL LIABILITY

In moving for summary judgment on the *Monell* claims, the City ignores evidence of long-standing and widespread misconduct in the Homicide Unit and systemic deficiencies in the PPD's internal disciplinary system, all of which caused the wrongful arrest and incarceration of Shaurn Thomas.  The City, strikingly, does not take issue with or even mention the pivotal expert report and findings of Dr. McCauley.

The City claims that it cannot be found liable because Plaintiff failed to establish evidence that:  1) a relevant municipal custom or policy existed in the PPD in the early 1990s; 2) the City was deliberately indifferent; 3) a defective disciplinary system existed in the PPD at the relevant time period; 4) a City policymaker "personally and knowingly" acquiesced to a policy or custom that injured Mr. Thomas; and 5) the City's deliberate indifference caused harm to Mr. Thomas. The City is wrong on the facts and the law.

### A.  *Unconstitutional Policies and Customs in the PPD*

Plaintiff's claim is rooted in the principle that where training, supervision, and discipline are necessary to avoid constitutional violations, and the municipality is deliberately indifferent to the need to do so, a cause of action is stated under § 1983.  *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that when a municipal policy or practice is the cause of unconstitutional actions by its employees, the municipality is liable under § 1983.  To establish a *Monell* claim, it is not necessary to prove that municipal policymakers actually knew of unconstitutional policies or practices.

Rather, the acquiescence of municipal officials to unconstitutional policies or practices permits *the inference of constructive knowledge* where the practice is significant or widespread.[25]

Here, there is evidence that at least since 1978, when the *Philadelphia Inquirer* published a detailed investigative series (that later won a Pulitzer Prize) exposing a broad range of unlawful practices in the Homicide Unit, City policymakers knew about widespread unconstitutional customs and practices in the operation of the Homicide Unit *and* the lack of monitoring and disciplining of PPD officers, and failed to take remedial action.[26]   As a result of the City's deliberate indifference to known patterns of serious misconduct, Defendants Devlin and Worrell, and many other homicide detectives with whom they worked, continued to engage in the very same misconduct.   These officers were able to do so because they knew that the PPD's internal disciplinary system was dysfunctional and that they faced no adverse consequences.

The failure to provide adequate training and supervision to homicide detectives on the proper exercise of investigative powers is a paradigmatic example of a policy for which a city may be held liable if a constitutional violation results.   *City of Canton*, 489 U.S. at 390 n.10 (the absence of training or the failure to provide further training despite violations of constitutional rights by

---

[25]     *See Jeffes v. Barnes*, 208 F.3d 49, 64 (2d Cir. 2000); *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 152-53 (2d Cir. 1991); *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987).

[26]     The Third Circuit found that it was appropriate for a court to consider evidence of newspaper coverage and subsequent policy changes to "fairly infer that the problems that led to [federal supervision and new policies] were occurring during the time of [the plaintiff's] allegations and for some time before that."  *Estate of Roman v. City of Newark*, 914 F.3d 789, 799 (3d Cir. 2019).  In *Estate of Roman*, the media report, which detailed allegations against the police of "criminal misconduct, false arrest, planting evidence, and unlawful searches," supported the plaintiff's contention that "violations were widespread and causally linked to [his] alleged injury, as the Police Department was aware of them but "rare[ly] . . . acted."  *Id.* at 799.  Similarly, the court found that the federal supervision and establishment of new police policies—which began after the incident alleged by the plaintiff—"fortifie[d his] allegations of unlawful custom because it acknowledge[d] a pattern or practice of conduct by the Newark Police [Department] that deprive[d] individuals of rights, privileges, and immunities secured by the Constitution."  *Id.* (internal citation omitted).

officers amounts to deliberate indifference).  A municipality is liable where it fails to implement more thorough or comprehensive training in the wake of constitutional violations by its officers, or may be shown where a single constitutional violation was a "highly predictable consequence" of an inadequate training program.  *Berg v. Allegheny Cnty.*, 219 F.3d 261, 276 (3d Cir. 2000) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 408-09 (1997)).

In this case there are three critical areas in which the City failed to properly train and supervise:  1) the fabrication and concealment of evidence; 2) the use of improper interrogation methods; and 3) the intentional suppression of evidence that negated probable cause to arrest.

### 1.   Fabrication and concealment of evidence

Dr. McCauley's global analysis of the PPD found that the customs and practices related to the fabrication and concealment of evidence in this case were widespread, violated generally accepted police practices and constitutional mandates, and caused the wrongful arrest and conviction of Shaurn Thomas.[27]  These findings parallel the patterns of misconduct in this case, including:

- Defendants Devlin and Worrell coerced John Stallworth into providing a false confession naming Mr. Thomas as a co-conspirator in the murder of Domingo Martinez.  Defendants Devlin and Worrell knew his initial confession was false, they used the false confession to arrest John Stallworth for murder, and pressured him to selectively edit his confession so that the confession could be used to justify the arrest and prosecution of Mr. Thomas.

- Defendants Devlin and Worrell accessed information—after John Stallworth gave his first statement—that tended to show (and, if investigated, would have proven) that Shaurn Thomas had been scheduled to and did appear at the Youth Study Center the morning of the murder—an unimpeachable alibi.

- Defendants Devlin and Worrell provided the false story to the second corrupted witness, William Stallworth, who later recanted to the Pennsylvania Innocence Project and the CRU of the District Attorney's Office, and has signed a sworn declaration to that effect.  While William Stallworth's police-supplied narrative falsely placed Mr. Thomas at the murder scene, he later admitted to counsel for Mr. Thomas and prosecutors that he had testified

---

[27]     Exhibit C at 28-30.

falsely at trial due to the misconduct of the detectives.  Four neutral eyewitnesses to the murder contradicted the Stallworth brothers' version.

- Defendants Devlin and Worrell provided photographs of a blue car to the trial prosecutor that fit the detectives' contrived story.  Yet they knew at the time of trial—based on unrebutted forensic evidence that only white paint fragments were found—that this blue car was not involved in the murder.

- The District Attorney's Office disclosed in May 2017 portions of the homicide file that included statements from Oliver Walthour, Lloyd Hicks and Bobby Harris, witnesses in an unrelated homicide case.  Those statements cast suspicion on suspects other than Shaurn Thomas in Mr. Martinez's murder.  Defendants Devlin and Worrell concealed these statements and other evidence from Mr. Thomas.  The concealment of the statements has convinced a Philadelphia Common Pleas judge to vacate Mustafa Thomas's conviction and grant him a new trial.

