## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **SHAURN THOMAS,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | **No. 17-4196** |
| *Defendants.* | : | |

## MEMORANDUM

PRATTER, J.                                                                                    AUGUST  22, 2019

Shaurn Thomas—the plaintiff[1]—was convicted of the 1990 murder of Domingo Martinez. Twenty-four years later, the plaintiff was exonerated. In 2017, he sued the City of Philadelphia and Martin Devlin and Paul Worrell, the detectives who allegedly fabricated evidence against him.

All of the defendants now move for summary judgment. First, they argue that the malicious prosecution and fabrication of evidence claims against the detectives must be dismissed because the plaintiff's original convictions were not "favorably terminated," and because the plaintiff has not described evidence from which a reasonable jury could conclude that the detectives violated the plaintiff's constitutional rights. The defendants also argue that the plaintiff's claims against the City must be dismissed for failing to meet the requirements of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The Court denies the defendants' motion for summary judgment in its entirety.[2]

---

[1]    To avoid confusion between Shaurn Thomas and his brother Mustafa Thomas, the Court refers to Shaurn Thomas as "the plaintiff"—as opposed to "Mr. Thomas"—throughout this Memorandum.

[2]    The plaintiff also brings conspiracy and failure to intervene claims against the detectives. The defendants argue that these claims cannot proceed absent a valid underlying claim, but they do not otherwise challenge the plaintiff's conspiracy and failure to intervene claims. Because the

1

On the morning of November 13, 1990, Domingo Martinez was murdered after making a large cash withdrawal from a North Philadelphia bank. As the 78-year-old drove from the bank to his payday-lending business, another driver side-swiped his car. At least one man emerged from the initiating car, shot Mr. Martinez, pulled him from his car, and left him to die in the street. The killer drove away in Mr. Martinez's car, followed by the assailing car.

The case was investigated by Detectives Devlin and Worrell of the Philadelphia Police Department. Four years later, two pairs of brothers were convicted for the murder: the plaintiff and Mustafa Thomas, along with John Stallworth and William Stallworth. The plaintiff was 16 years old at the time of the Martinez murder.

At the plaintiff's trial in 1994, the Stallworth brothers testified that they, the Thomas brothers, and two other individuals planned the murder at the Abbotsford Homes housing project. They testified that they coordinated the attack on Mr. Martinez in two separate cars, one gray and one blue.

## I. The Investigation

### A. Evidence from Mr. Martinez's Car

Following the murder, the police recovered Mr. Martinez's car. An officer not involved in this lawsuit took photos of the car and recovered a "sample of white paint" "from the left front fender." Ex. 26 to Plaintiff's Counterstatement of Facts at 16:11–26:14.[3] The officer did not find

---

Court will not grant summary judgment on the malicious prosecution or fabrication of evidence claims, the plaintiff may also proceed with his conspiracy and failure to intervene claims.

[3]     Hereinafter, the Court cites exhibits to Plaintiff's Uncontested Statement of Facts as "Plaintiff's Ex. [ ]."

2

any blue paint on the victim's car. *Id.* at 18:6–19:10.[4] The color of the paint is important because John Stallworth later testified that the assailing car was blue.

## B. *Eyewitness Reports*

Four people witnessed the murder of Mr. Martinez. All four eyewitnesses stated that the assailing car was a Chevrolet Nova or a Buick Skylark. *See* Plaintiff's Exs. 4, 6, 22, and 23. One stated that the assailing car was gray, and the others reported that it was red and white. *See id.* None said anything about a blue car. *See id.* All agreed that the shooter was about six feet tall. *See id.* All agreed that there were no more than three assailants. *See id.*

The detectives did not follow up with the eyewitnesses after taking their initial statements.

## C. *Oliver Walthour and the Chevy Nova Traffic Stop*

Three days after the Martinez murder, Philadelphia police officers stopped a gray Chevrolet Nova six blocks from the crime scene. *See* Plaintiff's Ex. 35. Three men—Oliver Walthour, Lloyd Hicks, and Bobby Harris—were in the car, and the officers recovered a gun from the vehicle. *See* Plaintiff's Ex. 36. Detectives Devlin and Worrell interrogated the three men, and all three admitted that they knew—or at least knew of—Mr. Martinez. *See* Plaintiff's Exs. 37, 38, and 39.

Mr. Walthour told the detectives that the gray Nova belonged to Mr. Hicks. *See* Plaintiff's Ex. 35. Mr. Walthour suggested that Mr. Hicks' cousin—John Lewis—may have murdered Mr. Martinez because Mr. Lewis had access to the car and because, the day after the murder, he saw Mr. Lewis "flashing around a lot of money." *See id.* Mr. Walthour told the detectives that he asked Mr. Lewis where he got the money, and Mr. Lewis said that he "robbed this old Puerto Rican guy between 7th and Tioga and Sedgley." *See id.* Mr. Walthour also told the detectives that Mr.

---

[4]     At his deposition, the officer agreed that "if [he] had found . . . blue paint on the victim's car, [he] would have documented it." Plaintiff's Ex. 26 at 19:7–10.

Lewis told him that "they followed [the Puerto Rican man] in a car and they hit the dude's car." *Id.*

Mr. Walthour later told Detective Devlin that his original statement was false. *See* Plaintiff's Ex. 37. Mr. Walthour claimed that he blamed Mr. Lewis for the murder because he was afraid Detective Devlin was going to charge him [Mr. Walthour] for the murder and that he only knew facts about the murder because his uncle told him. *See* Plaintiff's Exs. 37, 40.

Four months later, three men robbed and murdered a store owner—Rene Cardona—two blocks from the scene of Mr. Martinez's murder. On April 5, 1991, Mr. Walthour confessed to participating in the robbery and murder of Mr. Cardona. *See* Plaintiff's Ex. 51.

Sometime before May 1, 1991, the Police Department's Homicide Division conducted "a review of incidents similar to the Martinez murder." *See* Plaintiff's Ex. 54. During this review, the Homicide Division identified Mr. Cardona's murder as a crime having "some similarities" to the Martinez murder. *Id.* Therefore, on May 1, 1991, Detective Devlin interrogated Mr. Walthour again. *See id.* This time, Mr. Walthour told Detective Devlin a different story, claiming that he heard "Shawn" and "T-Bop" from "7th and Butler" killed Mr. Martinez.[5] Plaintiff's Ex. 55.

Detectives Devlin and Worrell did nothing with this information. Plaintiff's Ex. 20 at 43:6–44:1; 151:22–155:20.[6]

---

[5]    The plaintiff testified at his deposition that he never lived near, frequented, or even visited the area of 7th and Butler. *See* Plaintiff's Ex. 10 at 9:9–18.

[6]    The plaintiff's brother, Mustafa Thomas, ultimately secured PCRA relief, and his conviction for the Martinez murder was vacated due in part to the defendants' failure to disclose evidence related to Mr. Walthour. *See* Plaintiff's Ex. 122 at 73–77, 82–83.

4

### D. Nathaniel Stallworth's First Statement

On February 8, 1992, two detectives not involved in this lawsuit interrogated Nathaniel Stallworth, John and William Stallworths' cousin. *See* Plaintiff's Ex. 75. Nathaniel Stallworth told these detectives that the plaintiff, Mustafa Thomas, John Stallworth, and William Stallworth participated in the robbery/murder of Mr. Martinez. *Id.* Nathaniel Stallworth also stated that two friends of Mustafa Thomas who he did not know participated in the crime. *Id.* After being shown photographs by detectives, Nathaniel Stallworth identified an individual named Raynard Hardy as one of the participants. *Id.*

### E. John Stallworth's First Statement

On October 27, 1992, Detectives Devlin and Worrell interrogated John Stallworth. *See* Plaintiff's Ex. 81. John Stallworth told the detectives that he, the plaintiff, Mustafa Thomas, William Stallworth, and two other individuals—"Nasir" and Louis Gay—followed Mr. Martinez from the bank in two cars (one blue and one gray), and that the plaintiff blocked Mr. Martinez's route of escape while Mustafa Thomas shot and robbed Mr. Martinez. *Id.*

Detectives Devlin and Worrell soon learned that Mr. Gay could not have participated in the crime because he was incarcerated on the day of the murder. *See* Plaintiff's Ex. 7 at 75:4–8; Plaintiff's Ex. 83.

In a sworn declaration, John Stallworth now claims that, during the October 1992 interrogation, he was handcuffed to a metal chair and repeatedly questioned about the Martinez murder. Plaintiff's Ex. 80. He claims that the detectives told him that they knew he was not the shooter, that they really wanted Mustafa Thomas, and that he would be free to leave as soon as he told the detectives what they wanted to hear. *Id.* John Stallworth further claims that the detectives hit him with a phone book and squeezed his testicles. *Id.* He claims that he told the officers what

5

they wanted to hear to end the abuse and that he had no personal knowledge about the Martinez murder. *Id.*

### F. Nathaniel Stallworth's Second Statement

After John Stallworth named "Nasir" and Mr. Gay as participants in the murder, Detectives Devlin and Worrell interrogated Nathaniel Stallworth again. Nathaniel Stallworth changed his story. This time, he stated that Raynard Hardy—who he positively identified as a participant of the crime in his initial interview— "could [have been] one of the guys in the cars" who participated in the murder and added that "Nas"—who he did not previously identify—was a participant. Plaintiff's Ex. 88.

### G. Detectives Devlin and Worrell Learn that the Plaintiff May Have Appeared at the Youth Study Center on the Morning of the Martinez Murder

In November 1992, the detectives learned that the plaintiff had been arrested and charged with attempted theft of a motorcycle the day before the Martinez murder. *See* Plaintiff's Ex. 19 at 193:10–18; Plaintiff's Ex. 90. The detectives gained access to the plaintiff's juvenile file and found and photographed a subpoena issued by the Youth Study Center that was purportedly signed by the plaintiff on the day of the murder. Plaintiff's Ex. 95. The detectives did not conduct any investigation of this potential alibi.