It is well settled that because "convictions premised on deliberately falsified evidence will always violate the defendant's right to due process[,]" cities may be held liable when officers are inadequately trained or disciplined for falsifying evidence. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *see Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("[T]o procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial.").

The prohibition against the fabrication and concealment of evidence has been established for decades, and courts have recognized "[c]it[ies'] corresponding obligation to adequately train its officers in th[is] regard." *Moldowan v. City of Warren*, 578 F.3d 351, 393 (6th Cir. 2009) (discussing *City of Canton*, 489 U.S. at 390); *see also Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) ("The obligation to turn over exculpatory materials is a significant constitutional component of police duties with obvious consequences for criminal defendants.").

47

Courts have denied requests for summary judgment by municipalities where factual disputes about the inadequacy of police training remained. *See, e.g.*, *Ricciuti*, 124 F.3d at 130; *Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006).

The Third Circuit has made clear that where, as here, "a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone Fourteenth Amendment claim under 42 U.S.C. § 1983." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). In recognizing this claim, the Third Circuit joined "every court of appeals that has considered the question of whether a state actor has violated the defendant's right to due process of law by fabricating evidence to charge or convict the defendant." *Id.* at 292; *see also Limone v. Condon*, 372 F.3d 39, 45 (1st Cir. 2004) ("It is a long established principle that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.").

In *Mooney v. Holohan*, the Supreme Court found that "a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court" is a violation of due process and "the fundamental conceptions of justice." 294 U.S. at 112. In *Pyle v. Kansas,* 317 U.S. 213 (1942), the Court expanded this principle finding the plaintiff's "allegations that his imprisonment resulted . . . from the deliberate suppression by [the] authorities of evidence favorable to him" constituted a due process violation.[28] *Id.* at 216; *see Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000).

---

[28]     By Order dated February 2, 2018, this Court dismissed Plaintiff's *Brady* claims. However, the due process right that protects against the deliberate concealment of evidence is distinct from the obligation to produce exculpatory evidence established in *Brady v. Maryland*, 373 U.S. 83 (1963). *See Limone,* 372 F.3d at 47 ("To restrict the plaintiffs to a *Brady* claim would require us to disregard the forest and focus single-mindedly on a particular tree."). Indeed, this right is central to fundamental principles of due process, and it is "self-evident that a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the

The First Circuit discussed the contours of this right in *Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011). The Court described the right as a prohibition "against intentionally concealing evidence and permitting false testimony to be given at a defendant's trial." *Id.* at 49. The Court rejected the defendants' attempt to limit the plaintiffs to a *Brady* claim, and allowed them to proceed on a claim that defendants had violated their Fourteenth Amendment rights through the deliberate suppression of evidence. "Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights." *Id.*; *see also Drumgold v. Callahan*, 707 F.3d 28, 39 (1st Cir. 2013) ("We have been careful to distinguish between the proscription originating in *Mooney* and *Pyle* against the deliberate suppression of evidence and the more recent affirmative disclosure obligation announced in *Brady*.").

In *Haley*, the prosecution's case rested on the testimony of the accused's estranged wife and her sister. Both women, when interviewed by police, claimed not to have seen the accused in the area for almost a month before the crime took place. 657 F.3d at 44. However, at trial they testified that while walking together in the neighborhood, they had seen the accused the day before. *Id.* In finding the deliberate suppression of these contrary statements to be a violation of the accused's rights, the court stated "[t]here is no doubt that this due process protection applies to

---

truth-seeking function of the trial process.'" *Halsey,* 750 F.3d at 293 (quoting, *inter alia*, *United States v. Agurs*, 427 U.S. 97, 104 (1976)). In *Halsey*, the Third Circuit found that this same right was clearly established in 1985, well before the events in Mr. Thomas's case. *Id.* at 295 ("Analogous precedent should have informed appellees or any reasonable state actor that, by fabricating evidence for use in a criminal prosecution, a state actor would violate a defendant's constitutional rights."); *see Limone*, 372 F.3d at 45 ("[T]he right not to be framed by law enforcement agents was clearly established in 1967.").

police officers who deliberately keep the defense in the dark about important evidence." *Id.* at 50. Mr. Thomas's claim fits squarely within the doctrine created by *Mooney* and its progeny.

The City ignores substantial evidence supporting the claim that during the time period relevant to this case—and for many years before and after Mr. Thomas's arrest—there was a widespread practice in the Homicide Unit and PPD of fabricating and concealing evidence.

### 2.   Improper interrogation methods

The City also disregards evidence of widespread misconduct in the interrogations of witnesses and suspects that mirrors the improper techniques used by Defendants Devlin and Worrell in this case.  There is evidence of systematic abuses known to City policymakers—the numerous cases documented in *The Homicide Files*, the multiple class action suits in the 1980s challenging investigative abuses by PPD officers, the cases involving similar misconduct from the early 1990s analyzed by Dr. McCauley, and the complaints that finally led to the issuance of a remedial police directive in 2014—that demonstrate a long-term and pervasive pattern of misconduct.  As Dr. McCauley concluded:

> The City's failure to have appropriate training, operational directives, remedial measures, and supervision regarding the prohibition on coercion, threats, and low-level force during the interrogations of suspects and witnesses represents a violation of generally accepted police and municipal practices . . . .  The use of coercion, threats, and improper inducements . . . were contrary to accepted police practices for the period 1990-1995.

Exhibit C at 30.

Dr. McCauley made specific findings regarding these customs and practices which, he concluded, were pervasive in 1978 and persisted at the time of and long after the arrest of Shaurn Thomas.  Dr. McCauley cited evidence provided by ranking PPD officials that corroborated the lack of meaningful training and supervision.  For example, the matter of *Eugene Gilyard and Tyree Wells a/k/a Lance Felder v. Detective Dennis Dusak, et al*, E.D. Pa. No. 16-cv-2986, is a 1995

50

cold case reopened in 1997 with a 1999 conviction and exoneration in 2014.  Detective Dusak
(who was also a defendant officer in the *Anthony Wright* case) testified he received two weeks of
detective training that did not include specific training in homicide investigations.[29]  He was not
trained about the use of coercion, intimidation, or low-level force and his sergeant always rated
him "satisfactory."[30]

At a deposition in *Gilyard*, Captain Francis Healy, Special Legal Advisor to the
Philadelphia Police Commissioner, testified that:

- Low-level force was not prohibited by policy but was referenced in the Disciplinary Code.