### H. Nathaniel Stallworth Recants His Previous Statements

At John Stallworth's preliminary hearing for the Martinez murder in December 1992, Nathaniel Stallworth recanted his previous statements. *See* Plaintiff's Ex. 76 at 8–30. He testified that the first group of detectives told him that they would let him out of jail to see his girlfriend deliver a baby if he told them what they wanted to hear. *Id.* at 29–30.

6

## I. *The Harry James Murder*

In December 1992, Harry James, an elderly business man, was robbed and murdered at his speakeasy. In January 1993, Christopher Dinwiddie, an eyewitness, told Detective Jeff Pirree that he observed the plaintiff stand "in the vestibule [of the speakeasy] with a long shotgun" while the plaintiff's father robbed and murdered Mr. James. Ex. 10 to Defendants' Mot. Sum. J. In February 1993, Mr. Dinwiddie again told Detective Pirree that the plaintiff "stood inside by the front door with the shotgun" while the plaintiff's father robbed and murdered Mr. James. *See* Ex. 12 to Defendants' Mot. Sum. J.

Thereafter, an arrest warrant was issued for the plaintiff in connection to the James murder. Ex. 14 to Defendants' Mot. Sum. J. The plaintiff turned himself in two days later. *See* Ex. 16 to Defendants' Mot. Sum. J.

In March 1993, at the plaintiff's preliminary hearing for the James murder, a different eyewitness testified that the plaintiff was not at the speakeasy when Mr. James was killed. Plaintiff's Ex. 97 at 16–18. Mr. Dinwiddie also recanted his previous statements and testified that the plaintiff was not at the speakeasy that night. *Id.* at 71.[7] Detectives Devlin and Worrell attended this hearing. *See* Plaintiff's Ex. 99.

## J. *John Stallworth's Second Statement*

On July 6, 1993, John Stallworth pleaded guilty to third-degree murder for his claimed involvement in the robbery and murder of Mr. Martinez and agreed to testify against the plaintiff, Mustafa Thomas, and William Stallworth to avoid the death penalty. *See* Plaintiff's Ex. 80. He gave a second statement to Detectives Devlin and Worrell in which he eliminated Mr. Gay from

---

[7]     A jury acquitted the plaintiff of the James murder in 1994. Plaintiff's Ex. 108 at 6–7.

the story and instead claimed that an unknown man participated in the murder of Mr. Martinez.

Plaintiff's Ex. 101.

### K. The Detectives Submit an Affidavit of Probable Cause for the Plaintiff's Arrest

On July 27, 1993, the detectives submitted an affidavit of probable cause for the plaintiff's

arrest for the Martinez murder. Plaintiff's Ex. 104. The only information in the affidavit

connecting the plaintiff to the murder was:

- John Stallworth's first statement in which he claimed that six people, including the plaintiff, Mustafa Thomas, John Stallworth, and William Stallworth, murdered Mr. Martinez; and
- Nathaniel Stallworth's identification of the plaintiff, Mustafa Thomas, John Stallworth, and William Stallworth as participants in the murder.

*See id.* The detectives omitted from their affidavit the following information:

- Nathaniel Stallworth gave two conflicting statements and then later recanted both statements during John Stallworth's preliminary hearing;
- John Stallworth's original statement included at least one lie, that Mr. Gay—who was in prison at the time—participated in the murder;
- Contrary to John Stallworth's story, none of the four eyewitnesses saw two cars, a blue car, or six participants in the murder;
- Police officers found white, not blue, paint on Mr. Martinez's car;
- Evidence indicating that the plaintiff may have been at the Youth Study Center at the time of the murder; and
- Information concerning Mr. Walthour and the traffic stop of the gray Chevy Nova.

*See id.*

### L. William Stallworth's Guilty Plea

Thereafter, the detectives arrested William Stallworth for the Martinez murder. William

Stallworth pleaded guilty and made a statement to the police, confirming John Stallworth's second

statement. *See* Plaintiff's Ex. 107. He stated that he, John Stallworth, the plaintiff, Mustafa

Thomas, Nasir, and an unknown man drove in two cars, one blue and one gray, to rob and murder

Mr. Martinez. *Id.*

8

In a sworn declaration, William Stallworth now many years later claims that he was coerced into providing false testimony by the detectives. *See* Plaintiff's Ex. 106. He claims that he falsely testified because he knew he would likely be convicted of murder either way, and because the detectives told him he would get a deal if he agreed to tell the same story as John Stallworth. *Id.* He further claims that the detectives told him that if he did not agree, John Stallworth was not going to get his deal and would face the death penalty. *Id.*[8]

## II.     The Trial

In December 1994, the plaintiff was convicted of second-degree murder, among other offenses, for his alleged involvement in the robbery and murder of Mr. Martinez. Plaintiff's Ex. 109 at 20. The only witnesses who connected the plaintiff to the murder were John and William Stallworth. There was no forensic evidence linking Shaurn Thomas to the murder of Mr. Martinez.

## III.    The CRU Vacates the Plaintiff's Conviction and Decides Not to Retry the Case

In January 2017, BJ Graham-Rubin and Andrew Wellbrock, Assistant District Attorneys in the Conviction Review Unit ("CRU"), began to investigate the plaintiff's claim of innocence.

Ms. Graham-Rubin investigated the plaintiff's Youth Study Center alibi. After reviewing documents and speaking to employees at the Center, she concluded that the plaintiff "most likely" had his intake interview at the Center on the morning of November 13, 1990. Plaintiff's Ex. 17 at 6.

In April 2017, Ms. Graham-Rubin and Mr. Wellbrock interviewed William Stallworth. *See* Plaintiff's Ex. 113. William Stallworth told them that he was not involved in the murder and that

---

[8]     William Stallworth does not identify Detectives Devlin or Worrell in his declaration. However, Detectives Devlin and Worrell are listed on the statement William Stallworth provided to the Homicide Division on January 25, 1994, *see* Plaintiff's Ex. 107, and there is no record of any other detective or officer taking a statement from William Stallworth.

he did not believe that the plaintiff was either. *Id.* Mr. Wellbrock believed William Stallworth, but Ms. Graham-Rubin did not. Plaintiff's Ex. 57 at 94:9–13.

In May 2017, the CRU received the homicide file for the Martinez murder. Mr. Wellbrock discovered the statements from Messrs. Walthour, Hicks, and Harris. Plaintiff's Ex. 57 at 65:15–66:13. Mr. Wellbrock concluded that these statements were significant because "it was information that discussed alternate suspects that were identified contemporaneously with the murder" and "the alternate suspect was driving a car that fit the description of the eyewitness." *Id.* at 66:9–17.

Based on this information, the CRU and the Acting District Attorney, Kathleen Martin, decided to vacate and dismiss the case against the plaintiff. Mr. Wellbrock memorialized the rationale underlying their decision in a memo dated May 11, 2017:

> Based on our review and investigation, sufficient evidence exists to undermine confidence in the conviction and creates a basis for relief in the interest of justice. Based on the evidence, we do not believe sufficient evidence exists to prove [the plaintiff] guilty beyond a reasonable doubt. As such, the CRU recommends agreeing to a new trial and moving to *nolle prosequi* the charges.

Plaintiff's Ex. 98 at 5. The memo reaffirmed that "it is most likely that [the plaintiff] appeared in Juvenile Court for an intake interview on the morning of November 13[th], 1990." *Id.* at 3. Ms. Graham-Rubin and Ms. Martin both reviewed and approved Mr. Wellbrock's memo. *Id.* at 5.

On May 23, 2017, the plaintiff was released from prison after 24 years of incarceration. Plaintiff's Ex. 115. On June 13, 2017, Ms. Graham-Rubin appeared in front of Judge Rose Marie DeFino-Nastasi and stated the reasons for dismissing the plaintiff's case:

> [A]fter reviewing further investigation, the District Attorney's Office Conviction Review Unit has determined that it is most likely that [the plaintiff] was, in fact, at the Youth Study Center sometime during the morning of November 13, 1990. However, the evidence does not establish an absolute alibi. So, therefore, the Conviction

10

Review Unit cannot determine [the plaintiff's] actual innocence. Furthermore, there has been a recent recantation by one of the witnesses who testified, William Stallworth.

In his recantation, [William Stallworth] recanted his trial testimony, but his recantation also does not actually exculpate [the plaintiff]. Mr. Stallworth now claims that he was not present at the time of the crime and, therefore, he does not know, he has no firsthand knowledge of who was or was not a participant in the crime.

Although [William Stallworth] states he believes [the plaintiff] wasn't there, he states now he has no actual knowledge of who participated because he wasn't there and, finally, as to the statements from Oliver Walthour, these statements were the statements that were not provided to the District Attorney's Office or to the Defense at the time of trial but on their face, they are both potentially exculpatory and inculpatory. So they too do not establish any innocence.

However, under present case law, the Conviction Review Unit believes that these statements are discoverable under *Brady* and, accordingly, [the plaintiff] would be entitled to a new trial. So that is why we recommended vacating the [plaintiff's] conviction and as this Court knows at this time, the District Attorney's Office is faced with considering whether or not we were going to retry [the plaintiff].

Based on the totality of the circumstances here, including his age at the time of the crime, the fact that he was not the shooter and in consideration of the time that he has already spent in prison, the Conviction Review Unit recommended to the District Attorney's Office, and the district attorney's office agrees, that we will not be seeking retrial and that we will seek to *nol pros* the case at this time.

Plaintiff's Ex. 121 at 2:5–4:12. Judge DeFino-Nastasi granted the DA's request to *nol pros* the case. *Id.* at 4:17–18.

In September 2017, the plaintiff filed this lawsuit against the City and Detectives Devlin and Worrell. The defendants now move for summary judgment on the plaintiff's malicious prosecution and fabrication of evidence claims asserted against the detectives and on the plaintiff's failure to train, supervise, and discipline claim asserted against the City.

11

## LEGAL STANDARD

A court grants a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary

12

judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

First, the Court discusses the plaintiff's malicious prosecution and fabrication of evidence claims against the detectives, followed by a discussion of the claim against the City.