- Low-level force was not reported or methodically tracked prior to 2014.

- Because it was unclear if and when officers may yell, scream, and curse at a witness, the
  PPD in 2014 finally issued a directive limiting officer discretion and prohibiting threats,
  threats of violence, slapping, kicking, and low-level force against witnesses and suspects.

- Lawsuits did not lead to Internal Affairs Investigations (IAIs) until 1998 by order of Police
  Commissioner Timoney.

- The use of low-level non-physical force was acceptable if there was no threat of physical
  violence.  Police could yell, curse, and scream as long as there were no threats of physical
  violence.[31]

As found by Dr. McCauley:

- The PPD had no official policies/directives defining or prohibiting the use of low-level
  force in the interrogation and interviewing of witnesses and suspects prior to Directive 5.23
  INTERVIEWS AND INTEROGATIONS—RIGHTS OF INDIVIDUALS AND DUTIES
  OF LAW ENFORCEMENT, effective date 01-01-14 (Updated 09-04-14).

- The Integrity and Accounting Office (IAO) found in its 1999 report that the majority of
  force incidents involve low level force resulting in minor or no injury and these incidents
  need to be tracked, investigated, and analyzed.

---

[29]    Exhibit C at 20-21.

[30]    *Id.*

[31]    *Id.*

- The PPD had no official policies/directives prohibiting the use of low-level force in the interrogation and interviewing of witnesses and suspects prior to 1999.

- The use of district level first-line supervisors/sergeants was ineffective in the investigation of use of force investigations.

- First-line supervisors/sergeants were ineffective in the control, discovery, and investigation of low-level use of force by subordinates in their units.

- Videotaping of interrogations, interviews, and confessions was discretionary until 2013.

- The plaintiff's conviction was based on the testimony of witnesses who now claim they had implicated Mr. Thomas because the police had coerced them to do so.[32]

Dr. McCauley also reviewed the findings of Teri Himbaugh, Esquire, who conducted an independent investigation of Homicide Unit detectives and found that these improper interrogation practices persisted for many years after the arrest of Mr. Thomas.[33]

These improper interrogation practices are directly relevant to this case. The central prosecution witnesses confirmed that Defendants Devlin and Worrell used threats, coercion, and physical force to induce the witnesses to falsely implicate Mr. Thomas.[34] While not specifically referenced in their brief, the defendants have suggested that Stallworth's claim of threats and abuse cannot be true because the interrogation rooms at the Homicide Unit were and are closely monitored to ensure that such unlawful police practices cannot take place. Yet the recent indictment of Philip Nordo, a former PPD homicide detective, shows that a homicide detective was able to commit serious crimes, including sexual assaults, in the interrogation rooms that either

---

[32]   *Id.*

[33]   (SUMF ¶ 300).

[34]   (*Id.* ¶¶ 134-138).

went unnoticed or were tolerated.[35]  This evidence shows there was no meaningful monitoring of the interrogation rooms in place when John Stallworth falsely implicated Shaurn Thomas after he was interrogated at the Homicide Unit.

The mistreatment and prolonged detention of witnesses and suspects at the Homicide Unit had gone unchecked for decades.  Dr. McCauley examined a number of these cases over the years and will testify that the PPD failed to take appropriate remedial measures until 2014, when the threat of litigation prompted the PPD to issue Directive 5.23, which comprehensively addressed police practices relating to Interviews and Interrogations.[36]

Municipalities may be liable for coercive or other improper interrogation techniques.  *See, e.g.*, *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("[T]riable issues with respect to [] municipal liability on theories of both failure to train and refusing to correct complained-of behavior" based on police department's deliberate indifference to officers threatening to take female suspect's children away during interrogations); *see also Tillman v. Burge*, 813 F. Supp. 2d 946, 979 (N.D. Ill. 2011) (plaintiff falsely confessed to a murder after being subjected to physical abuse by defendant police officers); *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 561 (9th Cir. 2001).

### 3.   Suppression of material evidence that negated probable cause

It has long been accepted police practice to consider all available evidence, including exculpatory evidence, in determining whether there are grounds to arrest.  *See Dempsey*, 834 F.3d at 469.  Yet, as found by Dr. McCauley, there was a widespread practice in the PPD—followed by

---

[35]      (*Id.* ¶ 302).

[36]      (*Id.* ¶ 303).

Defendants Devlin and Worrell in this case—to ignore or conceal evidence that negated the existence of probable cause.[37]

Defendants Devlin and Worrell knew and had access to evidence that exculpated Mr. Thomas and pointed to other more likely suspects. Defendants Devlin and Worrell concealed or disregarded credible evidence that did not support their theory of the case, in particular:

- Defendants Devlin and Worrell failed to follow-up with their investigation of suspects Sarah Negron (the decedent's daughter) and her boyfriend Benjamin Quiles, both of whom had a motive and an opportunity to murder Mr. Martinez;

- Defendants Devlin and Worrell failed to conduct a meaningful investigation of suspects Oliver Walthour, Lloyd Hicks, and Bobby Harris, who had been stopped in a grey Chevy Nova, fitting the description of the car the eyewitness had said was involved in the Martinez murder only three days before; and

- Most critically, Defendants Devlin and Worrell concealed or ignored available evidence that established Shaurn Thomas could not have committed the Martinez murder because he was very likely at a juvenile court hearing at the time the crime was committed.

Further, Defendants Devlin and Worrell failed to mention in the affidavit of probable cause that they knew that Lewis Gay, one of the men implicated by John Stallworth, could not have been culpable because he had been out of state when Mr. Martinez was killed. Thus, Defendants Devlin and Worrell submitted an affidavit based on the word of a witness known to have lied about a critical fact, and omitted other known evidence that exculpated Mr. Thomas, all of which negated probable cause. The defendant officers' failure to follow accepted police practices is the direct result of the failure of the PPD to train officers regarding the importance of including in arrest warrants evidence that negated the existence of probable cause.