### I.    Malicious Prosecution

The plaintiff brings a Fourth Amendment malicious prosecution claim and a state-law malicious prosecution claim.   A malicious prosecution claim under the Fourth Amendment requires a plaintiff to establish that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014) (citations omitted).   A malicious prosecution claim under Pennsylvania law requires a plaintiff to show all but the fifth element (deprivation of liberty). *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000) (citation omitted).

The defendants argue that the plaintiff's malicious prosecution claims must fail because (1) the plaintiff's underlying convictions were not "favorably terminated"; and (2) because the detectives had probable cause to arrest the plaintiff for the murder of Mr. Martinez.   The Court disagrees and will not dismiss the plaintiff's malicious prosecution claims on summary judgment.

### A. *Favorable Termination*

Favorable termination for purposes of a malicious prosecution claim is demonstrated where "a prior criminal case [was] disposed of in a way that indicates the innocence of the accused . . . ." *Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009). "Actual innocence is not required for a common law favorable termination . . . ." *Smith v. Holtz*, 87 F.3d 108, 113 (3d Cir. 1996) (citing Restatement of the Law of Torts §§ 659, 660 (1938)).

In analyzing whether a *nol pros* decision constitutes a favorable termination, a district court must consider "the underlying facts of the case, the particular circumstances prompting the *nol pros* determination, and the substance of the request for a *nol pros* that resulted in the dismissal." *Geness v. Cox*, 902 F.3d 344, 356 (3d Cir. 2018) (cleaned up) (citations omitted). An abandonment of charges for "insufficient evidence unquestionably provides an indication that the accused is" innocent of the crimes charged. *Id.* (citation and quotations omitted). However, where the *nol pros* "merely reflect[s] an informed and reasoned exercise of prosecutorial discretion as to how best to use . . . limited resources" and does "not suggest that [the plaintiff] was innocent," it does not constitute a favorable termination. *Donahue v. Gavin*, 280 F.3d 371, 384 (3d Cir. 2002).

To support their argument that this plaintiff fails to meet the favorable termination requirement, the defendants rely on *Donahue* and *Morris v. Verniero*, 453 F. App'x 243 (3d Cir. 2011). However, these cases are distinguishable. In *Donahue*, the charges underlying the plaintiff's malicious prosecution claim were dismissed because of intervening changes in controlling law. 280 F.3d at 384. The prosecutor decided not to retry the case because the plaintiff "was not likely to receive any additional jail time" and "further prosecution was . . . not an appropriate use of limited resources." *Id.*

14

In *Morris*, the New Jersey Attorney General moved to dismiss 76 cases based on allegations of racial profiling by the police. 453 F. App'x at 244–45. There was no evidence suggesting that the plaintiff was innocent of the charges underlying his malicious prosecution claim, and the Attorney General specifically stated "let's be clear; the defendants in these cases may have prevailed in their motions to suppress, but they are criminals nonetheless. All were carrying some form of contraband for distribution . . . ." *Id.* at 246.

Here, in contrast, the *nol pros* determination is indicative of the plaintiff's innocence. In his memo recommending the *nol pros*, Mr. Wellbrock, the Assistant Director of the CRU, wrote that:

> [W]e do not believe sufficient evidence exists to prove [the plaintiff] guilty beyond a reasonable doubt. As such, the CRU recommends agreeing to a new trial and moving to *nolle prosequi* the charges.

Plaintiff's Ex. 98 at 5. Mr. Wellbrock also stated that "contrary to the Commonwealth's theory at trial regarding the alibi, it is most likely that [the plaintiff] appeared in Juvenile Court for an intake interview on the morning of [the murder]." *Id.* at 3.

Similarly, when Ms. Graham-Rubin appeared before Judge DeFino-Nastasi, she stated that

> [A]fter reviewing further investigation, the District Attorney's Office Conviction Review Unit has determined that it is most likely that [the plaintiff] was, in fact, at the Youth Study Center sometime during the morning of November 13, 1990.

Plaintiff's Ex. 121 at 2:5–12. Although Ms. Graham-Rubin qualified the CRU's conclusion—stating that the evidence did not establish "an absolute alibi" and that the CRU could not determine the plaintiff's "actual innocence," *id.* at 2:12–16—only an indication of innocence, not actual innocence, is required under Third Circuit case law. *See Smith*, 87 F.3d at 113.

The reasons underlying the plaintiff's *nol pros*—particularly the CRU's conclusion that it did not "believe sufficient evidence exists to prove [the plaintiff] guilty beyond a reasonable

15

doubt"—are indicative of his innocence and are more in line with *Geness*, 902 F.3d at 356 (stating that an abandonment of charges for "insufficient evidence unquestionably provides an indication that the accused is actually innocent of the crimes charged"), than with *Donahue* and *Morris*. Therefore, the Court will not dismiss the plaintiff's malicious prosecution claims on failure to show favorable termination grounds.[9]

## *B. Probable Cause*

Where, as here, a probable cause finding was made by a neutral magistrate in connection with a warrant application, a malicious prosecution plaintiff must establish that: (1) the officer, with at least a reckless disregard for the truth, made false assertions or omissions that created a falsehood in applying for a warrant; and (2) those assertions or omissions were material or necessary to the finding of probable cause. *Geness*, 902 F.3d at 356–57. Assertions are made with reckless disregard when an officer "had obvious reasons to doubt the accuracy of the information he reported," and omissions are made with reckless disregard when an officer "omits facts that any reasonable person would know that a judge would want to know." *Wilson v. Russo*, 212 F.3d 781, 783, 788 (3d Cir. 2000) (citations and quotations omitted). To determine the materiality of misstatements or omissions, a court should "excise the offending inaccuracies and insert the facts

---

9       At the *nol pros* hearing, Ms. Graham Rubin did state that "[b]ased on the totality of the circumstances here, **including [the plaintiff's] age at the time of the crime, the fact that he was not the shooter and in consideration of the time that he has already spent in prison,** . . . we will not be seeking retrial." Plaintiff's Ex. 121 at 4:2–12 (emphasis added). The defendants argue that these comments underlying the *nol pros* show that the decision not to prosecute the case was not indicative of the plaintiff's innocence because these other factors were considered. However, a holding here that the *nol pros* did not indicate the plaintiff's innocence because the City considered additional factors would ignore the more obvious primary reason for the *nol pros* and allow the City to avoid civil rights liability simply by referencing several non-innocence-based factors in its *nol pros* requests.

16

recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Id.* at 789 (citation omitted).

The Third Circuit Court of Appeals has explained that "[c]ourts should exercise caution before granting a defendant summary judgment in a malicious prosecution case when there is a question of whether there was probable cause for the initiation of the criminal proceeding because, '[g]enerally, the existence of probable cause is a factual issue.'" *Halsey*, 750 F.3d at 300 (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)). "It certainly is inappropriate for a court to grant a defendant officer's motion for summary judgment in a malicious prosecution case if there are underlying factual disputes bearing on the issue or if 'reasonable minds could differ' on whether [there was] probable cause for the institution of the criminal proceedings based on the information [available]." *Id.* (quoting *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)).

Here, the affidavit of probable cause for the plaintiff's arrest included bare-bones facts about the murder of Mr. Martinez, information about general interviews with Mr. Martinez's family members, a few details from interviews with the bank teller and a bank security guard, information about where Mr. Martinez's car was located after the murder, details from John Stallworth's first statement, and details provided by Nathaniel Stallworth. *See* Plaintiff's Ex. 104. John and Nathaniel Stallworths' statements were the only evidence identifying the plaintiff.

The plaintiff has presented evidence from which a reasonable jury could conclude that the detectives included false assertions and made material omissions in the affidavit of probable cause.

### 1. *False Assertions*

John Stallworth has since declared that the detectives fed him the story, assaulted him, and told him that he could leave the interrogation when he "told them what they wanted to hear."

17

Plaintiff's Ex. 80. The defendants argue, however, that John Stallworth's declaration should not be considered in this case as evidence that the defendants made false assertions in their affidavit of probable cause because John Stallworth remains convicted of murdering Mr. Martinez, and a trier of fact in a civil case cannot "base its verdict on findings not consistent with the conclusion . . . reached in [a criminal case]." *Nelson v. Jashurek*, 109 F.3d 142, 146 (3d Cir. 1997) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)); *see also Jacobs v. Bayha*, No. 07-237, 2011 U.S. Dist. LEXIS 27926, at *6 (W.D. Pa. March 18, 2011) ("[f]actual allegations that are inconsistent with the validity of a conviction cannot be used to support a civil action.").

But the defendants ignore a critical distinction between there being an outstanding criminal conviction of a *plaintiff* versus that of a *third-party witness*. In *Heck*, the Supreme Court explained that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of **the plaintiff** would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless **the plaintiff** can demonstrate that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487 (emphasis added). However, "if the district court determines that **the plaintiff's action**, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment **against the plaintiff**, the action should be allowed to proceed." *Id.* (emphasis added).

The cases cited by the defendants involved a plaintiff's claim being barred by his own conviction, not a witness's testimony being barred by the witness's conviction, and the Court's separate research reveals no cases extending *Heck* in such a way. Therefore, the Court will consider John Stallworth's declaration at this stage in the litigation.[10]

---

[10] The defendants argue that the Court will at least have to instruct the jury that John Stallworth in fact participated in the murder of Mr. Martinez because his conviction is still in place. Defendants' Mot. Sum. J. at 18–19. However, the defendants cite no cases supporting the

The defendants also argue that the Court should discredit John Stallworth's declaration based on the Third Circuit Court of Appeals' opinion in *Morris*, 453 F. App'x at 246. In *Morris*, at summary judgment, the court discredited the malicious prosecution plaintiff's own statement that a police officer planted drugs on him. *Id.* The court explained that the reasons for discrediting the plaintiff's statement included: (1) the fact that the plaintiff did not raise the allegation that the officers planted drugs on him until six years after his initial arrest; and (2) the state court judge who heard testimony pursuant to the plaintiff's suppression motion found the officer to be "truthful, trustworthy, persuasive and detailed." *Id.*

The defendants argue that the reasons to discredit John Stallworth's declaration in this case are even stronger than the reasons provided by the Third Circuit Court of Appeals in *Morris*, because (1) John Stallworth waited 24 years to change his story; and (2) 12 Philadelphia jurors found John Stallworth's original story credible when he testified at the plaintiff's trial, as evidenced by the plaintiff's guilty verdict. Defendants' Mot. Sum. J. at 17–18.