On this issue, Defendant Worrell was explicit. At his deposition, he made it clear that the PPD did not train officers to consider exculpatory evidence in the determination of probable cause,

---

[37]     Exhibit C at 26-28, 30-31.

or to include evidence in arrest warrant affidavits that negated probable cause.  His testimony on this point was unambiguous:

> Q.     Were you trained that you didn't have to put in the previous lie?
>
> A.     No one had ever trained me to the opposite way that I had to put what's called exculpatory information in an affidavit for a warrant.
>
> Q.     So your testimony is that nobody ever told you that you had to put the previous lie by the person who you're relying upon to give you probable cause in the arrest warrant, is that correct?
>
> A.     . . . It's my recollection no one specifically ever told me to put that in a warrant. [38]

Further, Dr. McCauley noted that it is not standard police practice to accept an incentivized witness' claims simply because the police like what the witness has to say.  Corroboration by witnesses or physical evidence and further investigation is essential to confirm the incentivized witness' version.  It was not done in this case.  Based on data from the Vera Institute and the National Registry of Exonerations, between 26 and 44% of DNA exonerations involved false confessions or admissions.  False confessions, and tainted convictions based on incriminating information provided by coerced or incentivized witnesses, are not uncommon.[39]

The law on this point is compelling.  In determining whether an arrest is proper, the "*totality* of circumstances determines the existence of probable cause [and] evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause." *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (emphasis in original).

Officers are required to conduct a reasonably thorough investigation to establish probable cause and may not "close his or her eyes to facts that would help clarify the circumstances." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986); *Gardenhire v. Schubert*, 205 F.3d 303, 315-317 (6th

---

[38]     (SUMF, Ex. 21, Deposition of Paul Worrell, 11/6/18, 51:24-52:16).

[39]     Exhibit C at 21-24.

Cir. 2000); *Kelly v. Jones*, 148 F. Supp. 3d 395, 403 (E.D. Pa. 2015); *Briscoe v. Jackson*, 2 F. Supp. 3d 635, 644 (E.D. Pa. 2014) ("[A]n officer cannot look only at evidence of guilt while ignoring all exculpatory evidence."); *see also Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1257 (10th Cir. 1998); *Sevigny v. Dicksey*, 846 F.2d 953, 957 n.5 (4th Cir. 1988) (quoting *BeVier*, 806 F.2d at 128). If an investigation yields evidence that negates what otherwise would be probable cause, there can be no lawful arrest. *Kuehl*, 173 F.3d at 650; *see also Pitt v. D.C.*, 491 F.3d 494, 502 (D.C. Cir. 2007); *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004) (explaining that officers may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts"); *Clipper v. Takoma Park, Md.*, 876 F.2d 17, 19-20 (4th Cir. 1989).

The mandate of *Wilson*, *Baptiste*, and *Gardenhire* is clear: the officers' actions must be examined in context to determine whether *prior to the arrest* they considered all relevant and available information, including exculpatory evidence, in the probable cause calculus. Here, Defendants breached their constitutional duty by intentionally omitting from the affidavit of probable cause (and later concealing from the prosecutor, defense counsel, and court) evidence that negated probable cause.

### B.  The City's Deliberate Indifference

In moving for summary judgment, the defendants disregard evidence of the City's deliberate indifference to the need for training, supervision, and discipline, and utterly ignore the explicit findings of a police practices expert. The record of this case contains evidence that in the time period relevant to this action, the City failed to satisfy the mandate of *Monell* in connection with policies and customs related to the operation of the Homicide Unit of the PPD *and* a flawed departmental disciplinary mechanism. As found by Dr. McCauley:

> The above-described policies, practices, and customs in the PPD
> relating to the fabrication of evidence, improper interrogation
> techniques, suppression of evidence, and a deficient disciplinary

> system were widespread in the 1990s and known to PPD and City officials as well as the general public.  The failure of responsible officials to remedy these improper policies, practices, and customs were contrary to generally accepted police and municipal practices and caused the improper arrest, prosecution, and conviction of Shaurn Thomas.

Exhibit C at 31.

Dr. McCauley based his conclusions on numerous examples of misconduct before, at the time of, and after Mr. Thomas' arrest.[40]  Dr. McCauley's findings are based on government reports and statistics, the findings of City officials, federal court litigation, as well as his independent research over three decades.  Further, Dr. McCauley examined a number of homicide cases that involved the defendant officers in this case and other homicide detectives with whom the defendants worked during the period of time in which Shaurn Thomas was arrested.[41]  In each case

---

[40]    In determining whether unlawful policies or customs were widespread, a court may consider evidence that such policies or customs existed before and/or after the incident at issue.  *See Estate of Roman*, 914 F.3d at 799 ("While the consent decree was not in place during Roman's search and arrest, we may fairly infer that the problems that led to it were occurring during the time of his allegations and for some time before that… with this mind, the decree fortifies Roman's allegations of unlawful custom because it acknowledges "a pattern or practice of conduct by the Newark Police [Department] that deprives individuals of rights, privileges, and immunities secured by the Constitution.");  *Foley v. City of Lowell, Mass.*, 948 F.2d 10, 15 (1st Cir. 1991) ("The incidents occurred in fairly close temporal proximity. There was no evidence of any policy revision or other change in course during the subsequent interval. On the facts of this case, it was well within the trial court's discretion to conclude that the Finnegan incident was competent, if indirect, evidence of a preexisting municipal policy of indifference.");  *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.");  *United States v. Mena,* 933 F.2d 19, 25 (1st Cir. 1991) ("[E]vents that occur after an offense has been perpetrated may be relevant in an assessment of what transpired at the earlier time.");  *Henry v. Cnty. of Shasta*, 132 F.3d 512, 518 (9th Cir. 1997) ("'[P]ost-event evidence' may be used to prove the existence of a municipal policy in effect at the time that [the plaintiff] was detained.").

[41]    The materials reviewed in these cases include facts drawn from court submissions and/or judicial findings, as well as evidentiary support such as notes of testimony, witness statements, and forensic reports.  Each of the cases took place at or near the time frame of the murder of Domingo Martinez and the arrest of Shaurn Thomas.  Exhibit C at 12-18.

Dr. McCauley identified and documented investigatory misconduct strikingly similar to the misconduct perpetrated by Defendants Devlin and Worrell in this case.[42]

## ANTHONY WRIGHT

Mr. Wright was convicted of the 1991 rape and murder of a 78 year old woman.  A squad of PPD homicide unit detectives—including Defendant Devlin—fabricated evidence, coerced confessions, concealed material evidence, and failed to consider exculpatory evidence, before arresting and initiating the prosecution of Mr. Wright.  After spending 25 years in prison, the Supreme Court of Pennsylvania reversed his conviction and he was later acquitted at a retrial based on DNA exoneration evidence and the misconduct of the PPD detectives.  Mr. Wright filed suit in U.S. District Court.  The case settled for nearly $10 million.