However, there are several differences between this case and the *Morris* case which lead the Court to follow the general rule set out by the Supreme Court in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations . . . are jury functions, not those of a judge.") (citation and quotations omitted). For example, unlike the court in *Morris*, which was presented with the self-serving statement of a plaintiff, the Court here is presented with the statement of a third-party witness who can gain no financial benefit by lying to the Court. Moreover, unlike in *Morris*, where there was no evidence corroborating the plaintiff's change in story, John Stallworth's declaration does not exist in a vacuum. Rather, there is other evidence in

requirement for such a jury instruction. In any event, the Court need not decide this issue on summary judgment and will resolve disputes about jury instructions prior to or during trial.

this case that suggests that John Stallworth's original statements were false, including his own conflicting statements made to the detectives, eyewitness accounts contradicting John Stallworth's statements, and the plaintiff's alibi evidence. Therefore, it is entirely appropriate for the Court to allow a jury to weigh John Stallworth's credibility at trial.

Considering John Stallworth's declaration—and the other evidence casting his original statement in doubt—there is a disputed question of material fact as to whether the detectives suborned and included false assertions in their affidavit of probable cause. And such false assertions are clearly material given that John Stallworth's statement was one of two pieces of evidence—the other being Nathaniel Stallworth's conflicting statements—connecting the plaintiff to the murder of Mr. Martinez. Thus, the Court will not dismiss the plaintiff's malicious prosecution claims.

### 2. *Omissions*

Alternatively and additionally, even without considering John Stallworth's declaration, there are issues of fact as to whether the detectives acted knowingly or recklessly when they omitted evidence that questioned the veracity of John and Nathaniel Stallworths' statements from the affidavit of probable cause. The detectives omitted the following information:

- Nathaniel Stallworth gave two conflicting statements and then later recanted both statements during John Stallworth's preliminary hearing;
- John Stallworth's original statement included at least one lie, that Mr. Gay—who was in prison at the time—participated in the murder;
- Contrary to John Stallworth's story, none of the four eyewitnesses saw two cars, a blue car, or six participants in the murder;
- Police officers found white, not blue, paint on Mr. Martinez's car;
- Evidence indicating that the plaintiff may have been at the Youth Study Center at the time of the murder; and
- Information about Mr. Walthour and the traffic stop of the gray Chevy Nova.

This is all information that a reasonable jury could conclude that "a judge would want to know."

*Wilson*, 212 F.3d at 783.

20

This case is analogous to *Ballard v. City of Phila.*, No. 14-4740, 2015 U.S. Dist. LEXIS 145275 (E.D. Pa. Oct. 26, 2015). In *Ballard*, the victim of an assault initially told detectives that he did not know who attacked him. *Id.* at *5–6. In subsequent statements, the victim identified Mr. Ballard as his attacker. *Id.* at *8–9. Thereafter, however, the victim told police that he lied in his second statement, that he did not know Mr. Ballard, and that "I just put a name, and ya'll gave me a face, so I agreed with it." *Id.* at *10. The defendant detectives did not include any information about the victim's first statement or any other information that contradicted or questioned the veracity of the victim's identification of Mr. Ballard in their affidavit of probable cause for Mr. Ballard's arrest for the assault. *Id.* at *21–22. Because the probable cause affidavit did not include any other witness identifications or physical evidence linking Mr. Ballard to the crime, the court concluded that material issues of fact remained as to whether the defendants acted knowingly or recklessly in excluding the conflicting statements and denied the defendants' motion for summary judgment on Mr. Ballard's malicious prosecution claim. *Id.*

Here, like in *Ballard*, there are at least questions of fact remaining in dispute as to whether the detectives acted knowingly or recklessly when they included John and William Stallworths' identifications of the plaintiff but excluded evidence from the affidavit of probable cause that contradicted or questioned the veracity of those identifications. Thus, even without considering that John Stallworth's testimony may have been coerced, a reconstruction of the affidavit of probable cause with the omitted information places the finding of probable cause into question.[11]

---

[11] The Third Circuit Court of Appeals has instructed district courts to "perform a word-by-word reconstruction of the affidavit" to include any recklessly omitted information in malicious prosecution cases. *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 470 (3d Cir. 2016). A reconstructed affidavit is included in Appendix A following the conclusion of this Memorandum.

Therefore, the Court denies the defendants' motion for summary judgment on the plaintiff's malicious prosecution claims.[12]

## II. Fabrication of Evidence

To succeed on a fabrication of evidence claim, a plaintiff must show: (1) persuasive evidence supporting a conclusion that the proponents of the evidence were aware that it was incorrect or that the evidence was offered in bad faith, and (2) that the fabricated evidence was so significant that it could have affected the outcome of the criminal case. *Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016); *see also Halsey*, 750 F.3d at 295.

The defendants argue that the plaintiff's fabrication of evidence claims must be dismissed because (1) the plaintiff's underlying convictions were not "favorably terminated"; and (2) because the plaintiff cannot identify evidence from which a reasonable jury could conclude that Detectives Devlin and Worrell fabricated evidence against him.

### A. Favorable Termination

The plaintiff argues that the standard for favorable termination in fabrication of evidence claims is governed by *Heck*, not by malicious prosecution case law, and is less stringent. *See Heck*,

---

[12]    The defendants argue that the plaintiff's previous arrest for the murder of Harry James should be considered in the probable cause analysis. In response, the plaintiff argues that the defendants cannot rely on the plaintiff's suspected involvement in the James murder because the affidavit of probable cause in the Martinez case did not reference it. *See* Plaintiff's Ex. 104; *see also Wilkins v. DeReyes*, 528 F.3d 790, 802 (10th Cir. 2008) ("[O]fficers cannot use [information that was not included in the affidavit of probable cause] to escape liability.").

As discussed in the Background section above, the detectives attended the plaintiff's preliminary hearing in the James case and heard two eyewitnesses testify that the plaintiff was not present at the scene of the James murder prior to submitting their affidavit of probable cause in the Martinez case. *See* Plaintiff's Ex. 97 at 16–18, 71; Plaintiff's Ex. 99. Thus, the probable cause value of the plaintiff's suspected involvement in the James murder is limited, and the plaintiff has presented enough evidence to create a disputed issue of fact as to probable cause either way. At this time, therefore, the Court need not determine whether the plaintiff's alleged involvement in the James murder can be considered in the probable cause analysis.

512 U.S. at 486–87 (requiring only "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus"). The defendants, in contrast, argue that the favorable termination standard for fabrication of evidence claims is the same as that for malicious prosecution claims. However, for the reasons discussed above, the Court need not address this dispute because of the previous conclusion that the plaintiff's *nol pros* is indicative of his innocence, and the favorable termination requirement is thus satisfied regardless of which standard applies to the plaintiff's fabrication of evidence claims.

## B. *Sufficiency of the Evidence*

The defendants admit that the testimony of John and William Stallworth was the only evidence presented at trial connecting the plaintiff to the murder of Mr. Martinez. *See* Defendants' Mot. Sum. J. at 16. There is no dispute, therefore, that, if the detectives fabricated the Stallworths' testimony, it would be so significant that it could have affected the outcome of the plaintiff's criminal case. *See Halsey*, 750 F.3d at 294–95 ("Appellees do not argue that the false confession attributed to [the plaintiff], which the prosecutor acknowledged in the state courts was the *only direct evidence* linking [the plaintiff] to the crimes, could not have affected the jury's verdict. As a result, we have no difficulty in concluding that [the plaintiff] has demonstrated that there is a genuine dispute of material fact on the question of whether appellees violated his right to due process of law by fabricating evidence against him.") (emphasis added). The defendants argue, however, that the plaintiff did not present enough evidence to establish that the Stallworths' testimony was fabricated.

Similar to the defense arguments about the plaintiff's malicious prosecution claims, the defendants argue that the plaintiff cannot use the declarations of John or William Stallworth to

23

support his claims that the detectives coerced the Stallworths into testifying at trial because the Stallworths both remain convicted of murdering Mr. Martinez and because the Stallworth brothers are not credible. However, for the reasons discussed above, the Court is free to consider the Stallworths' declarations at this stage in the litigation, and it will be the jury's role, not the Court's, to assess the Stallworth brothers' credibility.

At a minimum, these declarations, detailing how the detectives allegedly coerced them into testifying against the plaintiff, *see* Background Section, pp. 5–6, 8, are sufficient to raise a genuine issue of material fact regarding the plaintiff's fabrication of evidence claims. Therefore, the Court denies the defendants' motion for summary judgment on the plaintiff's fabrication of evidence claims.

### III. The Plaintiff's Claim Against the City

As the Third Circuit Court of Appeals recently explained in *Forrest v. Parry*, "a § 1983 claim against a municipality may proceed in two ways." No. 16-4351, 2019 U.S. Appl. LEXIS 20486, at *19 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019)). A plaintiff may show: (1) "that an unconstitutional policy or custom of the municipality led to his or her injuries"; or (2) "that [his or her injuries] were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Id.* at *19–20. The latter avenue arises in the failure to train, supervise, and or discipline context. *Id.* at *20.

In his response to the defendants' motion for summary judgment, the plaintiff frames his § 1983 claim against the City as a failure to train, supervise, and discipline claim. *See* Plaintiff's Response at 44 ("Plaintiff's claim is rooted in the principle that where training, supervision, and discipline are necessary to avoid constitutional violations, and the municipality is deliberately indifferent to the need to do so, a cause of action is stated under § 1983"); *id.* at 46 ("[T]here are

three critical areas in which the City failed to properly train and supervise: 1) fabrication and concealment of evidence; 2) the use of improper interrogation methods; and 3) the intentional suppression of evidence that negated probable cause to arrest."); *id.* at 63 ("The failure to effectively monitor and discipline officers for misconduct also supports a *Monell* claim."). Therefore, the Court analyzes the plaintiff's claim under the failure to train, supervise, and discipline rubric.