## JAMES DENNIS

In 1992, Mr. Dennis was convicted and sentenced to death.  The allegations of police misconduct in the case included the fabrication of evidence, coerced statements, concealment of witnesses, and the failure to consider exculpatory evidence.  Mr. Dennis served nearly 25 years in prison.  In August 2016, the Third Circuit granted habeas relief, vacated the conviction, and remanded the case back to state court.  *Dennis v. Sec'y Pa. Dep't of Corrs.*, 834 F.3d 263, 269 (3d Cir. 2016).  Rather than spending another 2-3 years in custody awaiting a retrial, Mr. Dennis entered a *nolo contendere* plea to reduced charges for a time-served sentence.

## PERCY ST. GEORGE

In 1993, Mr. St. George was arrested for murder.  There is evidence that PPD homicide detectives coerced false statements implicating Mr. St. George in the murder, fabricated evidence, and suborned perjury. In 1994, faced with allegations that Percy St. George had been the subject of perjury, obstruction of justice, and other misconduct by the police, three PPD homicide detectives alerted the Court that they would be asserting their Fifth Amendment rights should they be called to testify. The capital murder case against Percy St. George was dismissed.

## WALTER OGROD

There is evidence that in 1992 Defendants Devlin and Worrell coerced false statements, concealed evidence, improperly supplied details of the crime during questioning, and subjected suspects/witnesses to prolonged detention, threats, and improper influences, and other practices that violated accepted police procedures and caused Mr. Ogrod's wrongful arrest.  Mr. Ogrod's PCRA Petition is currently under review by the CIU of the District Attorney's Office.

## WILLIE VEASY

---

[42]   *See* Exhibit C at 12-16 for a more complete analysis of the cases and supporting evidence by Dr. McCauley.

In 1993, Mr. Veasy was convicted of second-degree murder and sentenced to life imprisonment without the possibility of parole. Mr. Veasy recently obtained the police homicide file related to his prosecution. The file included previously undisclosed information—withheld from the prosecution and defense—that undermines the theory of the prosecution, including evidence that both Defendants Devlin and Worrell conducted improper interrogations of witnesses, fabricated evidence, including a false confession by Mr. Veasy, and concealed material evidence. Mr. Veasy's PCRA Petition is pending in the Philadelphia Court of Common Pleas.

**ANDREW SWAINSON**

In 1989, Mr. Swainson was given a life sentence for murder. There is direct evidence that homicide detectives had pressured the key prosecution witness to implicate Mr. Swainson, and that detectives concealed evidence that another suspect had committed the murder, concealed the existence of material witnesses and evidence, and fabricated evidence against Mr. Swainson. Mr. Swainson's PCRA Petition is pending in the Philadelphia Court of Common Pleas.

**CARL TONEZ**

Mr. Tonez was convicted of murder in 1992. There is evidence that Defendants Devlin, Worrell, and other homicide detectives concealed material evidence, ignored evidence that others had committed the crime, and extracted a false "confession" from Mr. Tonez, who was convicted and sentenced to life in prison. Mr. Tonez has since died in prison.

**JACK COMBS**

Defendant Devlin was the assigned investigator in this murder case in 1990. All witnesses initially reported that the shooting was a murder-suicide. Some witnesses later changed their stories to claim that Mr. Combs shot Sheppard. The witnesses who changed their stories stated: 1) they were either physically or mentally coerced to make the second statements, or 2) they never said Mr. Combs shot Sheppard and police wrote the statements. Defendant Devlin drafted an affidavit of probable cause for the arrest of Mr. Combs and failed to disclose that every witness claimed the shooting was a murder-suicide until they were pressured to change their statements. Combs was convicted of murder and sentenced to mandatory life in prison. Mr. Combs's PCRA Petition is pending in the Philadelphia Court of Common Pleas.

Dr. McCauley's review of these homicide cases, as well as more than 1,000 IAD investigations dating from the 1990s to quite recently, shows that the City has long tolerated recurring and widespread police misconduct, often of the same nature as had been committed by Defendants Devlin and Worrell in the investigation of the Martinez murder.

The City misconstrues the legal standards governing municipal liability and seeks to impose an enhanced, indeed impossible burden of proof on the plaintiff.  In fact, *Monell* claims have been upheld on far less evidence of widespread practices and customs than have been shown in this case.

In *City of Oklahoma City v. Tuttle*, 417 U.S. 808, 823 (1985), the Supreme Court held that a jury could not infer a "policy" of inadequate training from a single incident.  However, the Court made clear in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), that the requirements of policy and custom do not necessitate proof of a long-standing practice.  Thus, where a plaintiff is able to prove only a single incident of violation of rights, it is necessary to show either the existence of the policy or custom which caused the incident, or that the incident was caused by the action or inaction of policymakers.[43]  Here, there is evidence of a widespread policy or custom dating from at least 1978 to beyond Mr. Thomas's arrest.

Further, *Monell* liability does not require showing of an affirmative policy or action by the defendant entity.  Since *City of Canton*'s endorsement of a failure-to-train theory of liability, courts have regularly concluded that municipalities can be liable for a more general failure to act.  "*Monell* requires no more" than a showing that a municipality "made 'a deliberate choice to follow a course of action . . . from among various alternatives' to do nothing." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379-81 (7th Cir. 2017), *cert. denied sub nom., Corr. Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109 (2017) (quoting *City of Canton*, 489 U.S. at 389).

Third Circuit precedent, ignored by the City, confirms that even the absence of policies may give rise to *Monell* liability.  In *Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003), a diabetic inmate sued a prison medical provider for failing to provide insulin,

---

[43]        *See, e.g.*, *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 523 (9th Cir. 1999).

contending that the entity defendant had not established appropriate policies for ensuring the provision of important medications. *Id.* at 578. Reversing a grant of summary judgment, the court ruled that "[a] reasonable jury could conclude that *the failure to establish a policy* to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs." *Id.* at 585 (emphasis added). Other circuits have reached similar results.[44] The need for clear policies governing the proper operation of the Homicide Unit was and is manifest.

As found by Dr. McCauley and supported by evidence of record, City policymakers had, at a minimum, constructive knowledge of unconstitutional police practices that were widespread and pervasive.[45] The City offers no evidence to rebut the existence of the widespread unlawful

---

[44]     *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185, 1190 (9th Cir. 2006) (noting that "[a] policy can be one of action or inaction" and finding triable issue as to whether failure to implement policies constituted deliberate indifference); *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (allowing *Monell* claim to proceed on ground that "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction"); *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981) (holding that conduct of county entities "may be actionable if their failure to promulgate policies and regulations rose to the level of deliberate indifference").