To support such a claim, the plaintiff must demonstrate "a failure or inadequacy amounting to deliberate indifference on the part of the municipality." *Forrest*, 2019 U.S. Appl. LEXIS 20486, at \*21 (citing *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997)). The Third Circuit Court of Appeals has held that "a failure to train, discipline or control can only form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citation omitted).

However, the Third Circuit Court of Appeals has explained that deliberate indifference for a failure to train, supervise, or discipline claim can also be established by showing that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 2019 U.S. Appl. LEXIS 20486, at \*21 (citing *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)); *see also Estate of Roman*, 914 F.3d at 798.

25

Therefore, the plaintiff need not establish that the municipal policymaker had actual

knowledge of a pattern of constitutional misconduct. Constructive knowledge or a showing that

the municipal policymaker "should have known" about the pattern of constitutional misconduct is

sufficient. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) ("[Municipal

decisionmakers'] continued adherence to an approach that they know or *should know* has failed to

prevent tortious conduct by employees may establish the conscious disregard for the consequences

of their action--the 'deliberate indifference'--necessary to trigger municipal liability.") (emphasis

added) (citation omitted);[13] *Forrest*, 2019 U.S. Appl. LEXIS 20486, at \*30–31 ("Camden

policymakers knew *or should have known* that supervisor-level officers would be confronted with

officer misconduct . . . and that the wrong choice—failure to report or admonish—would lead to

the sort of behavior that occurred here . . . ."); *Hernandez v. Borough of Palisades Park Police

Dep't*, 58 F. App'x 909, 913 (3d Cir. 2003) ("[C]onstructive knowledge may be evidenced by the

fact that the practices have been so widespread or flagrant that in the proper exercise of their

---

[13]     In *Bd. of Cnty. Comm'rs*, the Supreme Court noted "the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious protentional for such a violation, could trigger municipal liability." 520 U.S. at 409 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). And the Third Circuit Court of Appeals has "previously found that a single-incident constitutional violation was sufficient to preclude summary judgment on a failure-to-train claim against a municipality." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 224–26 (3d Cir. 2014) (finding a single incident sufficient to establish a county's liability for failure to train prison guards in conflict resolution); *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) ("A reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs.").

During oral argument, plaintiff's counsel stated that "[t]his is not a single incident case." *See* June 14, 2019 Oral Argument Tr. (Rough) at 29:20. Therefore, the Court does not analyze this case under single-incident case law. The Court notes, without deciding, however, that the evidence on the record may support such a claim.

26

official responsibilities the municipal policymakers should have known of them.") (citation and quotations omitted).[14]

In addition, for a municipality to be liable, "the identified deficiency in a training [supervision, or discipline] program must be closely related to the ultimate injury, which means the plaintiff must prove that the deficiency in training [supervision, or discipline] actually caused the constitutional violation at issue." *Logan v. Bd. of Educ. of the Sch. Dist. of Pittsburgh*, 742 F. App'x 628, 633 (3d Cir. 2018) (citing *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011)).

The defendants argue that the plaintiff's failure to train, supervise, and discipline claim must be dismissed because he cannot establish: (1) a pattern of similar misconduct in the 1990s; (2) that the City was deliberately indifferent to such a pattern; (3) causation; or (4) the identity of a final policymaker. First the Court discusses the evidence the plaintiff presents to support his claim against the City, followed by an analysis of the defendants' arguments.

### A. *The Plaintiff's Evidence*

#### 1. *Pattern of Misconduct*

The plaintiff highlights the following facts to support his claim that there was a pattern of constitutional violations in the Philadelphia Police Department involving the fabrication and concealment of evidence,[15] the use of improper interrogation methods, and the intentional suppression of evidence that negated probable cause in the early 1990s:

---

[14] Even the defendants admit that a plaintiff can establish deliberate indifference if he or she shows that "a policymaker had (*or at least should have had*)" contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents. Defendants' Surreply at 1 (emphasis added).

[15] The defendants accuse the plaintiff of attempting to circumvent this Court's previous Memorandum and Order dismissing the plaintiff's *Brady* claim by including allegations of "concealment of evidence" within the alleged pattern of constitutional misconduct underlying his *Monell* claim. *See* Defendants' Reply at 12. In response, the plaintiff argues that the due process

27

- A 1978 series by the *Philadelphia Inquirer* titled *The Homicide Files*, a four-part series exposing a pattern of misconduct by homicide detectives that mirrored the alleged unlawful conduct in the plaintiff's case, including the fabrication of evidence and the coercion of witnesses. *See* Plaintiff's Ex. 127.

- Three instances in the 1980s in which federal courts enjoined the Police Department's unconstitutional investigatory practices. *See Cliett v. City of Phila.*, No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of the unconstitutionality of "Operation Cold Turkey," during which 1,500 individuals were unlawfully subjected to search and arrest); *Spring Garden United Neighbors v. City of Phila.*, 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining the police sweep of Latinos in the Spring Garden area in the aftermath of a shooting of a police officer); *Arrington v. City of Phila.*, No. 88-2264 (E.D. Pa. 1988) (enjoining the stop and searches of young African American males during the investigation of the "Center City Stalker").

---

right that protects against the deliberate concealment of evidence is distinct from the obligation to produce exculpatory evidence established in *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Plaintiff's Response at 48 n.28. Rather, the plaintiff claims that his accusations concerning the concealment of evidence, which are incorporated into his fabrication of evidence and conspiracy claims against the individual defendants, are based on long established Supreme Court precedent establishing that the Due Process Clause prohibits officers from engaging in deliberate deception and the suppression of evidence. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (explaining that "a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court" is a violation of due process); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) (explaining that imprisonment resulting from "the deliberate suppression by [the] authorities of evidence favorable to him" constitutes a due process violation"); *see also Limone v. Condon*, 372 F.3d 39, 47 (1st Cir. 2004) ("To restrict the plaintiffs to a *Brady* claim would require us to disregard the forest and focus single-mindedly on a particular tree."); *Siehl v. City of Johnstown*, Civ. No. 18-771, 2019 U.S. Dist. LEXIS 26546, at *24 (W.D. Pa. Feb. 20, 2019) ("Although Plaintiff invokes *Brady* . . ., he also invokes his due process protections under the Fourteenth Amendment which is sufficient to state a claim pursuant to *Mooney* and its progeny.").

At this stage in the litigation, the Court will not bar the plaintiff from basing his *Monell* claim, in part, on allegations concerning the concealment of evidence. In their motion to dismiss, the defendants moved for the dismissal of the plaintiff's "*Brady*" claim based on the alleged withholding of evidence." *See* Defendants' Mot. to Dismiss at 8. The defendants did not, however, ask the Court to bar the plaintiff from raising the concealment of evidence outside of the *Brady* context. Thus, the Court did not address this issue in its Memorandum resolving the motion to dismiss. *See* the Court's February 2, 2018 Memorandum at 11, 20–23 (granting the defendants' qualified immunity-based motion as to "the *Brady* claim").

The Court notes, however, that the parties' briefing on this issue was limited compared to the other issues raised on summary judgment, and the defendants are free to renew their arguments in a future motion *in limine* if they seek to bar the plaintiff from relying on a pattern of "concealment of evidence" at trial.

- Eight similar incidents of police misconduct in Philadelphia from 1988 to 1994. In the cases of Anthony Wright, James Dennis, Percy St. George, Walter Ogrod, Willie Veasy, Andrew Swainson, Carl Tonez, and Jack Combs, the plaintiff highlights evidence that homicide detectives, including Detectives Devlin and Worrell, coerced witnesses, fabricated evidence, and/or concealed material evidence. *See* Plaintiff's Ex. 126 at 12–17. Three of these cases are summarized below:

  o **Anthony Wright:** Mr. Wright was convicted of the 1991 rape and murder of a 78-year-old woman. Mr. Wright claims that a squad of Police Department homicide detectives—including Detective Devlin—fabricated evidence, coerced confessions, concealed material evidence, and failed to consider all relevant exculpatory evidence before arresting him. After he spent 25 years in prison, the Supreme Court of Pennsylvania reversed Mr. Wright's conviction, and he was later acquitted after a retrial. He filed suit against the City and a number of officers, and the parties settled the case. *See id.* at 12–13.

  o **James Dennis**: Mr. Dennis was arrested and prosecuted for the 1991 robbery and murder of a young woman. In 1992, he was convicted and sentenced to death. In August 2016, the Third Circuit Court of Appeals granted habeas relief, vacated the conviction, and remanded the case to state court. The Third Circuit Court of Appeals found that the officers failed to consider and investigate evidence of other suspects and suppressed exculpatory evidence. Mr. Dennis later entered a *nolo contendere* plea to reduced charges for time served. *See id.* at 13.

  o **Percy St. George:** In August 1993, Mr. St. George was arrested for murder. In October 1994, faced with allegations that there had been perjury, obstruction of justice, and other misconduct by the police, three homicide detectives alerted the court that they would be asserting their Fifth Amendment rights should they be called to testify. The case was subsequently dismissed. *See id.* at 13–14.

- A series of police misconduct events in the late 1980s and early 1990s—known as the 39th District Scandal—which led to hundreds of arrests and prosecutions based on fabricated evidence, false police testimony, and falsified probable cause affidavits. *See id.* at 10. Thereafter, the District Attorney agreed to vacate hundreds of convictions, the City agreed to compensate those wrongfully accused, and a number of officers faced federal indictments. *See id.* A 1996 class action lawsuit brought by the NAACP led to a settlement agreement requiring the City to implement policy and training initiatives to ensure that police officers abide by restrictions on their investigative powers. *See id.*; *NAACP et al. v. City of Phila.*, E.D. Pa. No. 96-6045. As part of the settlement agreement, the City agreed to appoint an Integrity and Accountability Officer ("IAO") to assess and monitor the City's compliance. *See* Plaintiff's Ex. 126 at 10.