[45]     The Third Circuit has endorsed municipal liability for policy, practice and custom claims in numerous contexts. *See, e.g.*, *Berg*, 219 F.3d at 275-77 (reversing summary judgment to municipality based on fact that county's established practice for arrest warrants was likely to result in issuance of faulty warrants); *Beck v. City of Pittsburgh*, 89 F.3d 966, 974-76 (3d Cir. 1996) (reversing directed verdict to municipality based on finding that "a reasonable jury could have inferred that the City of Pittsburgh knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers"); *Bielevicz v. Dubinon*, 915 F.2d 845, 852-53 (3d Cir. 1990) (reversing directed verdict in favor of municipality based on trial testimony that police officers "generally understood" that public intoxication could be used to arrest someone without probable cause and that it was "common knowledge" that the charge could be used at the officer's discretion to remove someone from the street); *Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986) (stating that "routine disregard by the city police of an applicable legal procedure designed to preserve the right of citizens detained in their custody amounts to a 'policy' as construed by *Monell*").

practices catalogued and analyzed by Dr. McCauley. Rather, the City cites to three cases that stand for the obvious proposition that scant examples of unlawful practices do not support a finding of pervasive misconduct. For example, the plaintiffs in *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002), presented only 11 examples of warrantless searches in the fourth largest city in the country. *Id.* at 329. Similarly, the plaintiff in *Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010), a case involving the denial of medical attention in prison, offered only four examples of inmates who claimed their medical needs had been ignored. *Id.* at 946. Finally, the City cites to *Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009), where the plaintiff was able to show—over a four-year period where there were 268,000 arrest incidents—that only 27 citizen complaints had been filed. *Id.* at 851.

Defendants' effort to trivialize the City's deliberate indifference must fail. From the many misconduct incidents brought to light by *The Homicide Files*, to the class actions challenging investigatory malfeasance, to the eight murder investigations scrutinized by Dr. McCauley and, finally, to the considerable evidence of ongoing constitutional violations, deliberate indifference is clear. It bears mention that of the eight cases analyzed by Dr. McCauley, three convictions were later reversed, three are currently under review by the CIU and three have pending PCRA petitions that raise serious claims of misconduct by the defendant officers and their colleagues. One man has since died in prison.

In summary, the City acted with deliberate indifference by failing to train and supervise officers on the constitutional limits of the investigative powers of homicide detectives, and by ignoring known instances of abuse and misconduct. At the time of Mr. Thomas' arrest and prosecution, the City knew or should have known of the disturbing pattern of police misconduct related to the fabrication and concealment of evidence, improper interrogation techniques, and the

suppression of exculpatory evidence that negated probable cause.  In Dr. McCauley's view, such training likely would have prevented the arrest and prosecution of Shaurn Thomas.[46]

### C.  Systemic deficiencies in the PPD's internal disciplinary mechanism

The failure to effectively monitor and discipline officers for misconduct also supports a *Monell* claim.  *See Estate of Roman*, 914 F.3d at 800-01.  The evidence in this case demonstrates that the PPD's long-troubled disciplinary system was and remains "fundamentally ineffective, inadequate and unpredictable."  Exhibit C at 23.

The failure to properly monitor and discipline Philadelphia police officers has been the subject of considerable study, scholarship and litigation.  In 1996, the NAACP and others brought suit against the City asserting that a systematic failure to properly investigate police misconduct and impose appropriate remedial or disciplinary action against offending officers has caused constitutional violations.  *NAACP v. City of Philadelphia*, E.D. Pa. No. 96-6045.[47]  A Settlement Agreement resulted in the creation of the Integrity and Accountability Office ("IAO") to assess and monitor the PPD in several areas, including the investigation of misconduct complaints against officers.  The function of IAO was to assess and monitor the PPD in several areas, including the investigation and disposition of misconduct complaints against officers.

In the period from 1997-2003, the Director of IAO, Ellen Green-Ceisler, issued three reports on the Disciplinary System of the PPD.[48]  While the final report noted some improvements in the PPD's internal affairs mechanism, the IAO concluded that the disciplinary system in the

---

[46]     Exhibit C at 30-31.

[47]     *Id.* at 10-11.

[48]     *Id.*

PPD remained fundamentally flawed.  The IAO cited serious and continuing deficiencies in critical

areas, including:

- Excessive and chronic delays in resolving disciplinary complaints;

- Lack of consistent, rational and meaningful disciplinary actions; and

- Failure to discipline substantial numbers of officers who were found to have engaged in misconduct.

Since the mid-1990s, Dr. McCauley has undertaken a detailed analysis of more than 1,000

IAD investigations of PPD officers as well as City data relating to complaints against PPD officers.

Dr. McCauley has offered expert evidence and opinions in numerous cases involving misconduct

allegations against PPD officers and has found that systemic deficiencies in the PPD's internal

disciplinary system existed in the 1990s and thereafter.  The evidence supports the following

conclusions:

- The PPD's internal investigatory process has fallen below accepted practices and is arbitrary and inconsistent;

- The PPD discipline, as practiced, is incident-based rather than progressive.  Thus, repeat violators are not being penalized in proportion to the number of violations;

- The conduct of IAD investigations demonstrates that PPD internal affairs personnel are not adequately trained and supervised in the proper conduct of such investigations;

- A global analysis of IAD's investigatory procedures indicates a pattern of administrative conduct where the benefit of the doubt is given to the officer;

- There are serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions; and

- The PPD lacked an effective early warning system to identify, track, and monitor "problem" officers.[49]

---

[49]     *Id.* at 11.

The systemic deficiencies in the disciplinary system persisted for decades.  In August 2013, Police Commissioner Ramsey asked the U.S. Department of Justice (DOJ) to investigate several issues, including the effectiveness of the PPD's internal disciplinary mechanism.  On March 24, 2015, the DOJ issued a Report that was highly critical of PPD policies and practices, finding that:

> The department's disciplinary mechanism is inconsistent, subject to chronic delays, failed to impose meaningful disciplinary or remedial sanctions, and marred by inadequate investigations. (Finding 36)

The DOJ recommended numerous changes to PPD policies and practices, many of which have since been adopted.  However, as found by Dr. McCauley, the PPD's disciplinary mechanism in the early 1990s suffered from the same if not more problematic deficiencies that persisted for years thereafter.  Dr. McCauley noted that the citizen complaint procedure in place at that time was not as developed as it became after the work of the OIA, and individuals in Philadelphia were often strongly discouraged from pursuing misconduct complaints against PPD officers.  Therefore, it is unsurprising that far fewer complaints had been filed and investigated in the late 1980s and early 1990s than under current procedures.[50]

Dr. McCauley concluded that the PPD had a longstanding custom and practice of inadequate internal investigations and a defective disciplinary system.  The PPD's failure to take reasonable actions to address these problems, as discussed in his report, was contrary to accepted police practices and reflects the City's deliberate indifference to the need for proper supervision and discipline to ensure the safety of civilians and officers alike, and the integrity of policing practices in the PPD.[51]

---

[50]     *Id.* at 12.