## 2. *The City's Failure to Train, Supervise, and Discipline*

In addition to this list of allegedly similar misconduct, the plaintiff submitted an expert report prepared by Dr. R. Paul McCauley, a nationally recognized expert on police and municipal practices. *See id.* In preparing his report, Dr. McCauley reviewed, among other things, the plaintiff's case, the events listed above, and over 1,000 Internal Affairs Division ("IAD") investigations of police officers in the Police Department. *See id.* at 2–5. Dr. McCauley concluded that, since at least the 1970s and persisting through the 1990s and beyond, there have been credible and well-documented reports of policies, practices, and customs within the Department that deviated from generally accepted police procedures. *Id.* at 9–12. He further concluded that the Department failed to take meaningful steps to remedy this misconduct and did not train or discipline officers appropriately. *Id.* at 30–31.

> a. Lack of Training as to Inclusion of Exculpatory Evidence in Affidavits of Probable Cause

Specifically, Dr. McCauley opines that "police are required to consider all available evidence, including exculpatory evidence, in determining whether there is probable cause to arrest" and that "the City's failure to have appropriate training, operational directives, and supervision regarding the duty to disclose and the prohibition on concealment of material evidence constitutes a violation of accepted polices practices." *Id.* at 26, 30. To demonstrate the inadequacy of the Police Department's training in this area, the plaintiff also highlighted the deposition testimony of detectives Devlin and Worrell. Detective Worrell testified that "no one had ever trained [him] to . . . put what's called exculpatory information in an affidavit for a warrant," and that he included only what he "believe[d] to be the truth." Plaintiff's Ex. 21 at 49:12–54:10. Detective Devlin also testified that he was not taught to include exculpatory facts or evidence in

30

affidavits of probable cause. Plaintiff's Ex. 20 at 222:4–223:20 ("[I]t was just not done. And I never heard of it done.").

b. Lack of Training as to Interrogation Methods

As to training related to interrogation methods, Dr. McCauley concluded that the "there was a widespread practice in the [Police Department], including the Homicide Unit, of improper coercion, threats, and inducements of suspects and witnesses" and that "the [Police Department] failed to implement accepted police practices designed to eliminate the improper conduct [in] interrogations." Plaintiff's Ex. 126 at 19. To demonstrate this lack of training, the plaintiff pointed to the testimony of a homicide detective involved in another § 1983 case stemming from alleged unconstitutional conduct in the 1990s. *See Gilyard et al v. Dusak et al*, E.D. Pa. No. 16-2986. In that case, Detective Dennis Dusak testified that he was not trained about the use of coercion, intimidation, or low-level force.[16] Plaintiff's Ex. 126 at 19–20. The plaintiff also pointed to the testimony of Captain Francis Healy, a special advisor to the Police Commissioner, who stated that, before 2014, there was no directive or policy prohibiting the use of low-level force in interrogations and interviews. Ex. B to Defendants' Reply at 47:18–47:23.

Dr. McCauley also references additional police practices related to interrogations that the Department allegedly disregarded around the time of the plaintiff's arrest and prosecution. For example, Dr. McCauley explained that "the [Police Department] had access to audio and video recording equipment but its use was discretionary." Plaintiff's Ex. 126 at 22. According to Dr.

---

[16] Dr. McCauley defines the use of low-level force as "police language (vocabulary, tone, or volume), physically positioning or touching an individual for the purpose of threatening, coercing or intimidating that individual to say or do something that individual would not do or say otherwise." Plaintiff's Ex. 126 at 19 n.1. Dr. McCauley identifies the detectives' alleged threats of imposing the death penalty on John Stallworth as an example of their use of improper low-level force to coerce confessions in the plaintiff's investigation.

31

McCauley, because of this discretionary non-use, "the verbal and physical conduct of the investigators could not be reviewed by supervisors." *Id.* at 22.

      c. Lack of Supervision and Discipline

Dr. McCauley opines that there were "fundamental flaws in the [Department's] internal disciplinary system." *Id.* at 24. Dr. McCauley highlighted the following deficiencies that allegedly existed in the 1990s:

- The investigation of police misconduct was often left to the offending officers' immediate supervisors, which were generally their sergeants. *Id.*;

- Supervisor accountability was compromised by the labor union structure in which every member of the Police Department—from patrol officers to the Chief Inspector—was part of the same union, which led to supervisors having to discipline personnel who were in the same bargaining unit. *Id.*;

- The internal affairs operations were conducted in deteriorated physical facilities where IAD investigators had no privacy. *Id.*;

- The Department did not conduct regular reviews of homicide investigations; *Id.* at 24–25;

- Department discipline was incident based rather than progressive, and repeat violators were not being penalized in proportion to the number of violations. Nor was there an effective "early warning system" to identify, track, and monitor "problem" officers. *Id.* at 11;

- Investigators frequently gave the officers the "benefit of the doubt." *Id.*; and

- Victims of misconduct were often deterred from making complaints. *Id.* at 12.

Dr. McCauley also referenced that, in the period from 1997-2003, the Director of the IAO issued three reports on the Department's disciplinary system. Although the final report noted some improvements in the internal affairs mechanism, the IAO concluded that the disciplinary system remained fundamentally ineffective, inadequate, and unpredictable. *Id.* at 10. According to the IAO, the continuing deficiencies included excessive delays in resolving complaints, a lack of consistent, rational, and meaningful disciplinary action, and failure to discipline officers who were

32

found to have engaged in misconduct. *Id.* at 11. According to Dr. McCauley, the "disciplinary mechanism in the early 1990s suffered from the same if not more problematic deficiencies that persisted for years thereafter." *Id.* at 12.[17]

## B. *Sufficiency of the Evidence*

### 1. *Pattern of Misconduct*

The defendants first argue that the plaintiff has not presented sufficient evidence for a jury to determine that there was a prior pattern in the Police Department involving the fabrication and concealment of evidence, the use of improper interrogation methods, and the intentional suppression of evidence that negated probable cause. The Court disagrees.

As discussed above, the plaintiff supports his claim that there was an alleged and reported upon pattern of similar incidents in the early 1990s by pointing to: (1) the 1978 *Philadelphia Inquirer* series; (2) eight specific incidents similar to the plaintiff's allegations that occurred between 1988 and 1994 (all within five years of the plaintiff's arrest in 1993); (3) the 39th District

---

[17]    The defendants argue that the Court should not consider the IAO reports because the first report was issued in 1997, which postdates the plaintiff's arrest by four years. Defendants' Reply at 4 n.2 (citing *Wright v. City of Phila.*, No. 16-5020, 2017 U.S. Dist. LEXIS 64649, at *6–8 (E.D. Pa. Apr. 28, 2017)). In *Wright*, the plaintiff sought documents, including "material related to the City's policies and procedures, as well as the production [of] complaints of a similar nature, from four to 15 years after the Defendants in [that] case conducted their allegedly unconstitutional investigation." *Id.* at *7. Ruling on a discovery motion, this Court held that the plaintiff was not entitled to those documents because Mr. Wright had not met "his burden to demonstrate how the City's policies and procedures from 1995 to 2016 as to those topics [were] sufficiently related to the Defendants' 1991 conduct as to be properly considered 'proportional' to the needs of [the] case." *Id.* at *8.

Here, however, the Court is not dealing with a discovery motion. The plaintiff and Dr. McCauley already have access to the IAO reports. And in the context of this case, in which, after reviewing over 1,000 IAD investigations, Dr. McCauley plans to testify that the deficiencies in the disciplinary system identified in the IAO reports existed, and, if anything, were worse, in the early 1990s, these reports are relevant to the expert's opinion as to the plaintiff's claim on a failure to supervise and discipline. *See Estate of Roman*, 914 F.3d at 799 ("While the consent decree was not in place during Roman's search and arrest, we may fairly infer that the problems that led to it were occurring during the time of his allegations and for some time before that.").

Scandal; (4) deposition testimony from Department police officers, including Detectives Devlin and Worrell; and (5) and Dr. McCauley's expert report. In their briefing, the defendants attack these pieces of evidence individually.

**First,** the defendants argue that the 1978 *Philadelphia Inquirer* series cannot be used to establish a Department practice in the 1990s because it is too temporally remote. *See* Defendants' Reply at 3 (citing *Watson v. Abington Township*, 478 F.3d 144, 156 (3d Cir. 2007)). However, in *Watson*, the court dismissed the *Monell* claim because, other than the plaintiff's own affidavit, the **only** evidence of unlawful behavior was from five years prior to the conduct at issue in that case. *Id.* at 156. Although the *Philadelphia Inquirer* series alone would certainly not be enough to survive summary judgment here, it is relevant given the other evidence presented by the plaintiff, including Dr. McCauley's opinion that the misconduct brought to light in the *Philadelphia Inquirer* in 1978 continued in the 1990s and beyond. *See Forrest*, 2019 U.S. App. LEXIS 20486, at *9 (considering the New Jersey Attorney General's reviews of the Camden Police Department in 1986, 1996, 1998, 2002, and 2006, even though the conduct underlying the case occurred in 2008). Considered in the light most favorable to the plaintiff, a reasonable jury may conclude that the *Philadelphia Inquirer* series is the first link in a chain of evidence suggesting a publicly disclosed pattern of misconduct in the Department that allegedly continued before, during, and after the events at issue in this case.

**Second,** the defendants argue that the eight specific incidents identified by the plaintiff are not enough to establish a pattern. *See* Defendants' Mot. Sum. J. at 20 (citing *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding that evidence that misconduct occurred in 11 out of 500 incidents cannot create a triable issue as to the existence of a widespread practice); *Jones v. Muskegon Cnty.*, 625 F.3d 935, 946–47 (6th Cir. 2010) (holding that five instances of

34

misconduct in a county jail did not create a triable issue as to the existence of a widespread practice); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851–52 (5th Cir. 2009) (holding that 27 complaints of excessive force over a four-year period—in which there were 268,000 arrests—did not create a triable issue as to the existence of a widespread practice in an urban police department)). The defendants claim that if eleven out of 500 incidents could not create a triable issue of fact in *Pineda*, eight incidents out of over 2,200 homicides that occurred in Philadelphia from 1990–1994 is similarly insufficient. *See* Defendants' Reply at 4.