[51]     *Id*. at 11-12.

There is evidence that, at the time of Shaurn Thomas' arrest, the PPD had failed to maintain a disciplinary system that ensured officers would follow constitutional requirements and be held accountable when they failed to do so. Indeed, as Dr. McCauley makes clear, the citizen complaint process was so flawed that there was no effective process in place to facilitate the filing of complaints, and that victims of misconduct were often deterred from filing complaints.[52]

The failure of the City to remedy these deficiencies in the face of continuing constitutional violations is proof of deliberate indifference. As the Supreme Court found in *Board of County Commissioners v. Brown*:

> If a program does not prevent constitutional violations, municipal decision-makers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference' necessary to trigger municipal liability.

520 U.S. at 407.

Similarly, in *Beck*, 89 F.3d at 975, the Third Circuit found that the existence of formal departmental procedures to receive and investigate misconduct complaints does not shield a municipality from liability:

> It is not enough that an investigative process be in place . . . . The investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens . . . . Formalism is often the last refuge of scoundrels.

While *Beck* does not suggest that a disciplinary mechanism be perfect, it does mandate that a system be in place that *effectively* deals with continuing constitutional violations. Where, as

---

[52]      *Id.*

66

here, there is evidence that a disciplinary system failed to meaningfully respond to misconduct complaints, failed to impose appropriate disciplinary and remedial measures, and failed to identify and monitor officers who violate the rights of individuals (and thus pose a future risk), it is up to the jury to determine whether the City was deliberately indifferent.[53]

There is a considerable body of federal law that supports a finding of municipal liability on less evidence of unlawful practices than is presented by this case. In *Brown v. Bryan County*, 219 F.3d 450, 459 (5th Cir. 2000), the Fifth Circuit found sufficient evidence of municipal liability where the need to provide specific officers with more or different training was apparent and was nonetheless disregarded by the municipality. As the court concluded:

> *City of Canton*, we think, spoke rather directly to the facts in the case before us when it observed that with respect to specific officers, a need for more or different training can be so obvious and the inadequacy of training so likely to result in a violation of constitutional rights that the city can reasonably be said to have been deliberately indifferent to the need for training.

In *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), there was no direct evidence of misconduct by officers prior to the event in question. *Id.* at 171. The Court found, however, that the conduct of the officers during the incident and the failure of the department to properly investigate and discipline the officers was proof of municipal liability:

> The disposition of the policymaker may be inferred from his conduct after the events of that night. Following this incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error. The officers testified at the trial that no changes had been made in their policies. If that episode of such dangerous recklessness obtained so little attention and action by the

---

[53]     Even where a municipality has a policy of investigating reports of officers who have falsified evidence, courts have granted summary judgment where there is evidence that "most complaints are simply reviewed…and no disciplinary action is taken in response." *Coggins v. Cnty. of Nassau*, 254 F. Supp. 3d 500, 521 (E.D.N.Y. 2017).

> City policymaker, the jury was entitled to conclude that it was
> accepted as the way things are done and have been done in the City
> of Borger... This reaction to so gross an abuse of the use of deadly
> weapons says more about the existing disposition of the City's
> policymaker than would a dozen incidents where individual officers
> employed excessive force.

*Id.*  Similarly, in *Vineyard v County of Murray, Ga.*, 990 F.2d 1207 (11th Cir. 1993), the Court

found that the failure to properly investigate the incident in question may be relied upon as

evidence of a policy or practice of deliberate indifference, together with other evidence of improper

procedures in the handling of complaints against police officers.  *Id.* at 1212.  The First Circuit has

also held that evidence of misconduct by officers during the event which gave rise to the lawsuit

may be used as evidence of a municipal policy or custom which caused the constitutional violation.

In *Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989), the Court held that where, as here, there

is independent proof of the existence of an improper practice, the facts of the incident on trial may

be relied upon as additional proof of the practice.  *Id.* at 1161.

Further, as previously noted, both prior and subsequent incidents that are similar to the

misconduct in question may support a finding of municipal liability. *See, e.g.*, *Estate of Roman*,

914 F.3d at 799; *Bordanaro*, 871 F.2d at 1167; *Henry*, 132 F.3d at 518.  Post-event evidence is not

only admissible for the purposes of establishing policy or custom; it is also considered "highly

probative with respect to that inquiry."  *Henry*, 132 F.3d at 519.

Courts of this district have found sufficient evidence of a *Monell* claim to defeat summary

judgment based upon Dr. McCauley's expert opinions on facts directly analogous to the issues

raised in this case.  For example, in *Lyons v. City of Philadelphia*, No. 06-5195, 2007 WL 3018945,

at *8 (E.D. Pa. October 12, 2007), Dr. McCauley submitted an expert report with similar findings

and, in denying summary judgment, the Honorable John Padova concluded:

> [W]ith respect to a policy or custom exhibiting deliberate
> indifference on the part of policymakers, Plaintiff has submitted [a

> Report] . . . that concluded in part that "[t]he disciplinary system in the Philadelphia Police Department remains fundamentally ineffective, inadequate, and unpredictable."[54]

As Dr. McCauley makes clear, the failure to conduct meaningful investigations on a consistent basis, the excessive and chronic delays in resolving disciplinary issues, the lack of consistent, rational and meaningful disciplinary actions, and the failure to discipline officers who were found to have engaged in misconduct, rendered the PPD's disciplinary process in the 1990s constitutionally deficient.

In the final analysis, the evidence supports Dr. McCauley's conclusion that the PPD has fallen below the accepted practices of police internal investigatory conduct and that the actions and/or inactions of the PPD "were substantial contributing factors causing the harm suffered by Plaintiff."[55]   Defendants seek summary judgment where the facts and controlling law clearly establish the City's deliberate indifference.