However, the cases relied on by the defendants are, once again, distinguishable. In *Jones* and *Peterson*, excluding the similar events identified by those plaintiffs, there was no evidence of an unlawful pattern. *Jones*, 625 F.3d at 946–47; *Peterson*, 588 F.3d at 851–52. And in *Pineda*, although the plaintiff filed an expert report to support his claim in addition to highlighting the eleven similar incidents, the court discounted the expert report because it relied heavily on those eleven incidents. *Pineda*, 291 F.3d at 329. Here, in contrast, the plaintiff has presented a collection of other evidence as listed above. Moreover, in addition to the eight specific incidents, Dr. McCauley bases his report on his review of over 1,000 IAD investigations, reports from the IAO, and more. *See* Plaintiff's Ex. 126.

Moreover, courts in this circuit—including the court of appeals—have accepted similar numbers of incidents as evidence of a pattern and have been more prone to do so when such evidence is accompanied by additional support, such as an expert report or the deposition testimony of officers. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 969–70, 973 (3d Cir. 1996) (the plaintiff's offering of five written civilian complaints of the use of similar excessive force within five years of the plaintiff's injury was sufficient to establish a pattern); *Williams v. Twp. of W. Deptford*, No. 05-1805, 2008 U.S. Dist. LEXIS 32979, at \*30–33 (D.N.J. Apr. 22, 2008) (the

35

plaintiff's reference to six similar incidents within a five-year period, in conjunction with a report prepared by Dr. McCauley, was sufficient to establish a pattern); *see also Bielevicz v. Dubinon*, 915 F.2d 845, 852 (3d Cir. 1990) (testimony from two police chiefs and a police officer concerning the practice of arresting non-intoxicated people for public intoxication was sufficient to establish a pattern).

**Third,** the defendants argue that the Court should not consider the class action lawsuits from the 1980s because those cases involved stop and frisk and unlawful search and seizures, not the fabrication and concealment of evidence, the use of improper interrogation methods, or the intentional suppression of evidence that negated probable cause. *See* Defendants' Reply at 3 n.1 (citing *Bd. of Cnty. Comm'rs*, 520 U.S. 397 (explaining that a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights")). They also argue that the Court should not consider the 39th District Scandal because it involved Police Department patrol officers, not homicide detectives. *See id.*

The Court agrees that the class action lawsuits involving unrelated types of misconduct are not relevant to this case. *See Cliett*, No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of the unconstitutionality of "Operation Cold Turkey," during which 1,500 individuals were unlawfully subjected to search and arrest); *Spring Garden United Neighbors*, 614 F. Supp. 1350 (E.D. Pa. 1985) (enjoining the police sweep of Latinos in the Spring Garden area in the aftermath of a shooting of a police officer); *Arrington*, No. 88-2264 (E.D. Pa. 1988) (enjoining the stop and searches of young African American males during the investigation of the "Center City Stalker").

As for the defendants' argument concerning the 39th District Scandal, however, *Bd of Cnty. Comm'rs* does not require a § 1983 plaintiff to limit evidence to a single specific unit within a police department, and the defendants do not cite any authority supporting such a rigid

36

requirement. Rather, the Third Circuit Court of Appeals recently explained that "evidence is not irrelevant merely because it does not show causation, does not specifically pertain to one unit of [a] police department, or does not focus on the particular activities carried out by the officers that were involved in [the plaintiff's] encounter. It is only irrelevant if it bears on no aspect of the overarching theory and its underlying elements." *Forrest*, 2019 U.S. Appl. LEXIS 20486, at *41. In light of this appellate instruction not to frame a plaintiff's § 1983 claim in an "unduly narrow" way, the Court would be ill-advised to limit the plaintiff to evidence of misconduct by Police Department homicide detectives. *See id.* at *43. The 39th District Scandal involved misconduct similar to that alleged by the plaintiff, including the coercion of witnesses and the fabrication of evidence, *see* Plaintiff's Ex. 126 at 10, and a reasonable jury may consider it as evidence of a pattern in this case.

**Fourth**, the defendants attack the plaintiff's use of Detectives Devlin's and Worrell's deposition testimony. Defendants' Reply at 4 (citing *Blankenhorn v. City of Orange,* 485 F.3d 463, 484 (9th Cir. 2007) (plaintiff cannot establish a *Monell* claim based on "evidence of the failure to train a single officer")). However, the Court must—as so must the defendants—acknowledge that the plaintiff cites deposition testimony from multiple officers, and, as discussed above, relies on additional evidence. Therefore, *Blankenhorn* is not applicable.

The defendants challenge the credibility of Mr. Healy's deposition testimony because he was a rookie police officer in 1990, and he allegedly did not have significant knowledge of the training offered to detectives. *See* Defendants' Reply at 5. And they cite the deposition testimony of Inspector Laurence Nodiff, who contradicted Mr. Healy and stated that Department homicide detectives were trained that they could not use or threaten to use physical force against a suspect or a witness. Ex. C to Defendants' Reply at 143:13–154:14. However, the Court will not assess

37

Mr. Healy's credibility or weigh his testimony against the testimony of Inspector Nodiff at this stage in the litigation. Those are tasks better suited for a jury at trial.

**Finally**, the defendants attack Dr. McCauley's report. They cite *Woloszyn v. Cnty. of Lawrence*, in which the Third Circuit Court of Appeals held that a plaintiff could not escape summary judgment by relying on a report prepared by Dr. McCauley. 396 F.3d 314, 325 (3d Cir. 2005). In *Woloszyn*, however, the court of appeals was concerned with causation and did not discuss whether Dr. McCauley's report could be used to establish the existence of a pattern. *Id.* Other courts have found Dr. McCauley's reports helpful in establishing a prior pattern of incidents. *See Doswell v. City of Pittsburgh*, No. 07-0761, 2009 U.S. Dist. LEXIS 51435, at *35 (W.D. Pa. June 16, 2009) (relying, in part, on a report by Dr. McCauley in denying summary judgment on the plaintiff's *Monell* claim); *Williams*, 2008 U.S. Dist. LEXIS 32979, at *32 (same).

Based on all of the evidence discussed above, considered in the light most favorable to the plaintiff, a reasonable jury could conclude that, prior to the plaintiff's arrest and conviction, Philadelphia Police Department officers engaged in a pattern of similar misconduct.

### 2. *Deliberate Indifference*

Next, the defendants argue that, even if there is enough evidence to establish a pattern of similar misconduct showing deficiencies in the City's training, supervision, and discipline, the plaintiff cannot establish deliberate indifference because there is no evidence that a City policymaker had knowledge of these issues before the detectives allegedly violated the plaintiff's constitutional rights, and there is no evidence that Detectives Devlin's and Worrell's supervisors "communicated a message of approval" regarding their alleged conduct. Defendants' Reply at 6–8 (citing *De Simone*, 159 F.3d at 127). The available record discloses otherwise.

Assuming, without deciding, that a City policymaker did not have actual knowledge of the alleged pattern of misconduct prior to the plaintiff's arrest, constructive knowledge or a showing that a municipal policymaker "should have known" about the pattern of constitutional misconduct is sufficient to establish deliberate indifference in a failure to train, supervise, and discipline claim. *See Bd. of Cnty. Comm'rs*, 520 U.S. at 407 (1997) ("[Municipal decisionmakers'] continued adherence to an approach that they know or *should know* has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action- -the 'deliberate indifference'--necessary to trigger municipal liability.") (emphasis added) (citation omitted); *Forrest*, 2019 U.S. Appl. LEXIS 20486, at *31 ("Camden policymakers knew *or should have known* that supervisor-level officers would be confronted with officer misconduct . . . and that the wrong choice—failure to report or admonish—would lead to the sort of behavior that occurred here . . . .") (emphasis added); *Hernandez*, 58 F. App'x 909, 913 (3d Cir. 2003) ("[C]onstructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of their official responsibilities the municipal policymakers should have known of them.") (citation and quotations omitted); *Burdyn v. Old Forge Borough*, No. 12-2236, 2016 U.S. Dist. LEXIS 137143, at *44 (M.D. Pa. Oct. 3, 2016) ("A decision-maker or final policymaker cannot eliminate the imposition of liability on a state agency for which she is responsible by simply neglecting her duties or purposefully turning a blind eye to the actions of her subordinates in order to later assert that she was unaware of any misconduct.").

As discussed above, the plaintiff has presented evidence of supposedly similar misconduct in the years leading up to the plaintiff's arrest.[18] Dr. McCauley concluded that the Department's

---

[18]     At the very least, the 1978 series published by the *Philadelphia Inquirer* gave senior personnel in the Police Department a reason to look closer at the alleged pattern of misconduct, i.e. "constructive knowledge."

disciplinary system was fundamentally flawed in numerous respects, including the failure to have an effective process in place to facilitate the filing of complaints, and that victims of misconduct were often deterred from making complaints. *See* Plaintiff's Ex. 126 at 11–12. Dr. McCauley further concluded that "had the [Police Department] conducted a comprehensive internal investigation of the [eight homicide investigations highlighted by the plaintiff], the [Department] would have found and could have corrected a pattern of lack of supervision and discipline of officers." *Id.* at 16. Although the defendants are free to argue to the jury that the alleged misconduct was not obvious to City policymakers, the evidence on record could convince a jury otherwise. Indeed, a contrary ruling at this stage of the case would "put a premium on blinders." *See Simmons v. City of Phila.*, 947 F.2d 1042, 1091 (3d Cir. 1991) (Sloviter, J., concurring in judgment).

Moreover, the failure to train, supervise, and discipline claim asserted by the plaintiff meets the deliberate indifference test set out by the court of appeals in *Forrest* and *Estate of Roman*. *Forrest*, 2019 U.S. Appl. LEXIS 20486, at \*21 ("[Deliberate indifference] consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."); *see also Estate of Roman*, 914 F.3d at 798.