---

[54]   The Honorable Stewart Dalzell also denied the City summary judgment based on Dr. McCauley's findings of serious deficiencies in the PPD's disciplinary system.  As found by Judge Dalzell in *Henderson v. City of Philadelphia*, No. 06-532, Order at 4-5 (E.D. Pa. Jan. 30, 2007), attached as Exhibit D:

> Because "it is for the jury to determine" whether a particular course of action by city policymakers represents acquiescence in the alleged custom, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), we may not grant the City's motion for summary judgment if a jury could reasonably find that the *Monell* standard was satisfied. A jury who credited Dr. McCauley's testimony and the IAO Report could find that the Commissioner "acquiesced in a long-standing policy or custom of inaction." *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1064 (3d Cir. 1991).  The weight to be given to those items of evidence is a material question of fact that precludes our grant of summary judgment.

[55]  Exhibit C at 30.

### D.  Actual or Constructive Knowledge of City Policymakers

Defendants suggest that the failure to adduce evidence that identifies a particular policymaker is fatal to the municipal liability claims.  Defendants' Memorandum, at 19.  This position directly conflicts with Third Circuit law.  In *Bielevicz*, the Third Circuit held that the municipal decision-maker need not be "specifically identified by the plaintiff's evidence.  Practices so permanent and well-settled as to have the force of law are ascribable to municipal decision-makers."  915 F.2d at 850.  This principle was reaffirmed by the Third Circuit in *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996), and, more recently, in *Olivieri v. County of Bucks*, 502 F. App'x 184, 189 (3d Cir. 2012).  The courts in this District have, in numerous cases, followed *Bielevicz* and found that it was unnecessary to specifically name a policy maker.[56]  As this Court found in *Washington-Pope v. City of Philadelphia*, No. 12-4300, 2015 WL 7450522 (E.D. Pa. Nov. 24, 2015), it is not necessary for a plaintiff under these circumstances to specifically name every policymaker who served in the relevant time periods:

> The Third Circuit Court of Appeals has acknowledged that a responsible decision maker does not necessarily need to be identified given that permanent and well settled practices carrying the force of law can be ascribed to municipal decision makers.

*Id.* at *15 (citing *Kneipp*, 95 F.3d at 1213; *Anela*, 790 F.2d at 1067; and *Bielevicz*, 915 F.2d at 850).

---

[56]     *See Wilson v. City of Philadelphia*, 177 F. Supp. 3d 885, 909 (E.D. Pa. 2016); *Kingsmill v. Szewczak*, 117 F. Supp. 3d 657, 672 (E.D. Pa. 2015); *Brown v. Ridley Twp.*, No. 14-5871, 2015 WL 568640, at *4 (E.D. Pa. Feb. 10, 2015); *Austin v. Hill*, No. 11-2847, 2014 WL 1386338, at *8 (E.D. Pa. Apr. 9, 2014); *Boyden v. Township of Upper Darby*, 5 F. Supp. 3d 731, 742 (E.D. Pa. 2013).

### E.  Causation

The City's argument that there is no evidence linking the deficient training, supervision, and discipline to the arrest of Shaurn Thomas is seriously flawed.  On a *Monell* claim, a "plaintiff can establish causation by 'demonstrat[ing] that the municipal action was taken with "deliberate indifference" to its known or obvious consequences.'"  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. at 407).  A plaintiff need only "demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue."  *Bielevicz*, 915 F.2d at 850-51 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 507 (3d Cir. 1985)).  Once a plaintiff makes that showing, "[a]s long as the causal link between the alleged policy or custom and the constitutional injury is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *A.M.*, 372 F.3d at 581 (internal quotation marks omitted); *see Ruvalcaba*, 167 F.3d at 523.

As made clear in *City of Canton*, the proper causation inquiry is whether the harm to the plaintiff would have been "avoided had the employee been trained [or supervised or disciplined] under a program that was not deficient in the identified respects." *Vineyard*, 990 F.2d at 1213; *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014).  Dr. McCauley found, and the evidence supports, a clear link between the City's failure to train, supervise, and discipline and the arrest of Shaurn Thomas.  If the PPD had put in place a system to effectively monitor the operation of the Homicide Unit and had undertaken corrective measures, Mr. Thomas's unlawful arrest and imprisonment would have been avoided. Ex. C at 44-45.

In this case, there is compelling evidence—including deficient training, supervision, and discipline in the operation of the Homicide Unit; the failure to maintain an effective disciplinary

system; and the failure to monitor and take action against officers, like those in the Homicide Unit, whose performance created the likelihood of future constitutional violations—that creates a logical connection between the City's policy failures and the arrest of Mr. Thomas.  The 24-year prison sentence that was imposed on Mr. Thomas can be directly traced to—indeed, was the inevitable consequence of—the City's failure to properly train, supervise and discipline.  Under these circumstances, the courts have found that "the issue of causation remains to be decided by the jury."  *Vann v. City of New York*, 72 F.3d 1040, 1051 (2d Cir. 1995); *see also Brown v. Bryan Cnty.*, 219 F.3d at 465; *Grandstaff*, 767 F.2d at 171.

In the final analysis, and viewing the evidence in the light most favorable to the plaintiff, there is sufficient evidence showing that the City was deliberately indifferent to known constitutional customs, policies, and practices that caused the substantial harms suffered by Shaurn Thomas.  Summary judgment on the *Monell* claim should not be granted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants'

Motion for Summary Judgment.


Respectfully submitted,

Dated: April 25, 2019                    */s/ Stephen D. Brown*
                                         Stephen D. Brown
                                         James Figorski
                                         Tiffany Engsell
                                         Stefanie A. Tubbs
                                         **DECHERT LLP**
                                         Cira Centre
                                         2929 Arch Street
                                         Philadelphia, PA 19104
                                         (215) 994-4000

                                         Paul Messing
                                         **KAIRYS, RUDOVSKY, MESSING,**
                                         **FEINBERG, LIN**
                                         718 Arch Street, Suite 501 South
                                         Philadelphia, PA 19106
                                         (215) 925-4400

                                         *Attorneys for Plaintiff Shaurn Thomas*

## <u>CERTIFICATE OF SERVICE</u>

I, Stefanie A. Tubbs, hereby certify that on Thursday, April 25, 2019, the foregoing

Opposition to Defendants' Motion for Summary Judgment was served on Defendants City of

Philadelphia, Martin Devlin, and Paul Worrell via this Court's Electronic Case Filing System.


Dated: April 25, 2019                          <u>*/s/ Stefanie A. Tubbs*</u>
                                               Stefanie A. Tubbs