As discussed above, there is some admissible evidence that Detectives Devlin and Worrell used force and various threats to coerce the Stallworths into testifying against the plaintiff and that they did not include exculpatory evidence in their affidavit of probable cause for the plaintiff's arrest warrant. There is also evidence that Detectives Devlin and Worrell, and other Police Department officers, engaged in similar misconduct on multiple occasions in the early 1990s.

40

Detectives Devlin and Worrell both testified that they were not trained to include exculpatory information in affidavits of probable cause. And other police officers have testified that there was no policy prohibiting the use of low-level force in interrogation rooms in the 1990s.

A reasonable jury could find that City policymakers were aware that Department officers, particularly homicide detectives, would repeatedly be in a position to interrogate suspects and witnesses and submit affidavits of probable cause. A reasonable jury could also find that that these situations create a difficult choice "because the officers will be motivated to bring a suspect to justice," and that the wrong choice by officers will frequently cause deprivation of constitutional rights. *See Gilyard v. Dusak*, No. 16-2986, 2017 U.S. Dist. LEXIS 100881, at \*57 (E.D. Pa. June 29, 2017) (denying the City's summary judgment motion in case involving allegations that the plaintiffs were wrongfully convicted for a murder in the 1990s because "a municipality's failure to train [detectives] on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations"); *see also Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) ("[E]vidence pointing to a City's failure to provide *any* training on key duties with direct impact on constitutional rights of citizens [including the obligation to turn over exculpatory materials] is sufficient to survive summary judgment with a *Monell* failure to train claim.") (emphasis in original) (citation omitted).

In the face of this need to train, supervise, and discipline police officers, a reasonable jury may conclude that the City's inaction "communicated a message of approval" regarding Detectives Devlin's and Worrell's alleged conduct. *See De Simone*, 159 F.3d at 127 (stating that "a supervisor's actions or *inaction* could be found to have communicated a message of approval to the offending subordinate.") (emphasis added). Therefore, it is for the jury to decide if the City's

alleged failure to train, supervise, and discipline in this case rises to the level of deliberate indifference.

### 3. Causation

The defendants also argue that the plaintiff cannot establish a causal nexus between the City's failure to train, supervise, and discipline and the plaintiff's constitutional injuries. However, a plaintiff need only "demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850–51 (citation omitted). "As long as the causal link between the alleged policy or custom and the constitutional injury is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 581 (3d Cir. 2004) (citation and quotations omitted). The proper causation inquiry in a failure to train, supervise, or discipline case focuses on "whether the injury could have been avoided had the employee been trained [or supervised or disciplined] under a program that was not deficient in the identified respects." *Cumberland Cnty*, 749 F.3d at 226 (citing *Canton*, 489 U.S. at 391).

Dr. McCauley cites his view that specific flaws existed in the Department's training and supervision, including that:

- The City had no policies or directives defining or prohibiting the use of low-level force or threats in the interrogation and interviewing of witnesses. Plaintiff's Ex. 126 at 20;

- The City had no policies or directives regarding the duty to disclose material exculpatory evidence in affidavits of probable cause. *Id.* at 30; and

- The City had serious flaws in its internal investigatory and disciplinary process. *See supra* at 32–33.

Dr. McCauley then concludes that "the failure of responsible officials to remedy these improper policies, practices, and customs were contrary to generally accepted police and municipal practices and caused the improper arrest, prosecution, and conviction of [the plaintiff]." Plaintiff's Ex. 126 at 31.

The defendants argue that Dr. McCauley's conclusions are "too general and conclusory" to establish causation. Defendants' Reply at 6 (citing *Woloszyn*, 396 F.3d at 324–26 (3d Cir. 2005)). In *Woloszyn*, a prison suicide case, the court explained that "the plaintiff must [] identify specific training not provided that could reasonably be expected to prevent the suicide that occurred." *Id.* at 325 (citation omitted). It concluded that the deficiencies highlighted by Dr. McCauley in that case—including that (1) the facility failed to have in place appropriate intake documents necessary to the evaluation and prevention of suicide; (2) the facility failed to have a policy which would have resulted in the plaintiff being placed in a cell for prisoners at risk or with another person; (3) the staff was not qualified to assess and prevent suicide; and (4) emergency medical equipment was not located nearby—were too general and conclusory. *Id.*

In this case, Dr. McCauley identified specific policies that a reasonable jury could conclude would have prevented the plaintiff's alleged injuries, such as training officers to disclose exculpatory information in affidavits of probable cause and defining and prohibiting the use of low-level force and threats in interrogations. For example, Detectives Devlin and Worrell testified that no one had ever trained them to put exculpatory information in affidavits of probable cause. *See* Plaintiff's Ex. 20 at 222:4–223:20; Plaintiff's Ex. 21 at 49:12–54:10. A reasonable jury could conclude that, had the detectives been trained to do so, they would have also done so in the plaintiff's case. Moreover, as discussed in the malicious prosecution section above, a reasonable jury could also conclude that, had the detectives included exculpatory evidence in the affidavit of

43

probable cause for the plaintiff's arrest, a warrant would never have been issued, and the plaintiff would not have suffered the constitutional injuries alleged in this case.

Dr. McCauley also identified specific deficiencies with the Department's internal review system, such as the use of direct supervisors to investigate misconduct, the failure to conduct regular reviews of homicide investigations, and the failure to identify, track, and monitor "problem officers," which a reasonable jury could conclude would have enabled the Police Department to uncover and remedy the alleged pattern of misconduct prior to the plaintiff's constitutional injuries.

Post-*Woloszyn*, courts in this district have continued to find Dr. McCauley's testimony sufficient to establish causation. *See McDaniels v. City of Phila.*, 234 F. Supp. 3d 637, 654–55 (E.D. Pa. 2017) (admitting Dr. McCauley's report and finding causation was an appropriate issue to leave for the jury because there was evidence that the plaintiff's death could have been avoided had the defendant officer been "trained properly regarding the use of deadly force, or disciplined adequately for his previous shooting incidents"); *Lyons v. City of Phila.*, No. 06-5195, 2007 U.S. Dist. LEXIS 76646, at *25 (E.D. Pa. Oct. 12, 2007) (relying on Dr. McCauley's conclusion that "had the [Department] taken steps to systemically apply both positive and negative discipline, it is more likely than not that [the defendant's] conduct incidents . . . would have been reduced substantially").

Therefore, Dr. McCauley's report, when considered in conjunction with the other evidence in this case and the court of appeal's instruction to leave the causation question to a jury "[a]s long as the causal link between the alleged policy or custom and the constitutional injury is not too tenuous," precludes the Court from granting summary judgment on causation grounds. *See Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d at 581.

### 4. *Identification of a Final Policymaker*

Finally, the defendants argue that the plaintiff's *Monell* claim should be dismissed because he failed to identify a specific final policymaker who was responsible for the alleged constitutional violations. Defendants' Reply at 8 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (stating that a plaintiff must show that a policymaker "caused the deprivation of rights at issue . . . by acquiescence in a longstanding practice or custom") and *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (stating that a plaintiff must show that a policymaker "is responsible either for the policy or, through acquiescence, for the custom")). However, these cases do not require the Court to dismiss the plaintiff's *Monell* claim on summary judgment for failure to identify the specific final policymaker on the record.

In *Jett*, in which the plaintiff sued a school district after the principal and superintendent allegedly transferred him to another school because of his race, the Court reversed the trial verdict because the trial court did not clearly instruct the jury that it needed to find that the principal or superintendent were final policymakers in order to hold the school district liable. 491 U.S. at 736– 38. And in *Andrews*, the court of appeals reversed a trial verdict holding the city liable because the jury found that the police commissioner—who was the relevant policymaker in that case—did not acquiesce to the alleged unlawful conduct. 895 F.2d at 1482.

In denying the defendants' motion for summary judgment here, the Court is instead guided by the court of appeals' opinion in *Bielevicz*. 915 F.2d at 850. In *Bielevicz*, the court explained that "only the conduct of those officials whose decisions constrain the discretion of subordinates constitutes the acts of the municipality." *Id.* (citation omitted). "This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiff's evidence." *Id.* Rather, "[p]ractices so permanent and well settled as to have the force of law are ascribable to

45

municipal decisionmakers." *Id.* (citations and quotations omitted); *see also Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1213 (3rd Cir. 1996) (citing *Bielevicz* for this proposition); *Olivieri v. Cnty. of Bucks*, 502 F. App'x 184, 189 (3d Cir. 2012) (same); *Washington-Pope v. City of Phila.*, No. 12-4300, 2015 U.S. Dist. LEXIS 158522, at *46 (E.D. Pa. Nov. 24, 2015) ("The Third Circuit Court of Appeals has acknowledged that a responsible decision maker does not necessarily need to be specifically identified, given that permanent and well settled practices carrying the force of law can be ascribed to municipal decision makers.") (citing cases).[19]

At trial, the Court will follow *Jett* and *Andrews* and instruct the jury that it cannot find the City liable unless it attributes the alleged misconduct to a final policymaker. At this stage, however, based on the evidence discussed at great length above, the Court concludes that a reasonable jury may attribute the Police Department's alleged failure to train, supervise, and discipline to the appropriate policymaker, i.e, the police commissioner, even though acquiescence by the commissioner has not been specifically identified on the record.

---

[19]     The defendants argue that *Andrews* and *Bielevicz* (and its progeny) are conflicting precedent, and that the Court should turn to *Andrews* because, if Third Circuit Court of Appeals' decisions are inconsistent, "the earlier [case] is the controlling authority and [the latter cases are] ineffective as precedents." Defendants' Reply at 9 (citing *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008)). However, as discussed above, the Court does not interpret *Andrews* as standing for the proposition asserted by the defendants, and, hence, there is no conflict that needs to be resolved.

## CONCLUSION

For the reasons set out in this Memorandum, the Court denies the defendants' Motion for Summary Judgment. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE